**In re JARTRAN, INC., Debtor.**

**Bankruptcy No. 81 B 16118.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Sept. 29, 1984.

Gerald F. Munitz, Nachman, Munitz & Sweig, Ltd., and Kurt L. Schultz, Winston & Strawn, Chicago, Ill., for debtor.

John J. Dawson, Streich, Lang, Weeks & Cardon, P.A., Phoenix, Ariz., Donald R. Cassling, Jenner & Block, and David N. Missner, Schwartz, Cooper, Kolb & Gaynor, Chtd., Chicago, Ill., for U-Haul International, Inc.

Charles S. Stahl, Jr., Arvey, Hodes, Costello & Burman, Chicago, Ill., for Unsecured Creditors' Committee.

James R. Looman, Isham, Lincoln, & Beale, Chicago, Ill., for Equity Security Holders' Committee.

Karen Pohl Beiber, Levy & Erens, Chicago, Ill., for Debentureholders.

Dennis M. O'Dea, Keck, Mahin & Cate, Chicago, Ill., for Examiner.

## ORDER

LAWRENCE FISHER, Bankruptcy Judge.

This matter coming before the Court at the hearing on confirmation of Debtor's Fifth Amended Plan of Reorganization, thrice modified, and upon certain other matters arising in connection therewith, including, *inter alia,* the Joint Application for Approval of Settlement filed by Debtor and others, the Application of Debentureholders for Leave to Amend their Ballots to Vote in Favor of Confirmation of Debtor's Plan of Reorganization, and the Motion for Summary Denial of Confirmation filed by U–HAUL INTERNATIONAL, INC. ("U-Haul"), and

The Court having examined the pleadings filed in this matter, and having received and examined the evidence adduced, and having heard the testimony of witnesses and arguments of counsel, and having received and examined memoranda of the parties in support of their respective positions, and the Court being fully advised in the premises;

The Court Finds:

1. Debtor, JARTRAN, INC. ("Jartran"), is engaged in the one-way and local rental

of trucks and utility trailers, operating through a nationwide network of approximately 2,000 independent dealer agents. Its customers are primarily consumers, although Debtor provides contract carriage and other services for industrial and commercial firms through its wholly-owned subsidiary, Engineered Transport Services, Inc. ("ETS"). ETS is not a debtor in this or any other case under title 11.

Debtor's executive offices are located in Florida, and it maintains division and regional operations management facilities in nineteen states. In the intercity one-way rental of trucks to consumers, Debtor competes principally with three other national firms, U-Haul, Ryder Systems, Inc. (RSI), and Hertz Corporation. U-Haul's share of this market at least 60%, RSI's is almost 20%, Jartran's is close to 10%, and Hertz Corporation's is approximately 5%. Jartran's only competitor in the nationwide, one-way rental of trailers is U-Haul, which controls approximately 90% of this market. In addition, Debtor competes in local markets, not only with U-Haul, RSI, and Hertz, but also with local companies.

The truck rental industry and corresponding market share depend upon a nationwide distributorship system having available and well-maintained equipment. Consequently, it is an industry with high entry barriers, requiring thousands of units of high-priced equipment and the establishment of a well-organized distribution system providing adequate equipment servicing and pick-up and drop-off facilities.

Jartran was organized as a Florida corporation by James A. Ryder ("Ryder") in August, 1978[1] but had no significant operations until the latter part of 1979. As of January, 1984, Debtor's fleet consisted of approximately 10,800 trucks and 18,700 trailers. All of Debtor's vehicles are either leased from Fruehauf Corporation ("Fruehauf") or purchased and financed on a secured basis with Fruehauf, Chrysler Credit Corporation ("Chrysler"), or Ford Motor Credit Company ("Ford").

Debtor is currently involved in a number of important and complex litigations which affect its operations and potential for reorganization in this case. These suits include one filed by Jartran in September, 1980 against U-Haul and others in the United States District Court for the Southern District of Florida, entitled *Jartran, Inc. v. L. Samuel Shoen, et al.*, No. 80–2460 CIV WMH (the "Miami suit"). In the Miami suit, Debtor alleges that the defendants participated in predatory, monopolistic, and conspiratorial acts to impede Debtor's entry into the household truck and trailer rental markets, to damage Debtor's operations, and to drive Debtor out of business; that U-Haul abused its monopoly position in the truck and trailer rental markets by engaging in pricing practices injurious to Debtor and by interfering with Debtor's dealer agents; and that U-Haul engaged in systematic disparagement and libel of Debtor. The Miami suit seeks injunctive relief and $10,000,000 in compensatory damages. The action is not yet ready for trial.

Also in 1980, U-Haul filed an action in the United States District Court for the District of Arizona, entitled *U-Haul International, Inc. v. Jartran, Inc., et al.*, No. CIV 80–454–PHX–EHC (the "Phoenix suit"). In the Phoenix suit, U-Haul alleges that Debtor, in connection with an advertising campaign conducted in 1979 and 1980, engaged in false advertising, disparagement of U-Haul, wrongful interference with U-Haul's prospective business advantage, and unfair competition. U-Haul seeks up to $375,000,000 in damages and preliminary and permanent injunctive relief. In February, 1981, U-Haul's motion for a preliminary injunction relating to Jartran's advertising practices was granted, which ruling was upheld on appeal by the United States Court of Appeals for the Ninth Circuit in July, 1982. The trial has

---

1. Mr. Ryder was formerly employed by and affiliated with RSI, a company which he founded.

been concluded, and the district court has the matter under advisement.

2. Soon after Jartran commenced operations, its massive debt service requirements depleted working capital, and Debtor's principals initiated efforts to obtain additional funds. As part of these efforts, an offering document was prepared and utilized in the solicitation of prospective investors. Over fifty individuals and entities were contacted in 1980 and 1981, in connection not only with capital infusion proposals but also potential stock acquisitions. Except for the deal ultimately consummated with Frank B. Hall & Co., Inc. ("Hall"), discussed below, these efforts to obtain financing were unsuccessful. The only capital obtained was in the amount of $250,000 from Roy Carver, Chief Executive Officer of Band Aid Corporation.[2]

One of the companies contacted during this period was Ameribond Securities Associates ("Ameribond"). Ameribond's managing partner, Stanley Cheslock, Jr., learned of Debtor's marketing efforts in March of 1981. He met with Jartran representatives, reviewed their offering document, and discussed plans for restructuring the company's debt. According to Mr. Cheslock's testimony, offered by U-Haul at the confirmation hearings held herein, Debtor was seeking additional capital of about $5,000,000.

On or about April 21, 1981, Debtor and Ameribond executed a letter of intent pursuant to which Ameribond was engaged by Jartran for the purpose of securing additional capital and working out a debt restructuring arrangement. The letter of intent proposed a capital infusion of $20,000,000 in exchange for a 55% ownership interest in Jartran, after giving effect to conversion of all outstanding convertible debt, exercise of options, and other similar rights. The 55% interest was equivalent to an interest of 80% or more on an undiluted basis.

In accordance with this arrangement, Ameribond initiated efforts to find investors for Jartran. Mr. Cheslock testified that Touche, Ross & Company was engaged to make an evaluation of Debtor's viability, which evaluation was prepared in report form by Touche, Ross and paid for by Debtor.[3] This report was circulated, along with a document prepared by Ameribond and describing, *inter alia*, Jartran's business plan and financial history, to various potential investors, including Hall.

Subsequently, Ameribond arranged a meeting with Jartran's major secured creditors for September 1, 1981. In anticipation of that meeting, Ameribond contacted and invited all the individuals and entities considered to be prime prospects for investment in Jartran. Only two of those potential investors attended the meeting, Hall and one other firm.

According to Mr. Cheslock's testimony, he made a commitment at the September 1st meeting on behalf of Ameribond and its primary partner, The Securities Groups, to supply $20,000,000 in capital considered by Ameribond as necessary to a restructuring arrangement. Hall did not participate in the commitment. Thereafter, Mr. Cheslock delivered to the creditors what he referred to as a "firm commitment" in writing, dated September 11, 1981, wherein he stated that Ameribond and its partners were committing to provide Jartran with $20,000,000 in capital "[s]ubject to satisfactory resolution of th[e] debt restructuring."

The proposed resolution of Jartran's debt restructuring upon which this commitment was conditioned was the subject of a mid-September, 1981 meeting between Cheslock and representatives of Jartran and the major secured creditors. At that meeting, they reviewed a proposed restructuring plan prepared by Cheslock in concert with

---

2. Prior to these marketing efforts, at or about the time operations commenced, Debtor raised funds through the sale of subordinated debt, including an issue of convertible subordinated debentures due November 15, 1994, discussed *infra*.

3. Ameribond paid the bill, in the approximate amount of $100,000, and was reimbursed by Jartran.

Jartran representatives, which plan had been sent to the creditors along with the September 11, 1981 commitment letter. Mr. Cheslock testified that an agreement in principle was reached at that meeting with regard to the proposed debt restructuring plan. According to Mr. Cheslock, the agreement was a verbal understanding, later documented. No such documents were produced, however, or offered into evidence. Counsel for U-Haul, when asked by the Court about the documents, stated for the record that he thought he had them but did not consider them "... necessary ... to go forward." He then asked Mr. Cheslock, "[I]n your mind, did you reach an agreement at your mid-September meeting in 1981?" Mr. Cheslock responded affirmatively.

Mr. Cheslock further testified that toward the end of September, 1981, he learned of an attempted take-over of Hall by RSI and again contacted Hall concerning possible acquisition of stock in Jartran. When asked why he would have considered selling part of his participation to Hall, he responded in part, "Basically, we were just leveraging our own position." Several meetings were then held with Hall representatives. According to Mr. Cheslock, Hall expressed an interest in acquiring Jartran stock, but at the time of Mr. Cheslock's departure for a vacation in Italy on September 29, 1981, Hall had as yet made no commitment to Cheslock with respect to such a stock acquisition.

While in Europe, Mr. Cheslock learned of negotiations between Hall and Jartran and telexed a message to his chief financial officer, Bernie Hubert. In the telex, Mr. Cheslock authorized Hubert, on behalf of Cheslock and Ameribond, to execute and deliver a letter of intent "... as previously discussed, including a provision permitting Ameribond to furnish $20,000,000 equity to Jartran." Cheslock testified that he then returned from his vacation and took steps to reaffirm his position with Jartran and the secured creditors. Thereafter, he entered into negotiations with Hall to jointly acquire an interest in Jartran. He stated that a joint acquisition "... was suggested by the people at Jartran and agreed to by us and the Frank B. Hall people."

The joint acquisition never came to fruition, and Hall ultimately acquired 92% of Jartran stock issued and outstanding, as discussed below. When asked why the joint efforts failed, Mr. Cheslock stated that he and his participants "stepped aside" temporarily so that the deal could close by December 31, 1981 and the value of Jartran's net operating losses could be preserved. James A. Ryder, director and former majority shareholder of Jartran, was asked during his testimony at the confirmation hearings held herein why the Ameribond negotiations failed. He explained that "[t]hey never came up with a definite deal."

3. On December 31, 1981, Hall entered into a series of agreements (the "December 31 transaction"), pursuant to which, *inter alia*, it acquired 3,682,643 shares of common stock in Jartran. Of the shares so acquired, 3,595,043 were purchased from Ryder and 87,600 from five Jartran executives, viz., Walter LeMasurier ("LeMasurier"), Arnold Braun ("Braun"), Steven Lowe ("Lowe"), Vincent Scarano ("Scarano"), and Charles Stiller ("Stiller"). Hall agreed to pay the five named executives $1.00 per share thirty days after confirmation of a "Successful Plan". A Successful Plan was defined as a plan of reorganization pursuant to which Hall obtains at least 80% of the outstanding voting stock in Jartran and Ryder obtains releases from all guarantees of Jartran indebtedness entered into by Ryder or James A. Ryder Corporation ("Ryder Corporation"), except to the extent such releases are waived. On the date of the stock acquisition, the five named executives entered into employment agreements with Debtor, compensation thereunder being guaranteed by Hall. Debtor has rejected the employment agreements pursuant to Court approval.

The "Stock Purchase Agreement" executed by Ryder and Hall on December 31, 1981 provided an aggregate purchase price of $100 for the 3,595,043 shares acquired

by Hall from Ryder. Previously, JAR Corporation owned the stock of Jartran, and Ryder owned the stock of JAR Corporation. As part of the Hall acquisition transaction, JAR Corporation was merged into Jartran and Ryder thereby acquired his Jartran stock.

Ryder, Jartran, and Hall also entered into a "Consulting Agreement", pursuant to which Jartran hired Ryder as a consultant for a term beginning January 1, 1982 and ending December 31, 1991. The Consulting Agreement obligates Ryder to devote 70% of his business time and attention to the performance of his duties as consultant and to promoting Debtor's best interests. In consideration of the performance of such services, Ryder is to receive "Base Salary" of $100,000 per year, payable biweekly, plus fringe benefits customarily afforded to executive officers of Jartran. The Consulting Agreement also contains a covenant by Ryder not to compete with Debtor, for which Debtor is to pay Ryder "Non-Competition Compensation" of $25,000 quarterly, payable at the end of each calendar quarter for a period of ten years commencing March 31, 1982.

According to the agreement, Jartran is obligated to continue to pay Base Salary and Non-Competition Compensation in the event that Ryder becomes disabled. If Ryder dies on or before December 31, 1986, Jartran remains obligated to pay to Ryder's estate Base Salary and Non-Competition Compensation due and payable through December 31, 1986. If Ryder dies after December 31, 1986, the Consulting Agreement is to automatically terminate, and Jartran is to have no further obligation thereunder except to pay to Ryder's estate any unpaid Base Salary and Non-Competition Compensation for the period through termination.

In the Consulting Agreement, Hall irrevocably and unconditionally guarantees the payment of the first five years of Base Salary and Non-Competition Compensation payable by Jartran thereunder. Hall further agrees that nothing which might ordinarily act as a release of such liability shall in any way affect or impair its guarantee. In addition, Hall agrees to make an interest-free loan to Ryder on or before January 31, 1982 in the aggregate amount of $300,000, payable in full five years from the date of such loan. Finally, the Consulting Agreement provides that in the event there is a Successful Plan, as defined above, Hall is to pay Ryder an amount based and contingent upon Debtor's earnings and cash flow for each of the first three calendar years following confirmation. The amount to be paid is to equal one-half the amount legally available for payment to Hall as dividends or pursuant to any tax sharing agreement between Hall and Jartran. The payments under this "Contingent Earnout" provision are not to exceed $600,000 annually.

The Consulting Agreement contains a severability clause, which provides as follows:

... To the extent that the terms set forth in this Agreement or any word, phrase, clause, or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford [Jartran] the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

During the confirmation hearings held herein, the Court issued a rule upon Debtor, Hall, and Ryder to show cause why the Consulting Agreement should not be set aside. Immediately prior to hearing, Debtor filed an Application to Modify and Affirm the Consulting Agreement. Thereafter, and during the course of the confirmation hearings, the Court considered the Rule and Application and received evidence in connection therewith. The Court has decided these matters by separate order entered concurrent herewith, wherein the Application to Modify and Affirm has been denied and the Consulting Agreement has been declared of no force and effect with

respect to Jartran's obligations thereunder, from execution to this date, in all respects, but allowed prospective validity as to its non-competition provisions.

As part of the December 31 transaction, Hall and Ryder also entered into an "Option/Call Agreement", in which Hall granted to Ryder an option to purchase, for the sum of $100, 22½ of all shares owned by Hall on the date of confirmation of a Successful Plan, as defined above. The option is to be exercisable during the thirty day period beginning three years after the date of such confirmation. Pursuant to the Option/Call Agreement, Hall is granted the right to reacquire the option shares during the period March 1 through June 30 of any year beginning the fifth year after confirmation of a Successful Plan, to and including 1991. Hall may exercise these call rights by giving written notice of its election to do so during any of the foregoing call periods. Ryder [4] is given the right to force Hall to reacquire the option shares, if not previously called by Hall as aforesaid, during the period January 1, 1992 to January 31, 1992. The purchase price to be paid by Hall, upon the exercise of its call or Ryder's put rights, is the appraised value of the option shares, determined on a going concern basis. Except for a transfer of shares pursuant to a call or put, or in certain other limited circumstances described in the Option/Call Agreement, the option shares are not freely transferable without Hall's written consent prior to December 31, 1991.

Another contract executed by the parties on December 31, 1981 provided that if Hall proposed to sell any shares in Debtor prior to the earliest of confirmation, conversion, or dismissal of these proceedings, Ryder would have a right of first refusal to purchase such shares. In the event Ryder were to purchase shares by virtue of this right of first refusal, he would be required, in addition to meeting the terms bona fide offered by any third party, to release all guarantees given to him by Hall on December 31, 1981 and to repay any unpaid balance of the interest-free loan made by Hall pursuant to the Consulting Agreement.

Finally, a "Letter Agreement" was executed by Hall and Ryder on December 31, 1981, in which Hall agreed, in connection with its acquisition of stock in Jartran, to use its best efforts to secure the release of all guarantees of Jartran indebtedness given by Ryder or Ryder Corporation. In particular, Hall agreed that it would not propose a plan which would not, if confirmed, constitute a Successful Plan, as defined in the Option/Call Agreement, and that it would not support a plan which failed to provide for the release of all guarantees of Jartran indebtedness given by Ryder or Ryder Corporation.

4. On December 31, 1981, Jartran commenced these proceedings by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

5. Four months later, on April 30, 1982, Hall, Ryder, and Ryder Corporation entered into another letter agreement, offered and received into evidence as U-Haul Exhibit No. 40-A ("Exhibit 40-A"), in which Hall agreed to defend, or to cause Jartran to defend, Ryder and Ryder Corporation in any litigation brought by U-Haul and relating to the business of Jartran.[5] Hall further agreed to indemnify Ryder

---

4. Prior to execution of the Option/Call Agreement, Ryder transferred a portion of his rights thereunder to LeMasurier, Braun, Lowe, Scarano, and Stiller. A document entitled "Designation", attached to and referenced in the agreement, lists the five individuals and the percentages of Hall shares which are the subject of each individual's option. According to the Designation, Ryder transferred ⅖ of his option rights, retaining an option to purchase 17½% of all shares owned by Hall on the date of confirmation of a Successful Plan.

5. The covenant to defend applies to "... any litigation relating to the business of Jartran (i) heretofore instituted by an entity which is identified as part of the U-Haul System and (ii) hereafter instituted by such a U-Haul entity which asserts one or more of the same claims which are asserted in any of such litigation now pending ...." The expense of such defense is to be borne by Hall or Jartran, except to the extent that Ryder or Ryder Corporation retain their own counsel in addition to or in lieu of counsel retained for them by Hall or Jartran.

and Ryder Corporation and to hold them harmless against any loss or damage suffered as a result of such litigation. The right of indemnification is to apply, with respect to a money judgment, only to the extent that Ryder or Ryder Corporation actually pays such judgment, and the indemnification obligation with respect to all money judgments is not to exceed $2,000,-000. In addition, Hall agreed not to commence a proceeding under the bankruptcy laws against Ryder or Ryder Corporation.

In exchange for these benefits, Ryder agreed not to oppose a Successful Plan, as defined in the Option/Call Agreement, proposed or supported by Hall. However, in determining whether a plan is a Successful Plan as so defined, Ryder and Ryder Corporation retained their right to waive or not to waive releases of their guarantees of Jartran indebtedness. Further, Ryder may oppose any plan which impairs his or Ryder Corporation's rights under Exhibit 40–A or under any agreement entered into by Ryder with Hall or Jartran on December 31, 1981.

U-Haul has made an oral motion to deny confirmation based upon Exhibit 40–A. The Court will deny that motion for reasons discussed *infra* in connection with the Court's consideration of the good faith and other confirmation requirements of § 1129(a)(3).

6. On November 15, 1982, an adversary complaint, No. 82 A 3964, was filed against Debtor, Hall, Ryder, and Ryder Corporation by certain holders of Debtor's convertible subordinated debentures (the "debentures") due November 15, 1994, viz., Morgan Guaranty Trust Company of New York, as Trustee of a Commingled Pension Trust Fund ("Morgan"), Walter E. Heller & Company, Inc. ("Heller"), Southeast Venture Capital, Inc. ("Southeast"), and Vollmers & Co. ("Vollmers") (collectively, the "Debentureholders"). The amended complaint seeks, *inter alia*, a declaration that the December 31 transaction is null and void and alleges in substance as follows: In the latter part of 1979, Morgan, Vollmers, Heller, and Southeast entered into essen-

tially identical Purchase Agreements (the "Purchase Agreements") with Debtor for purchase of the debentures at an aggregate price of $5,000,000. The Purchase Agreements provided, *inter alia*, that as long as any of the debentures were outstanding, Debtor would not enter into a transaction with an Affiliate (defined in the Purchase Agreements as any Person which directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with Debtor) other than in the ordinary course of business and upon terms no less favorable to Debtor than would be obtained in a comparable arm's length transaction. The Purchase Agreements further provided that Debtor would not consolidate or merge with any other corporation if immediately after the merger or consolidation, the surviving corporation would be in default under the Purchase Agreements or the debentures. In Section 7.9 of the Purchase Agreements, the parties agreed that the obligation to purchase the debentures was conditioned on execution by Ryder and Ryder Corporation of an agreement that their guarantees of Jartran indebtedness would not be diminished or terminated without the Debentureholders' consent. Such an agreement (the "No Release Agreement") not to cancel or otherwise acquiesce in the release of their guarantees was executed by Ryder and Ryder Corporation. Finally, the Debentureholders allege that Section 5.5 of the Purchase Agreements provides for their subrogation, upon payment in full of the Senior Indebtedness (as defined in the Purchase Agreements), to all the rights and claims of the holders of such indebtedness against the guarantors thereof, viz., Ryder and Ryder Corporation.

The Amended Complaint is in three Counts, the first and second of which sound in contract and tort. The Debentureholders allege that the December 31 transaction was in violation of their rights under the Purchase Agreements and the No Release Agreement. Specifically, they aver 1) that the Consulting Agreement is a transaction with Affiliates (Ryder and Hall) that was not entered into upon fair and

reasonable terms no less favorable than would be obtained in a comparable arm's length transaction; 2) that immediately after the merger of JAR and Jartran, the surviving corporation was in default under the Purchase Agreements and the debentures; and 3) that the Letter Agreement executed on December 31, 1981 seeks to repudiate the Debentureholders' rights with respect to the guarantees of Jartran indebtedness, and Ryder's (and Ryder Corporation's) knowing acquiescence in Hall's efforts to secure releases of those guarantees constitutes a material breach of the No Release Agreement.

In Count I of the Amended Complaint, the Debentureholders seek a declaration that the December 31 transaction is null and void, a determination of the damages suffered by reason of Debtor's, Ryder's, and Ryder Corporation's breaches of their contractual obligations with the Debentureholders, and a permanent injunction against all attempts on behalf of Ryder and Ryder Corporation to secure the release of their guarantees of Jartran indebtedness. In Count II, the Debentureholders allege that Hall and Ryder knowingly and intentionally caused Debtor, Ryder, and Ryder Corporation to breach the Purchase Agreements and the No Release Agreement by entering into the December 31 transaction. They state that Hall and Ryder structured the December 31 transaction in a knowing and deliberate effort to interfere with the contractual relationships existing between Debtor and the Debentureholders and among Ryder, Ryder Corporation, and the Debentureholders and to deprive the Debentureholders of their bargained-for protection. In this Count, they seek a declaration that the December 31 transaction is null and void, an award of actual and punitive damages for the alleged tortious interference by Hall and Ryder, and a permanent injunction prohibiting such conduct in the future. In Count III, the Debenture-

holders pray, *inter alia*, for a declaratory judgment concerning their alleged rights of subrogation as against the guarantors of Jartran indebtedness.

Debtor, Hall, Ryder, and Ryder Corporation filed an Answer to the Amended Complaint generally denying the material allegations thereof and claiming certain defenses, including failure to state a claim and the absence of a case or controversy. Soon after the discovery process began, the parties commenced settlement negotiations, discussed at length *infra*.

7. Debtor's initial Plan of Reorganization, filed on April 8, 1982, was amended a number of times, culminating in the Fifth Amended Plan of Reorganization (the "Plan") [6], which, as modified, was the subject of lengthy confirmation hearings held herein. The Plan divides claims and interests into seven classes. Class 1 consists of secured claims other than those held by Chrysler, Ford and Fruehauf.[7] Class 2 consists of claims entitled to priority under clauses (3), (4), (5), and (6) of § 507(a) of the Bankruptcy Code. In Class 3, Debtor places all claims of Chrysler, Ford, and Fruehauf, including all claims secured by liens on Debtor's vehicles. Class 4 includes general unsecured claims not exceeding $500, as well as those voluntarily reduced to $500. Class 5 comprises general unsecured claims in excess of $500, up to and including $2,500, as well as those voluntarily reduced to $2,500. In Class 6, Debtor places all general unsecured claims, except those contained in Classes 3, 4, or 5. U-Haul's claim and the claims filed by the Debentureholders are included in Class 6. Class 7 consists of the interests of the holders of Debtor's common stock. In addition to these numbered classes, Debtor designates a class consisting of administrative claims.

Under the terms of the Plan, administrative claims and Classes 1, 2, and 4 are

---

6. The Fifth Amended Plan of Reorganization was modified several times, as discussed *infra*. Any reference in this opinion to the Plan includes, where applicable, the subsequent modifications.

7. Certain claims of Fruehauf with respect to 25 transport trailers are treated as Class 1, rather than Class 3, claims.

unimpaired within the meaning and purview of § 1124 of the Bankruptcy Code. Class 5 claims are to be paid one-half on the Effective Date of the Plan, (the "Effective Date"), as defined therein and discussed *infra*, and the balance six months thereafter. With respect to Class 7, the Plan provides that all common stock and all options, warrants, or rights to acquire capital stock in Jartran are to be cancelled upon the Effective Date.

Class 6 claims are to be paid the aggregate sum of $10,000,000 in equal annual installments of $1,000,000 commencing June 30, 1983, with the last installment due June 30, 1992. In the event that U-Haul's claim, as determined by judgment or settlement, exceeds $5,000,000, Class 6 claims are to receive certain additional sums, limited to $6,000,000, based upon the size of the U-Haul judgment. In addition, Class 6 claims are to receive 6⅔% of Jartran's "Excess Cash Flow," as defined in the Plan, for fiscal years 1984 through 1988. An annual limit of $500,000 is provided for the years 1984 through 1987, and a limit of $5,000,000 is designated for the total of Excess Cash Flow payments under the Plan. Finally, Jartran is to deposit $150,000 on the Effective Date for the establishment of the Class 6 Claims Defense Fund. Objections to Class 6 claims, other than U-Haul's, are to be prosecuted by counsel selected by the Unsecured Creditors' Committee and approved by the Court. The defense fund is for payment of fees and expenses incurred by such counsel. Any balance remaining after payment of fees and expenses will inure to the benefit of Class 6 creditors.

Article 5 of the Plan, concerning treatment of Class 3 claims, states that the allowed Class 3 claims of Chrysler, Ford, and Fruehauf shall be $69,927,999.96, $75,772,000.04, and $54,700,000.09, respectively. These claims are to be discharged by monthly payments described in Exhibit C to the Plan. According to Exhibit C, Debtor's total monthly payments to these creditors would be $1,250,000 for each month through December, 1985, $1,583,333.34 for each month from January through December of 1986, $1,750,000 for each month from January of 1987 through December of 1989, $1,749,540.91 for each month from January of 1990 through November of 1990, and a balloon payment of $41,651,750.00 on December 30, 1990. Monthly payments due prior to the Effective Date of the Plan are to be paid on the Effective Date,[8] after deducting all amounts paid pursuant to the adequate protection orders entered herein. Chrysler, Ford, and Fruehauf are each entitled to 11.1% of any Excess Cash Flow for fiscal years 1984 through 1989. The Excess Cash Flow payments are not in addition to the monthly payments designated in Exhibit C but are prepayments, to be credited against those monthly payments in inverse order of maturity on a present value basis computed at 10% interest, compounded annually. On or about the Effective Date of the Plan, Jartran and Hall are to enter into restructuring agreements with each of Chrysler, Ford, and Fruehauf concerning the obligations of Jartran under the Plan.

The Plan is to be funded through income derived from operations, periodic borrowings, and $5,000,000 to be paid by Hall on the Effective Date in consideration of the issuance to Hall of 1,000,000 common shares with a par value of $1.00 per share. The difference between the par value of such stock and the $5,000,000 paid by Hall is to be treated as paid-in surplus. Under the terms of the Plan, Hall is entitled to a credit against the $5,000,000 payment for any allowed administrative claims held by Hall pursuant to §§ 364(b) and 503(b) of the Bankruptcy Code.

The Plan further provides that Hall shall guarantee the first three $1,000,000 annual installments to Class 6. During the course of these proceedings, Hall has guaranteed $1,200,000 of rental obligations for Debtor's Miami headquarters and $340,000 for a telephone system installed at that location. In addition, Hall has guaranteed Debtor's

---

**8.** If the Effective Date does not fall upon the last day of the month, then these payments would be due on the last day of the month after the Effective Date.

substantial line of credit with the Bank of New York, which, as discussed *infra*, is to be increased from $10,000,000 to $16,500,000.

Hall is required to retain at least 90% of Jartran's common stock at all times during the first three years after the Effective Date of the Plan. At all times during the fourth through sixth years after the Effective Date, Hall is required to own at least 51% of such stock. As defined in the Plan, the Effective Date is as follows:

> The first business day occurring on or after the eleventh (11th) day after the Confirmation Date; provided, however, that if a stay of the order confirming the Plan is in effect on such first business day, then the Effective Date shall be the first business day thereafter on which (i) no stay of the order confirming the Plan is in effect and (ii) the order confirming the Plan has not been vacated.

On January 24, 1983, Jartran filed certain modifications to the Plan (the "First Modification"). In the First Modification, the definition of Effective Date is supplemented to provide for the situation where the confirmation order is certified to the district court pursuant to paragraph (E)(2)(a)(ii) of the General Order of the United States District Court for this district, dated December 20, 1982 and commonly described as the Emergency Rule. That Rule ceased to be effective on July 10, 1984, the date of the enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984. Accordingly, the supplemental provision is no longer effective.

The only other amendment to the Plan as a result of the First Modification concerns the treatment of Class 6. The amendment provides that Class 6 creditors are to receive an additional payment measured as 25% of any net recovery in excess of $10,000,000 received by Jartran in connection with the Phoenix and Miami suits.

8. Objections to confirmation and rejections of Debtor's Plan were filed, *inter alia*, by U-Haul and the Debentureholders. The Equity Security Holders' Committee (the "shareholder committee") also filed objections to confirmation on behalf of Debtor's shareholders (Class 7), who are deemed to have rejected the Plan. *See* 11 U.S.C. § 1126(g).

U-Haul's objections are numerous and will be discussed in detail *infra*. The objections of the shareholder committee are three-fold. First, they contend that there is intraclass discrimination violative of § 1123(a)(4) of the Bankruptcy Code [9], because Ryder, Braun, LeMasurier, Lowe, Scarano, and Stiller received substantial benefits for sale of their stock on December 31, 1981, while the remaining shareholders (the "minority shareholders") were offered nothing and are to receive nothing under the Plan. The committee contends that for purposes of determining whether the Plan discriminates unfairly, the six named shareholders must be considered as members of Class 7 notwithstanding the sale of their stock to Hall, because the December 31 transaction and the commencement of these proceedings were conceived of and carried out as a single transaction. According to the committee, the Plan, in conjunction with the December 31 transaction, effects a freeze out of the minority shareholders. In its second objection, the shareholder committee alleges that even if Hall's acquisition of stock from Ryder and the other named shareholders is seen as a transaction separate from these proceedings (rendering Hall the majority shareholder in Class 7), the Plan nevertheless violates § 1123(a)(4) by giving Hall the right to acquire all of the Debtor's stock. The shareholder committee contends that the Plan discriminates unfairly against the minority shareholders by failing to provide them an opportunity to acquire stock in the

9. § 1123(a)(4) provides as follows:
(a) A plan shall—

. . . . .

(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

. . . . .

reorganized company. In its third objection, the shareholder committee alleges that Ryder, Braun, LeMasurier, Lowe, Scarano, and Stiller have breached their fiduciary duty to the minority shareholders in connection with the December 31 transaction. According to the committee, the Plan, which in conjunction with the December 31 transaction effectively freezes out the minority shareholders, is not a plan "... proposed in good faith and not by any means forbidden by law", as required by § 1129(a)(3).

The Debentureholders objected to confirmation on various grounds, including lack of good faith and improper classification of claims. They also contend that the Plan may not be confirmed under § 1129(b), because Hall is underpaying for its participation in the reorganized company.

9. During the initial hearings on confirmation, which extended from January to June of 1983, the Debentureholders, Hall, Ryder, Ryder Corporation, and others negotiated a settlement of Adversary No. 82 A 3964, filed by the Debentureholders as aforesaid. On May 5, 1983, a Joint Application for Approval of Settlement was filed by the parties to that suit praying for its dismissal pursuant to their "Litigation Settlement Agreement." The Litigation Settlement Agreement and other settlement documents were appended as exhibits to the Stipulation to Approve Settlement with Debtor and to Dismiss (the "Stipulation"), which was filed with the Joint Application. In the Stipulation, the parties agree, *inter alia*, to the entry of an order dismissing Adversary No. 82 A 3964 and authorizing Debtor to consummate the transactions required of it by the Litigation Settlement Agreement. The Stipulation is signed not only by Debtor and the other parties to the proceeding, but also by the Unsecured Creditors' Committee, which "... acknowledges that its members and its counsel have reviewed and considered the Litigation Settlement Agreement and each of the Exhibits thereto, ... and that the Committee has voted in accordance with the by-laws to approve the settlement of this adversary proceeding in accordance with the terms therein contained."

Pursuant to the settlement documents, and in consideration, *inter alia*, of the Debentureholders releasing their claims against Hall and the other defendants in the adversary proceeding and waiving participation in the distribution to Class 6, Hall agrees to pay to the Debentureholders 3% of the value [10] of Jartran determined as of December 31st of the year next preceding notice of the Debentureholders' election to be paid. The Debentureholders may give such notice during the period beginning May 1st and ending June 30th of any year from 1988 through 1992.[11] Hall's maximum liability under this section of the Litigation Settlement Agreement depends upon the timing of the Debentureholders' notice of election to be paid. The maximum liability ranges from $1,500,000 for value determined as of December 31, 1987 to $3,000,000 for value as of December 31, 1992.

In addition to the foregoing sums, Hall agrees to pay to the Debentureholders, under circumstances described in the Litigation Settlement Agreement, 1.2% of any net proceeds in excess of $10,000,000 received by Jartran in connection with the Phoenix and Miami suits. These payments, when combined with the payments discussed above (measured by 3% of Debtor's value), are not to exceed $3,000,000. Finally, Hall agrees to reimburse the Debentureholders for the first $100,000 in legal fees and expenses incurred in connection with any suit brought against them seeking to enforce a right of subordination with respect, *inter alia*, to the settlement payments proposed to be made.

The final consideration flowing directly to the Debentureholders comes from Ry-

---

**10.** The value shall be the greater of going concern or liquidation value as of the relevant date.

**11.** If no notice is given prior to June 30, 1992, then Hall is to pay to the Debentureholders, on or before June 30, 1993, 3% of the value of Jartran as of December 31, 1992.

der, who agrees to assign to them his right to purchase ⁸/₄₅ of the shares which are subject to his option under the Option/Call Agreement. The assignment is intended to provide the Debentureholders with that number of shares in Debtor which will yield, when sold in a put, call, or sale under the Option/Call Agreement, an amount equal to 4% of Debtor's value. The Debentureholders agree to take the assignment subject to all of Ryder's rights and obligations under that agreement.

Ryder's and the Debentureholders' rights under the Option/Call Agreement are to be pledged[12], pursuant to an "Assignment/Escrow Agreement," to Chrysler, Ford, and Fruehauf to secure the payment of all sums due to those creditors under Section 5.1 and Exhibit C of the Plan.[13] Upon Debtor's failure to pay such sums when due (and the continuation of such failure for 30 days after notice to Debtor), the rights pledged by Ryder and the Debentureholders as aforesaid may be applied as necessary to cure the default.[14] If property pledged under the Assignment/Escrow Agreement is used to cure any such default, then the pledging party, viz., Ryder or the Debentureholders, is to be subrogated to the rights of the creditor against Debtor to the extent of the value of collateral so applied.[15] The agreement further provides that it may be assigned, in whole but not in part, by Chrysler, Ford, or Fruehauf, or by Ryder or the Debentureholders.

As a part of the litigation settlement, Ryder and Ryder Corporation are to be released from certain of their guarantees of Jartran indebtedness. The Litigation Settlement Agreement calls for execution of an Agreement of Release of Guarantees (the "Release Agreement") by each of eighteen creditors of Jartran, including Chrysler, Ford, and Fruehauf. Pursuant to each Release Agreement, and in exchange for a sum calculated as a percentage of the creditor's unsecured claim,[16] the creditor agrees to release Ryder and Ryder Corporation from their guarantees of Jartran debt owed to that creditor. Ryder and Ryder Corporation are to obtain the funds necessary to make these payments from Hall. Hall, in turn, will receive from Ryder an assignment of his right to purchase and to require Hall to sell under the Option/Call Agreement a stated percentage of Jartran shares owned by Hall on the date of confirmation.

Pursuant to the Release Agreements, the eighteen creditors consent to the payment of sums due the Debentureholders under the settlement documents, notwithstanding the subordination of the debentures, and release the Debentureholders from any causes of action the creditors may have by virtue of the consummation of the settlement or the Plan. The Debentureholders consent to the release of Ryder's and Ryder Corporation's guarantees of Jartran indebtedness, waive any rights they may have under the No Release Agreement, and release each of the eighteen creditors from any causes of action the Debentureholders may have by virtue of the consummation of the settlement or the Plan. Finally, each Release Agreement provides that it may be assigned by the creditor, in whole but not

12. Ryder also pledges his Non-Competition Compensation and certain of his Base Salary payments due under the Consulting Agreement.

13. The agreement is limited to payments due under Section 5.1 and Exhibit C "... as said Section and Exhibit existed on the date of [the] Assignment/Escrow Agreement." Exhibit C has substantially changed, and there are provisions in the agreement governing the effect of any amendment which increases the amount or advances the scheduled date of any payment.

14. If less than all collateral held under the agreement is necessary to cure a default, then

Ryder's collateral is liable for 71.4286% of the defaulted amount and the Debentureholders' collateral for 28.5714%.

15. Neither Ryder nor the Debentureholders is entitled to receive any payment by virtue of this subrogation right until the creditor is paid in full.

16. The payment to each creditor is to be 40% of the first $50,000 of the creditor's unsecured claim, 15% of any amount exceeding $50,000 up to $250,000, and 5% of any amount in excess of $250,000. The maximum payment is $100,000.

in part, by operation of law or voluntarily to one of the other seventeen creditors listed in Exhibit A thereto, but that it shall not otherwise be assignable.

In the Litigation Settlement Agreement, the parties recite that it is their intention that the consideration to the Debenture-holders shall flow from Hall, Ryder, and Ryder Corporation, "... and Hall represents that no payments to be made by it to the Debentureholders pursuant to the terms hereof shall, directly or indirectly, be made with funds of [Jartran]." The only consideration flowing from Debtor to the Debentureholders under the Litigation Settlement Agreement is a proposed Release and Consent to Subrogation, in which Debtor releases the Debentureholders from all causes of action it may have against them and consents to the subrogation of Ryder and the Debentureholders to the rights of the secured creditors to the extent contemplated by the Assignment/Escrow Agreement.

Pursuant to the settlement documents, each member of the Unsecured Creditors' Committee is required to execute a release of subordination claims against the Debentureholders. One of the members of that committee, Sandra Tinsley, Inc., has filed an objection to the proposed settlement and presumably will not execute the release. Counsel for the Debentureholders represented at the hearing on the proposed settlement that a written waiver of this requirement has been signed by the Debentureholders.

The Litigation Settlement Agreement is dated January 17, 1983 and has been executed by each of the parties thereto, viz., Hall, Ryder, Ryder Corporation, Morgan, Southeast, Heller, and Vollmers. Its effectiveness is tied to certain events which are defined in the agreement substantially as follows:

*Preliminary Effective Date:* "... the date upon which (i) the Court ... has entered a Confirmation Order ... (ii) the Court has entered an order in the form attached as Exhibit A to the Stipulation to Dismiss [i.e., the order dismissing Ad-

versary No. 82 A 3964] ..., and (iii) the Effective Date as defined in the Plan has occurred."

*Relevant Appeal:* "... any motion for rehearing, appeal or certiorari proceeding respecting the Confirmation Order which, if decided against the Confirmation Order, could have the effect of materially and adversely affecting the rights of any of the parties to this Litigation Settlement Agreement under the Settlement Documents unless waived by the adversely affected party."

*Adverse Ruling:* "... any final order in a Relevant Appeal which has the effect of materially and adversely affecting the rights of the parties hereto under the Settlement Documents and which is not subject to a further appeal or rehearing."

*Terminating Bankruptcy:* "... a voluntary or involuntary proceeding under the bankruptcy laws of the United States commenced on or before the ninetieth day subsequent to the Preliminary Effective Date and in which the debtor is Ryder or [Ryder] Corp., which proceeding is not dismissed within 90 days of the date upon which the petition commencing it is filed."

*Final Effective Date:* "... the first date after the Preliminary Effective Date upon which (i) the 90-day period after the Preliminary Effective Date has passed without the occurrence of a Terminating Bankruptcy, and (ii)(a) the time for filing a Relevant Appeal under applicable federal rules and statutes has passed without the filing of such appeal; or (b) if a Relevant Appeal has been filed, no such appeal is then pending and no Adverse Ruling therein has been issued."

*Event of Termination:* "... (i) September 1, 1983, unless prior to that date there has occurred the Preliminary Effective Date; (ii) the issuance in any Relevant Appeal of an Adverse Ruling; (iii) failure of the parties thereto to close the transactions contemplated by any one or more of the various Agreements of Release of Guarantees of even date herewith ... on or before the Preliminary

Effective Date; and (iv) the occurrence of a Terminating Bankruptcy.

If an Event of Termination occurs prior to the Final Effective Date, the Litigation Settlement Agreement is rendered null and void, the parties return to their status immediately prior to execution of the agreement, and the Debentureholders repay any funds received from Hall and reassign to Ryder his rights under the Option/Call Agreement. Consistent with the terms of the Litigation Settlement Agreement, the parties agree in the Stipulation that if the Final Effective Date [17] arrives prior to the occurrence of an Event of Termination, the dismissal of Adversary No. 82 A 3964 would be with prejudice. If, however, an Event of Termination occurs prior to the Final Effective Date, then the Stipulation and the dismissal order would be of no further force nor effect. Any termination of the Litigation Settlement Agreement would not affect the validity and binding character of the Release Agreements or the releases delivered pursuant thereto. Those agreements are effective on the Effective Date provided certain requirements enunciated therein are met. The Release Agreements terminate if (i) a bankruptcy proceeding is filed with respect to Ryder or Ryder Corporation prior to the Effective Date and is not dismissed within 90 days, or (ii) if the Effective Date has not occurred prior to September 1, 1983. The Assignment/Escrow Agreement is also effective on the Effective Date of the Plan, subject only to the effectiveness of the Release Agreements and the releases delivered pursuant thereto. However, upon the occurrence of an Event of Termination under the Litigation Settlement Agreement, the Assignment/Escrow Agreement is rendered void with respect to the Debentureholders, who then reassign their Option/Call rights to Ryder to be pledged to Chrysler, Ford, and Fruehauf pursuant to the terms of the Assignment/Escrow Agreement.

In the absence of any amendment, Events of Termination would, of course, have occurred under these settlement agreements, because September 1, 1983 passed without the occurrence of the Effective Date of the Plan. However, the parties to the Litigation Settlement Agreement, by letter agreements filed with the Court, have extended this termination date to October 31, 1984. The termination date in the Release Agreements has also been extended by agreement of the parties thereto.

As mentioned *supra*, the settlement calls for the Debentureholders' waiver of participation in any distribution to Class 6. The waiver is accomplished through an amendment to the Plan (the "Second Modification"), which was filed on December 1, 1983 and provides in relevant part as follows:

1. The Plan is amended by adding a new Article 7.9 thereto as follows:

"(a) Notwithstanding any other provision hereof and contingent on there being no Event of Termination under the terms of that certain Litigation Settlement Agreement dated January 17, 1983, ... the Debentureholders shall not participate in any distributions to Class 6 Creditors under this Plan...."

The Second Modification also includes a release by Jartran of the Debentureholders from all causes of action it may have against them and Debtor's consent to subrogation of Ryder and the Debentureholders as contemplated by the Assignment/Escrow Agreement, already discussed.

In addition to their release of claims against Debtor and the other defendants in Adversary No. 82 A 3964 and their waiver of participation in the Class 6 distribution, the Debentureholders also agree as part of the settlement to vote for confirmation of Debtor's Plan. The Debentureholders filed a rejection of the Plan on January 6, 1983, one day before the voting deadline of January 7, 1983.[18] In accordance with the pro-

---

17. In the Stipulation, the Final Effective Date is termed the "With Prejudice Date."

18. The voting deadline, originally set for January 3, 1983, was orally extended on that date to January 7, 1983.

visions of the Litigation Settlement Agreement, they have filed with the Court an application to change their vote. However, at the hearings on approval of the Litigation Settlement Agreement, counsel for the Debentureholders represented that the failure of the Debentureholders to vote for confirmation of the Plan, as a result of the Court's denial of their request to change their vote, would not constitute a breach of the Litigation Settlement Agreement or a default thereunder. On June 9, 1983, the parties filed with the Court a position paper to that effect.

10. During the initial hearings on confirmation, a settlement was also negotiated between Hall and the shareholder committee concerning the latter's claims that the Plan, in conjunction with the December 31 transaction, effected a freeze out of minority shareholders. The settlement agreement (the "shareholder agreement") provides for payment by Hall to the minority shareholders of $.50 for each share of common stock held by them on December 31, 1981. The payment is to be made after the Effective Date of the Plan to any shareholder who chooses to deliver to Hall a properly executed Letter of Transmittal and the stock certificate or certificates (or Affidavit of Lost Certificate) representing the shares of stock held on the relevant date.

In the Letters of Transmittal, the shareholders release Hall and Jartran from all causes of action they may have relating in any way to their ownership of Jartran stock. A similar release is contained in the shareholder agreement itself, running from the committee and its members to Hall and the Debtor. In the agreement, the parties recite that it is their "...intention...that the consideration to the Shareholders under this Agreement flows and shall flow from Hall, and Hall represents that no payments to be made by it to the Shareholders pursuant to the terms hereof shall, directly or indirectly, be made with the funds of Debtor."

The agreement requires that the shareholder committee present an application to withdraw its objections to confirmation, and Hall's agreement to pay the minority shareholders is conditioned upon allowance of that application. However, the parties subsequently filed a Stipulation and Agreement to the effect that a failure to withdraw the objections would not constitute a breach of the shareholder agreement or the failure of a condition precedent to Hall's obligations thereunder.

The application to withdraw objections was filed on May 10, 1983, and the shareholder agreement was appended as an exhibit thereto. Notice of the application was mailed to the 700 or more minority shareholders and was also published in the Wall Street Journal. Counsel for the shareholder committee used a skip-tracing agency to obtain addresses for shareholders who could not otherwise be located. In the notice, the shareholders were advised of the prospective hearing on the application to withdraw objections and of their right to object to the shareholder agreement or to the withdrawal of the shareholder committee's objections.[19]

After hearing, the Court allowed the shareholder committee's application to withdraw objections to confirmation. The Court was not called upon, and did not, at that time rule on the validity and propriety of the shareholder agreement. The propriety of that settlement is discussed *infra*, in connection with the fairness of Debtor's Plan and also in connection with U-Haul's objections concerning the confirmation requirements of § 1129(a)(3). In the ruling on the application to withdraw, the Court indicated that the shareholder committee's objections would remain the subject of the Court's determination insofar as they were raised or reiterated by U-Haul.

---

**19.** At the hearing concerning withdrawal of the objections, counsel for the shareholder committee reported that only two responses to the notice were received. One response was from a holder of 250 shares who felt the shareholders were not receiving enough from Hall, and the other was from an employee of Debtor who felt that the shareholders should not receive anything.

11. The evidence concerning the value of Jartran as a going concern was presented through the testimony of Debtor's witness, Dr. Robert S. Hamada, Professor of Finance and Director of the Center for Research in Security Prices at the University of Chicago's Graduate School of Business. Dr. Hamada also prepared a report of his analysis, entitled "Evaluation of Debtor's Going Concern Value" (the "Report"), which was appended as Exhibit F–1 to the Disclosure Statement and was also separately admitted into evidence as U-Haul Exhibit No. 8.

Dr. Hamada employed the discounted cash flow, or present value, method of valuation, rather than the capitalization of earnings approach.[20] As explained in his Report, the latter method requires an estimate of a firm's average annual accounting earnings, which are then capitalized at an appropriate rate. Dr. Hamada explained that the discounted cash flow approach has the advantage of "dating" the anticipated cash flows from operations, "... so that fluctuating and erratic cash flows [can] be considered precisely for their timing impact, rather than averaging all of these positive and negative yearly figures into one composite number to capitalize." [21]

In his analysis, Dr. Hamada first calculated Debtor's going concern value [22] unencumbered by the reorganized debt.[23] He then estimated the market value of the reorganized debt and subtracted that value from the going concern value of the firm. The residual was reported as the value of the shareholders' equity in reorganized Jartran.

Dr. Hamada's valuation is based upon cash flow projections supplied by Debtor. He testified that he relied upon the Pro Forma Receipts/Disbursements statement set forth in Exhibit E–6 to the Disclosure Statement ("Exhibit E–6"). Exhibit E–6 contains Debtor's projected cash flows through 1987 and is reproduced as Appendix A hereto. In his testimony, Dr. Hamada explained that he "rearranged" the figures presented in Exhibit E–6 as required by the discounted cash flow method.[24]

The projections in Exhibit E–6 embrace the cash flows forecast for ETS, Debtor's subsidiary. The Detail of Assumptions contained in Exhibit E to the Disclosure Statement indicates that increases in the consumer price index are assumed to be 7.5% per year and that the projected rental revenue reflects that annual increase. Real growth in rental revenue is projected in Exhibit E–6 at 12.5% per year for 1983 and 1984 and at 6.5% annually for 1985 through 1987. Dealer commissions and physical damage expenses are included at 19.1% and 3.8% of revenue, respectively. Maintenance expenses are included at 20% of truck rental revenue and 6% of trailer rental revenue. Other operating costs are

---

**20.** The capitalization of earnings approach also involves present value concepts, in that the figure obtained through use of that method represents the present value of a projected uniform stream of earnings.

**21.** If, for example, a projected revenue stream consisted of $25 per year for two years and $100 in the third year, the present value of that stream, discounted at 10%, would be $118.52. On the other hand, if the revenue figures were averaged and discounted at 10%, the present value of the uniform stream of $50 receipts would be $124.50.

**22.** Dr. Hamada explained in his Report, as well as in testimony, that this going concern value represents the value of Debtor's assets managed in a particular way; that is, the value of the assets so managed is reflected in the cash flow forecast associated with Debtor's business plan.

**23.** Dr. Hamada indicated that another advantage of employing the discounted cash flow approach arises from the fact that the present value of an unencumbered stream of cash flows is first obtained. He explained in his testimony that the risk associated with projected cash flows changes with different amounts of financing and accordingly, the appropriate rate at which to discount those cash flows changes as well. If the present value of an unlevered stream of projected cash flows is first obtained, there is no need to consider the impact of fluctuating debt-equity ratios on the discount rate.

**24.** He also obtained information from Debtor concerning the timing of the cash flows presented in Exhibit E–6. All anticipated cash inflows and outflows were discounted from the month of receipt or payment.

projected to be 3.6% of revenue for 1982 and 4.5% annually for 1983 through 1987.

The cash flow forecast of Exhibit E–6 also reflects expenditures in connection with Debtor's truck refurbishment program, described in the Detail of Assumptions. The refurbishment program calls for 370 trucks to be overhauled in 1983, 1,600 in 1984, and 2,600 in 1985, at a projected cost of $4,000 per unit (in 1982 dollars). The costs are projected to increase annually at the rate of 7.5%.

A replacement program is also planned, as reflected in the projections of Exhibit E–6. Pursuant to this program, 9,000 vehicles are to be purchased, 1,000 per year for 1984 through 1986 and 3,000 per year during 1987 and 1988. The replacement program is predicated upon 90% financing and the cost per unit is projected at $14,000 (in 1982 dollars). These costs are increased at the assumed annual inflation rate of 7.5%. According to Debtor's plan, outservicing of vehicles will take place in October and inservicing in February through April of the following year.

For the years beyond 1987 [25], it was assumed that a steady state, viz., no real positive or negative growth, would be reached in all operating cash inflows and outflows, other than vehicle investment and disposal. Jartran supplied the information necessary to obtain the steady state cash flow figures for these years.

A steady state in the replacement and disposal policy begins in 1989. According to the Report, Jartran provided Dr. Hamada with two different replacement strategies in the steady state years. Each strategy assumes a constant fleet size of 11,000 trucks. Under the "slow" replacement strategy, one-fifth of the fleet is to be replaced in each year, while under the "fast" program, one-fourth of the fleet will be replaced.

In performing his discounted cash flow analysis, Dr. Hamada took into consideration Debtor's substantial net operating loss carryforwards and investment tax credits. The pre-petition tax attributes alone aggregate approximately $122,000,000. Dr. Hamada stated that in his analysis, both pre-petition and post-petition net operating losses and investment tax credits had been used to offset projected taxable income of Jartran.

In his Report, Dr. Hamada explained that "[i]n order to avoid forecasting national inflation rates for five or more years into the future, all necessary forecasts of cash flows and cost of capital (discount rate) will be done in constant 1982 dollars." [26] Accordingly, the inflationary component of the operating cash flows presented in Exhibit E–6, viz., 7.5% per year, was removed before the flows were discounted to present value. Dr. Hamada then estimated the appropriate "inflation-adjusted" discount rate, or real cost of capital,[27] with which to perform his present value computations.

As explained in the Report, the method by which Dr. Hamada estimated Jartran's real cost of capital rests upon

the following relation between firm i's expected rate of return or required cost of capital r(i), the risk-free rate r(f), and the expected rate of return on the overall market r(m):

$$r(i) = r(f) + b(r(m) - r(f))$$

The court further explained that "[w]hen a discount rate is adjusted to reflect inflation, it must be applied to a stream of earnings calculated without regard to inflation ...." *Id.* at 40. *See also* Recent Development, *Inflation and the Concept of Reorganization Value*, 34 Vand.L.Rev. 1727 (1981).

25. Dr. Hamada's analysis is based upon the assumption that the company will continue in perpetuity.

26. In *Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30 (2d Cir.1980), where the court considered methods by which inflation could be taken into account in estimating lost future wages, it was explained that "[t]he adjusted discount rate approach ... avoids all predictions about the level of future inflation, and focuses instead only on the relationship between the inflation rate and the interest rate." *Id.* at 39.

27. The real cost of capital reflects not only the real (inflation-free) time value of money but also a risk premium for the type of business risk faced by Jartran.

where b is a measure of the relative riskiness of firm i (relative to the entire market). If b (or "beta") equals I, then firm i is just as risky as the overall market; if beta equals 0, investing in firm i is riskless.[28]

The variable "r(m) − r(f)" in the above equation is the risk premium required by the market of investors.[29]

In calculating Jartran's real cost of capital, Dr. Hamada assumed that the real risk-free annual rate of interest is 2% and that the required market risk premium is 8.3% annually.[30] The remaining variable in the equation quoted above is the appropriate beta coefficient for Jartran.

Dr. Hamada required the "unlevered" beta (b(u)) for Jartran, that is, the beta coefficient it would have if it had no debt.[31] To estimate Jartran's unlevered beta, he first made a determination that the appropriate industry classification for Jartran was "Automotive Rental and Leasing Without Drivers", SIC Code 751.[32] He then obtained a list of all the firms included within that classification since 1970 and ascertained which of them had been traded on either the New York or American Stock Exchanges. According to the Report and Dr. Hamada's testimony, there were eleven such firms for that period.[33] He then examined daily stock price and dividend data to establish daily rates of return[34] for each company. A series of these daily rates of return was obtained for each of the eleven companies, and Dr. Hamada testified that he used ". . . an econometric technique that related those rates of return to comparable rates of return on the general stock market in total." This procedure yielded estimates for the beta of each firm's stock (b(s)). Information from annual reports and other sources was examined to obtain annual debt-equity ratios for each firm. All the above data were then used to solve for each firm's unlevered beta in the following equation:

$$b(u) = (S/V) \times b(s) + (I - S/V) \times b(d)$$

where b(d) is the beta of the firm's debt, S represents the market value of the firm's stock, and V is the market value of the firm, or the value of stock plus the value of debt. The average of the unlevered beta coefficients for the eleven firms was .6506. Employing the formula relating risk to return, Dr. Hamada then calculated Jartran's

28. As explained by Eugene F. Brigham in *Financial Management Theory and Practice* 108–09 (2d ed. 1979), "[t]he tendency of a stock to move with the market is reflected in its *beta coefficient*, which is a measure of the stock's *volatility* relative to an average stock . . . . If beta (*b*) is 1.0, this indicates that, in general, if the market moves up 10 percent, the stock will also move up by 10 percent, and that if the market falls by 10 percent, the stock will likewise fall by 10 percent. . . . If *b* = 0.5, the stock is only half as volatile as the market—it will rise and fall only half as much . . . . On the other hand, if *b* = 2.0, the stock is twice as volatile as an average stock . . . ."

29. The equation employed by Dr. Hamada and quoted above is described in Brigham, *supra,* at 116, as specifying the relationship between risk and return. The equation ". . . shows that the required rate of return on a given stock . . . is equal to the return required in the marketplace for securities that have no risk . . . plus a risk premium equal to the risk premium demanded on an average stock . . . scaled up or down by the relative riskiness of the firm as measured by its beta coefficient."

30. Dr. Hamada stated in the Report that his estimate of the required market risk premium is based upon historical findings of Roger G. Ibbotson and Rex A. Sinquefield in *Stocks, Bonds, Bills and Inflation: The Past and the Future* (1982).

31. As previously indicated, operating cash flow was defined in the Report ". . . to represent the amount that would be available to stockholders if a firm were unlevered—i.e., had no debt and therefore no interest expense." With cash flow so defined, there is no need to consider the impact of fluctuating debt-equity ratios on the discount rate. *See* note 23, *supra.*

32. Standard Industrial Classification.

33. The eleven firms were Interway Corporation, Transport Pool Corporation, Ryder Systems, Inc., Bermec Corporation, Luby Corporation, Hudson General, RLC Corporation, CLC of America, Inc., Avis, Inc., Xtra Corporation, and Trans Union Corporation.

34. The daily rate of return was defined as

$$\frac{(\text{Ending price} - \text{Opening price}) + \text{Dividends (declared that day)}}{\text{Opening Price}}$$

real "pure equity" cost of capital as follows:

$$r = r(f) + b(r(m) - r(f))$$
$$r = 2\% + .6506(8.3\%)$$
$$r = 7.4\%$$

Dr. Hamada stated that his best estimate of Debtor's real cost of capital is 7.4%. He added, however, that Ryder System, Inc. was the firm most comparable to Debtor. The unlevered beta for Ryder System, Inc. was estimated at .7410, and its real cost of capital was accordingly found to be 8.15%.

Having obtained Debtor's real, pure equity cost of capital, Dr. Hamada then discounted the unlevered cash flows previously discussed to September 1, 1982.[35] As stated in his Report and in testimony, Dr. Hamada's best estimate of the September 1, 1982 going concern value of Jartran, unencumbered by the reorganized debt, is $129,864,000.

To determine the market, or present, value of the reorganized debt, Dr. Hamada first obtained from Jartran the set of payments projected to be made to creditors under the terms of the Plan.[36] As with the projected cash flows, the projected distribution to creditors was specified in each instance to the month of payment. Dr. Hamada explained that the stream of payments was expressed in nominal, as opposed to real, dollars, viz., "... dollars of whatever period they're being paid or received." Accordingly, he discounted the payments at a nominal (inflation-inclusive) rate.

In determining the appropriate discount rate to be applied, Dr. Hamada noted that the risk associated with each set of payments must be reflected in the discount rate selected. He determined that the appropriate annual rates to discount the proposed payment streams were as follows: (1) Class 3 scheduled payments: 15.63%;

(2) Class 3 prepayments—equipment disposal; 7.4% (or Jartran's real, pure equity cost of capital); (3) Class 3 prepayments—excess cash distribution: 7.4% (or Jartran's real cost of equity capital); (4) Class 6 scheduled payments—1983–85: 12.94%; (5) Class 6 scheduled payments—1986–92: 15.63%; (6) Class 6 prepayments—excess cash distribution: 7.4% (or Jartran's real cost of equity capital); (7) Classes 2, 4, and 5 payments: 15.63%; and (8) ETS debt: 15.63%.

The 15.63% rate represents the average yield for Moody's Baa bonds as of September 1, 1982. The 12.94% rate represents the average yield for Moody's Aaa bonds as of September 1, 1982. Dr. Hamada explained that because the first three annual installments to Class 6 are guaranteed by Hall, they are a safer set of payments and should be discounted at the lower Aaa rate. With regard to the excess cash and equipment disposal payments, Dr. Hamada explained that he considered them to be "... as risky as the rest of the business", and consequently discounted them at the cost of capital.[37]

Discounting the proposed payments at the rates discussed above, Dr. Hamada estimated the present value of Jartran's reorganized debt as of September 1, 1982 at $113,497,000. The value of the September 1, 1982 shareholders' equity in reorganized Jartran was accordingly reported as $16,367,000, being the difference between the going concern value of the firm ($129,864,000) and the market value of the reorganized debt ($113,497,000).

Dr. Hamada stated in his Report and in testimony that while these figures represent his best estimates of the values reported, "... they are highly sensitive to unavoidable predictions and forecasts of the future." Accordingly, he performed a sen-

---

**35.** Dr. Hamada's valuation was initially performed in connection with preparation of the Disclosure Statement in the fall of 1982.

**36.** In his analysis, Dr. Hamada assumed that Debtor's Plan would be confirmed, with an "Effective Date", as defined therein, of January 31, 1983.

**37.** In making these latter computations, Dr. Hamada first subtracted the Class 3 prepayments from the 1990 balloon payment otherwise due. He then converted all prepayments to 1982 dollars.

sitivity analysis [38] to estimate the impact of deviations in those forecasts on the going concern values reported.

One of the items as to which Dr. Hamada performed a sensitivity analysis was "rental revenues minus variable costs", where variable costs include commissions, maintenance, physical damage, sales tax, and other operating expenses. In other words, he determined what the going concern value of Jartran (and corresponding value of shareholders' equity) would be if rental revenues minus variable costs were actually 5% lower than the projections of Exhibit E–6 (and the forecast for subsequent years). He then determined what the going concern value of Jartran would be if rental revenues minus variable costs were actually 5% higher than the projections of Exhibit E–6. He made similar computations varying rental revenues minus variable costs 10% above and below the projections relied upon.

As explained in the Report, Dr. Hamada also performed sensitivity analyses with respect to fixed costs,[39] vehicle disposal revenue, vehicle replacement cost, and the sum of vehicle replacement cost and disposal revenue. Each item was varied (by positive 5% and 10% and by negative 5% and 10%) from its respective forecast in Exhibit E–6. The going concern value of Debtor (and value of shareholders' equity) resulting from each of these deviations is indicated in Tables 1 through 4 of the Report, which are reproduced as Appendix B hereto. Tables 1 and 2 present the values obtained when Debtor's cost of capital is assumed to be 7.4%. Tables 3 and 4 are based upon an 8.15% cost of capital. In Tables 1 and 3, Dr. Hamada reports the values predicated upon a "slow" vehicle

investment and disposal strategy in the steady state years. In Tables 2 and 4, values are predicated upon a "fast" replacement policy.

Dr. Hamada explained that the information in Tables 1 through 4 may be examined to determine the going concern value of Jartran (and the value of shareholders' equity) based upon combinations of deviations from the projections relied upon in the Report. He concluded that "[u]nder fairly feasible deviations from our best, unbiased estimates of the future for Jartran, the September 1, 1982, 'going concern' value of Jartran's assets can fall between $69,272,000 and $174,982,000; this implies that the September 1, 1982, 'going concern' value of the stockholders' equity in the reorganized Jartran can fall between [negative] $44,069,000 and $61,485,000." The figures representing the lower end of the feasible range were obtained from Table 4, assuming an 8.15% real cost of equity capital, a fast steady state replacement policy, and a negative 5% variance in rental revenues minus variable costs. The higher figures were obtained from Table 1, assuming a 7.4% cost of capital, a slow steady state replacement strategy, and a positive 5% variance in rental revenues minus variable costs.

At Debtor's request, Dr. Hamada updated his analysis to obtain going concern values for the firm and for shareholders' equity as of January 1, 1983. He explained that in his updated analysis (the "Update"), he did not repeat the entire procedure previously performed in connection with the Report. He began the Update with the $129,864,000 figure representing the September 1, 1982 going concern value of the firm.[40] He then proceeded with his analy-

---

**38.** In Brigham, *supra* note 28, at 413, the author discusses sensitivity analysis in connection with corporate capital budgeting decisions and the determination of the present value of proposed capital projects. He explains that *"[s]ensitivity analysis indicates exactly how much NPV [net present value] will change in response to a given change in an input variable, other things held constant.* Sensitivity analysis is sometimes called "what if" analysis because it answers questions such as this: 'What if sales are only

75,000 units rather than 100,000? What will then happen to NPV?'" (Emphasis in original)

**39.** Fixed costs were defined to include license and tax, field administrative, and corporate administrative expenses.

**40.** The values obtained in the updated analysis are founded upon the same cash flow forecast supplied by Debtor in connection with preparation of the Report.

sis as outlined in Table 9 of the Update [41], a portion of which is reproduced below:

Table 9

Breakdown of Components Resulting in Changes in Jartran's Estimated Values: Values as of 9/1/82 and 1/1/83
Estimated Real Cost of Capital = .0740
(thousands of dollars)

| | Steady-State Slow | Replacement Policy |
|---|---|---|
| September 1, 1982 Present Value Per ... Report | $129,864 | [Table 1] |
| Removing 1982 Flows (Last Four Months), Present Value as of September 1, 1982 | 123,839 | |
| Change | | −$6,025 |
| Redating Present Value as of January 1, 1983 | 126,822 | |
| Change | | + 2,983 |
| Adjusting for Favorable 1982 Cash Flow Variance | 128,151 | [Table 5] |
| Change | | + 1,329 |

As indicated above, Dr. Hamada subtracted from the September 1, 1982 going concern value of the firm the present value (as of September 1, 1982) of all cash flows which were projected to occur during the last four months of 1982. The resulting figure, $123,839,000, represents the present value, as of September 1, 1982, of all post-1982 cash flows. These flows would have a greater value as of January 1, 1983 than they would as of September 1, 1982, and Dr. Hamada determined that the magnitude of that increase was $2,983,000. Accordingly, he "redated" the post-1982 flows by adding $2,983,000 to the $123,839,000 previously obtained. He thus found the present value, as of January 1, 1983, of all

post-1982 cash flows as projected by Debtor to be $126,822,000.[42]

His final adjustment was based upon Debtor's Cash Flow Variance Report for the year 1982, a copy of which was offered and received into evidence as Jartran Exhibit No. 11. In that report, actual cash receipts for 1982 (including, *inter alia*, rental revenues, ETS profit, short-term borrowings, and equity contribution) exceeded disbursements (including commissions, insurance, licenses, sales tax, maintenance, advertising, other operating expenses, SRE [43] purchases, debt service,[44] exposure from leases, administrative overhead, and interest on short-term borrowings) by $895,000 (identified as "Net Cash Change"). The report further indicates that Net Cash Change was projected at negative $434,000 for 1982. Accordingly, $1,329,000 is reported as the positive cash flow variance. The entire positive variance was attributed to the last four months of 1982, because the projections which were used to calculate that variance incorporated actual results for the first eight months of 1982. Dr. Hamada added the $1,329,000 positive cash flow variance to the January 1, 1983 present value of post-1982 cash flows to arrive at the updated going concern value of the firm, viz., $128,151,000.

Having obtained his updated estimate of the going concern value of the firm, Dr. Hamada proceeded to update the value of the reorganized debt to January 1, 1983. He again began with the September 1, 1982

41. Table 9 also presents the corresponding calculations of change in going concern value based upon a fast steady state vehicle replacement policy. Table 10 is identical to Table 9, except that it is predicated upon an 8.15% cost of capital. Tables 9 and 10 were offered and received into evidence as U-Haul Exhibits Nos. 21 and 22, respectively.

42. The "redating" of the present value of post-1982 cash flows from September 1, 1982 to January 1, 1983 may be performed by determining the amount to which the September 1, 1983 value would grow if invested at the appropriate rate, compounded monthly for four months. Generally, to determine the value to which a given amount will grow at a stated rate of interest ("k"), compounded for a specified num-

ber of periods ("n"), one must multiply that given amount by the term $(1 + k)^n$. The rate of interest which, if compounded monthly, would yield an effective annual rate of 7.4% (Dr. Hamada's best estimate of Jartran's real cost of capital) is approximately 7.164%. Accordingly, to "redate" the post-1982 cash flows from September 1, 1982 to January 1, 1983, the following calculation must be made:

$$\$123,839,000 \times \left(1 + \frac{.07164}{12}\right)^4$$

43. Specialty rental equipment.

44. "Debt Service" in Jartran Exhibit No. 11 apparently includes payments made to Debtor's three major secured creditors during 1982.

value and made necessary adjustments, as summarized in Table 11 of the Update,[45] a portion of which is reproduced below:

Table 11

Breakdown of Components Resulting in Changes in the Value of Jartran's Debt: Values as of 9/1/82 and 1/1/83: (thousands of dollars)

| | Real Cost of Capital .0740 |
|---|---|
| September 1, 1982 Present Value Per ... Report | $113,497 |
| Removing 1982 Flows (Last Four Months), Present Value as of September 1, 1982 (September 1 Interest Rates) | 108,425 |
| Change | − 5,072 |
| Redating Present Value as of January 1, 1983 (September 1 Rates) | 113,779 |
| Change | + 5,354 |
| Using January 1, 1983 Interest Rates | 118,992 |
| Change | + 5,213 |

The first two adjustments are similar to those made in Table 9, in connection with the change in going concern value of the firm. Dr. Hamada first subtracted from the September 1, 1982 market value of the debt the present value (as of September 1, 1982) of all proposed payments to creditors projected to be made during the last four months of 1982. The present value of those projected payments was $5,072,000, discounted at the September 1, 1982 interest rates previously discussed. The resulting figure, $108,425,000, represents the present value, as of September 1, 1982, of all post-1982 payments to creditors. These proposed payments would have a greater value as of January 1, 1983 than they would as of September 1, 1982, and Dr. Hamada determined that the magnitude of that increase was $5,354,000. Accordingly, he concluded that the present value, as of January 1, 1983, of all post-1982 projected payments to creditors was $113,779,000.

The final adjustment reflects the change in interest rates from September 1, 1982 to January 1, 1983. Dr. Hamada testified that the average yield for Moody's Aaa bonds had dropped from 12.94% to 11.83% and that the average yield for Baa bonds had dropped from 15.63% to 14.14%. As a result of the drop in interest rates, the discounted value of the reorganized debt was increased by $5,213,000, for a total of $118,992,000.

The difference between the updated going concern value of the firm ($128,151,000) and the updated market value of the reorganized debt ($118,992,000), or $9,159,000, was reported as Dr. Hamada's "single" best estimate of the January 1, 1983 value of shareholders' equity in reorganized Jartran. His best estimates of going concern value, market value of debt, and value of shareholders' equity as of September 1, 1982 and January 1, 1983, based upon differing assumptions concerning the cost of capital and steady state vehicle replacement strategy, are summarized in Jartran Exhibit No. 29A. Tables 5 through 8 of the Update, offered and received into evidence as Jartran Exhibits Nos. 29B through 29E, respectively, comprise the updated sensitivity analysis for the January 1, 1983 values and are reproduced as Appendix C hereto.

12. After the conclusion of the initial hearings on confirmation and while the Court had the matter of confirmation under advisement, Debtor commenced negotiations with the secured creditors for the purpose of relieving a cash shortage which had developed. As a result of these negotiations, the Third Modification, which completely alters the treatment of Class 3 under the Plan, was proposed and filed.

In connection with the Third Modification, Jartran, Hall, Chrysler, Ford, and Fruehauf entered into an agreement (the "December 5 agreement") in which Hall agrees to make a cash payment (the "Hall Payment") to the secured creditors in the amount of $52,000,000 for the assignment of certain rights held by the secured creditors against Jartran. Of this amount, $45,000,000, equally divided between Chrysler and Ford, represents the purchase price for their aggregate respective rights against Debtor and its property, and $7,000,000

---

**45.** A copy of Table 11 was offered and received into evidence as U-Haul Exhibit No. 23. Table 11 also presents the corresponding calculation of change in market value of debt based upon an 8.15% real cost of equity capital.

represents advance lease payments to Fruehauf. The $52,000,000 payment is to be reduced by all payments made by Debtor on and after January 1, 1984, pursuant to the amended adequate protection orders entered herein. The December 5 agreement calls for the execution of a "Debt Restructuring Agreement" between Debtor and Hall and an "Obligation Restructuring Agreement" among Debtor, Hall, and Fruehauf. The Debt Restructuring Agreement obligates Debtor to make and deliver to Hall a promissory note (the "Hall Note") evidencing Debtor's obligation to pay to Hall as principal an amount equal to the Hall Payment plus interest to December 31, 1984, with interest on the principal sum subsequent thereto.[46] The Obligation Restructuring Agreement requires Debtor to pay to Fruehauf the sum of $14,400,000 in seventy-two equal monthly installments of $200,000 each beginning in January, 1985. In addition, Fruehauf is to receive on a quarterly basis an amount equal to 2% of Jartran's rental revenue for the years 1984 through 1990 derived from equipment leased to Debtor by Fruehauf.

In addition to reducing total payments due to Class 3, the Third Modification and the above agreements incorporated therein were intended to relieve the cash flow shortage by effecting a moratorium on debt service for the year 1984 (other than the two percent of rental payments). The Third Modification provides that Article 5 of the Plan concerning treatment of Class 3 claims is deleted in its entirety and that a new Article 5 is substituted therefor, which again specifies that the allowed Class 3 claims of Chrysler, Ford, and Fruehauf are $69,927,999.96, $75,772,000.04, and $54,700,000.09, respectively. These claims are to be discharged by the payments provided in the restructuring agreements described above. In the event the Effective Date of the Plan is subsequent to January 1, 1985, the Third Modification provides that the scheduled monthly installment payments

due under the Restructuring Agreements prior to the Effective Date, reduced by any sums paid pursuant to the amended adequate protection orders entered herein, shall be due and payable on or about the Effective Date of the Plan. Finally, the Third Modification provides to Fruehauf the same Excess Cash Flow prepayments as provided in the Plan.

13. In connection with the Third Modification, Debtor prepared revised pro forma financial statements through 1987. Mr. Kenneth Rumsey, Jartran's senior vice president and chief financial officer, testified in January, 1984 concerning Debtor's revised business plan and the assumptions underlying the new cash flow forecast. He stated that although Jartran had not met the revenue projections for 1983 set forth in the Disclosure Statement, its rental transactions had increased approximately 13% over 1982. According to Mr. Rumsey's testimony, the revenue shortfall was principally due to pricing activities in the industry. He indicated that prices ordinarily rise significantly during the summer months but that in 1983, the customary seasonal price increases did not materialize.

The revised revenue forecast is contained in the Statements of Operation offered and received into evidence as Jartran Exhibit No. 102 ("Exhibit 102"), a portion of which is reproduced as Appendix D hereto. Exhibit 102 presents the actual financial results of operations for the period 1978 through 1982, the estimated actual financial results for the year 1983, and projections for the years 1984 through 1987. According to Mr. Rumsey's testimony, the projections of Exhibit 102 are more conservative than the forecast prepared in connection with the hearing on the Disclosure Statement. The Detail of Assumptions included in Exhibit 102 summarizes the annual percentage increases in revenue resulting from productivity improvements, pricing practices, and other factors as follows:

---

**46.** The terms of the Hall Note are more fully described *infra,* at note 111.

| | Year Over Year Improvements | | | |
|---|---|---|---|---|
| Transaction | 1984 | 1985 | 1986 | 1987 |
| Acct.Adj.; May-June | 3.0% | – % | – % | – % |
| Econ. | 4.0 | 3.0 | 2.0 | 4.0 |
| Productivity | 5.5 | 2.5 | 2.5 | 2.5 |
| | 12.5% | 5.5% | 4.5% | 6.5% |
| Pricing | 3.0% | 5.0% | 5.0% | 5.0% |
| Total | 15.5% | 10.5% | 9.5% | 11.5% |

In addition to the increases listed above, the Detail of Assumptions also indicates that substantial increases in revenue are expected to result from expansion of the existing fleet, as explained *infra*.

Mr. Rumsey testified that the increase in 1984 revenues labeled above as "Acct.Adj; May-June" refers to a change in Debtor's accounting practice from a calendar month year to a "... four-five week year ... [which] relates to thirteen week quarters." Mr. Rumsey stated that the result of the change was a one-week revenue loss in 1983 and a one-week gain in 1984.

A further increase in revenues for 1984 is based upon the assumption that Debtor will "recapture" market share lost when Debtor raised its prices during May and June of 1983. With regard to the projected annual revenue increases related to the economy, Mr. Rumsey stated that the percentages indicated above represent a composite of various forecasts, including projections published by the National Association of Realtors, the Department of Commerce, and the Wharton School of Finance.[47]

A 5.5% increase in revenues for 1984 is predicated upon projected improvement in Debtor's productivity, attributable to new and improved marketing programs and a 30% increase in its dealer base.[48] For the years 1985 through 1987, a 2.5% projected annual increase in revenues is ascribed to this factor.

An additional 3.0% projected increase in revenues for 1984 is based upon improvement in industry pricing. Mr. Rumsey testified that Debtor's pricing department conducts telephone surveys of Debtor's competitors on a regular basis to ascertain current price levels in the industry. The 3.0% revenue increase ascribed to this factor is based upon Debtor's belief that pricing in the industry began to firm during the fourth quarter of 1983. For the years 1985 through 1987, the corresponding increase in revenues is projected to be 5.0% annually, based upon the Wharton School's[49] estimate for transportation inflation.

A substantial increase in revenues is also projected as a result of Debtor's new acquisition plan, which has supplanted the vehicle replacement program embraced within the original cash flow forecast of Exhibit E-6.[50] Pursuant to the new acquisition plan, Jartran will not replace any units but will add a specified number of vehicles to its fleet each year.[51] Debtor proposes to purchase 1,200 trucks[52] in 1985, 800 trucks in 1986, and 2,400 trucks in 1987. According to Mr. Rumsey's testimony, "some" vehicles would be purchased in 1988, but no decision has yet been made as to the exact

47. According to Mr. Rumsey, Debtor has analyzed a number of sources and concluded that of all the indices available, the housing market tracks the rental industry rather closely "... and ... their projections have been reasonably conservative over time." Accordingly, in formulating its projections, Debtor has consulted publications of the National Association of Realtors on a regular basis.

48. A minimal portion of this 5.5% increase was based upon emergence from Chapter 11.

49. The University of Pennsylvania's Wharton School of Finance.

50. Mr. Rumsey testified that "[i]t is Jartran's intention not to replace any equipment at this time...." Elsewhere he referred to Jartran's "... intention throughout this planning horizon not to replace any of the equipment." Presumably, the planning horizon referred to is the period embraced by the new pro formas, through 1987.

51. Mr. Rumsey testified that Debtor's fleet consisted of approximately 11,000 trucks and 19,000 trailers in October of 1982 and 10,800 trucks and 18,700 trailers in January of 1984. He further testified that no vehicles had been replaced, other than in Debtor's subsidiary, since prior to the filing of the petition herein on December 31, 1981.

52. Debtor plans to purchase Ford trucks, Model F-700.

number that would be acquired. He stated that as a result of the vehicle acquisition program contemplated by the Third Modification, Jartran's fleet would be approximately 40% larger than it would have been under the business plan reflected in the Disclosure Statement. The truck fleet is projected to increase under the new acquisition program to 15,000 units.[53]

In projecting the revenue increases attributable to new vehicles, Debtor assumed that the additional revenue per truck would decline as the fleet grew in size.[54] Debtor projects that the revenue yield of the new vehicles will be as follows relative to existing fleet:

| | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|
| F–700's | 0 | 1,200 | 800 | 2,400 |
| Revenue effectiveness compared to existing fleet | – | 100% | 90% | 80% |

Debtor's new business plan, as reflected in the projections of Exhibit 102, does not include a formal refurbishment program of the type described in Debtor's Disclosure Statement. According to Mr. Rumsey's testimony, Debtor repairs and replaces major components of its trucks on a routine basis and has found that the goals of the refurbishment program previously planned are being achieved in the context of Debtor's regular repair and maintenance program.

In addition to Exhibit 102, Debtor offered and the Court received into evidence as Jartran Exhibit No. 103 ("Exhibit 103") a summary of receipts and disbursements for the years ended December 31, 1982 through December 31, 1987. It reflects the same financial projections (and revenue and expense assumptions) as Exhibit 102, dis-

cussed above.[55] The cash flow forecast of Exhibit 103 is the analogue of the forecast in Exhibit E–6 to the Disclosure Statement and is reproduced as Appendix E hereto. Exhibits 102 and 103 were prepared on the assumption of a March 31, 1984 Effective Date.

In Exhibit 103, disbursements for the year 1984 include, *inter alia,* payments to creditors in Classes 2, 4, 5, and 6.[56] The amount scheduled therein to be paid to Class 6 in 1984 is $2,000,000. Mr. Rumsey testified that the $2,000,000 disbursement represents the two annual $1,000,000 installments payable to Class 6 under the Plan on June 30, 1983 and June 30, 1984. Payments to Class 6 for the years 1985 through 1987 are projected in Exhibit 103 at $1,500,000 annually. According to Mr. Rumsey's testimony, $1,000,000 of each $1,500,000 payment represents the annual installment due to Class 6 under the Plan. In addition, $500,000 per year is projected to be paid to Class 6 under the Excess Cash Flow formula. Mr. Rumsey explained that for conservative purposes, Jartran projected the maximum payment possible under that formula.[57]

Exhibit 103 also includes projected short-term borrowings for the years 1983 through 1987. At the time that Exhibit 103 was prepared, viz., December 1, 1983, Debtor anticipated peak short-term borrowings of $11,750,000 for 1983. However, operations were more favorable than projected, and Debtor found it unnecessary to exceed its existing $10,000,000 line of credit. The projected peak short-term borrowings for 1984 are $15,000,000, which includes Jartran's current $10,000,000 line of credit

**53.** Mr. Rumsey indicated that the new revenue projections reflect the fact that a certain number of vehicles will be lost each year. He stated that the "... projections are based on a continuation of our historic experience on attrition of both trailers and trucks."

**54.** Mr. Rumsey explained that the "diminishing return of the incremental revenue" per truck is attributable to the fact that there is a fixed market for Debtor's product.

**55.** There are minor differences between the two statements because of the fact that revenues and

expenses were recorded on an accrual basis for purposes of Exhibit 102.

**56.** Payment of administrative claims and certain payments to Fruehauf are also included in the anticipated 1984 disbursements.

**57.** Disbursements to Class 6 based upon potential recovery in the Miami suit were not included in the projections of Exhibit 103. Nor was such potential recovery considered in projecting Debtor's receipts.

with the Bank of New York, guaranteed by Hall. It is anticipated that the projected $5,000,000 increase in that line of credit will also be guaranteed by Hall, as provided in the Third Modification. Mr. Rumsey testified in January of 1984 that negotiations were under way to increase Debtor's line of credit to $16,500,000, rather than the $15,000,000 contemplated by the Third Modification. With respect to the additional $1,500,000, Hall, through its representative John Addeo, has made a verbal commitment to guarantee the loan. For the years 1985, 1986, and 1987, peak short-term borrowings are projected at $18,500,000, $22,000,000, and $16,500,000, respectively.

In addition to the new projections of Exhibits 102 and 103, Debtor offered and the Court received into evidence Jartran Exhibit No. 101 ("Exhibit 101"), which compares the proposed payments to Hall and Fruehauf under the Third Modification with the Class 3 payments originally called for by the Plan. Exhibit 101 is reproduced as Appendix F hereto. In preparing Exhibit 101, Debtor assumed that the Hall Payment would be made on April 1, 1984 in the amount of $52,000,000 and that Debtor's obligation to repay Hall would bear interest at the rate of 13.5% annually. Debtor further assumed that the quarterly payments to Fruehauf, representing 2% of Jartran's rental revenue derived from equipment leased by Fruehauf, would increase from $79,000 per quarter in 1984 to $120,000 in 1990. Mr. Rumsey testified that Debtor's estimate of the quarterly payments to Fruehauf was "... based on our experience and what the revenue generation capacity is on Fruehauf equipment to this date extended through the period 1990 consistent with the financial projection we have made for this period of time."

In Exhibit 101, which assumes a March 31, 1984 Effective Date, Debtor indicates that the sum of all payments to Hall and Fruehauf under the Third Modification would be $96,700,000. According to Debtor's calculations, the total of Class 3 payments originally proposed under the Plan was $172,900,000, for a savings under the Third Modification of $76,200,000. In addition, Debtor computes the present value, as of January 1, 1984, of all payments to Hall and Fruehauf under the Third Modification and of the Class 3 payments originally proposed under the Plan. Discounted at 13.5%, Debtor reports these values as $62,399,000 and $98,470,000, respectively. The difference, or $36,071,000, is Debtor's estimate of the present value of savings to be realized pursuant to the Third Modification's restructuring of Class 3 debt.

The last of the exhibits prepared by Debtor to demonstrate the feasibility of the Plan as modified is Jartran Exhibit No. 104, which presents Debtor's consolidated balance sheets at December 31, 1978 through 1983, as well as estimated balance sheets as of March 31, 1984 and April 1, 1984. The estimated balance sheets as of the latter two dates are intended to depict the accounting effects of a confirmation of Debtor's Plan. According to Debtor's estimates, the stockholders' equity in reorganized Jartran as of April 1, 1984, for accounting purposes, would be $6,000,000.

14. At the initial evidentiary hearings held in 1983, Debtor submitted Jartran Exhibit No. 60 as proof of the liquidation value of its assets. Subsequently, in January, 1984, in connection with the continued hearings on confirmation required with respect to the Third Modification, Debtor offered a revised and updated liquidation analysis, received into evidence as Jartran Exhibit No. 160 ("Exhibit 160"). According to Exhibit 160, no distribution would be made upon Class 6 claims if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Court Concludes and Further Finds:

1. One of the conditions of confirmation of a reorganization plan is that each class has voted to accept it or is not impaired thereunder. Central to the Court's determination in this case is whether Class 6 has rejected the Plan, for if it has, then the Plan may only be confirmed if the so-called "cram-down" requirements of

§ 1129(b) are met with respect to Class 6.[58] In determining whether Class 6 has rejected the Plan, the Debentureholders' application for leave to amend their ballots will first be considered.

Bankruptcy Rule 3018 [59] provides in relevant part as follows:

"... For cause shown and within the time fixed for acceptance or rejection of a plan, the court after notice and hearing may permit a creditor or equity security holder to change or withdraw an acceptance or rejection...."

Here, the Debentureholders sought leave to amend their ballots after the voting deadline had passed. The language of Rule 3018 appears to bar the change of vote from rejection to acceptance. The Debentureholders argue, however, that the rule should not be read to preclude all exercise of judicial discretion. They urge that such a reading would subvert Congressional intent to have negotiated, consensual plans wherever possible.

■ The Court is reluctant to rule that the exercise of judicial discretion concerning a tardy change or withdrawal of vote is completely precluded by the language of Rule 3018. There may be exceptional circumstances which, in light of the spirit of Chapter 11 to promote consensual plans, would warrant such a change notwithstanding the unequivocal language of the Rule. However, in this case no such exceptional circumstances exist. As discussed *infra,* the case is in a cram-down posture with respect to Class 6 regardless of any vote by the Debentureholders.

■ There is a further reason for disallowing the vote change in this case. In the Litigation Settlement Agreement, the De-

bentureholders agree not only to waive participation in the Class 6 distribution and to release the defendants from all causes of action in Adversary No. 82 A 3964, they also agree to amend their ballots from rejection to acceptance of Debtor's Plan. There has been full disclosure of the contractual commitment to the Court and parties in interest throughout the negotiation process and at the hearings on the Debentureholders' application. Notwithstanding such disclosure, the change of vote must be disallowed. Where leave to amend a ballot is sought pursuant to a contract with fewer than all members of a class and constitutes partial consideration thereunder, the proposed amendment is inappropriate as against public policy, even if the contract is also in settlement of claims or actions brought by those contracting members of the class.[60]

■ The parties to the Litigation Settlement Agreement have filed a position paper to the effect that the failure of the Debentureholders to amend their ballots would not be a breach of the Litigation Settlement Agreement or constitute a default thereunder. In light of the Court's ruling that the provision concerning change of vote is against public policy, the Court considers the provision expunged from the Litigation Settlement Agreement, and deemed not enforceable.

■ 2. By separate order entered concurrent herewith, the Court has estimated the claim of U-Haul, arising out of Jartran's alleged unlawful conduct which is the subject matter of the Phoenix suit. The Court has allowed U-Haul's claim in the amount of $22,500,000. Based upon the Report of the Creditors' Committee on

**58.** Pursuant to § 1126(g) of the Bankruptcy Code, Class 7 (Debtor's shareholders) are deemed to have rejected the Plan. Accordingly, the Plan must also meet the cram-down requirements with respect to Class 7.

**59.** According to the Order of the Supreme Court of the United States of April 25, 1983, the new National Bankruptcy Rules apply to all proceedings pending on August 1, 1983 unless the application of those rules would work an injustice.

The Court finds that no interests would be prejudiced by application of the new Rules.

**60.** In addition, it may be observed that the Debentureholders will only participate in the Class 6 distribution if an Event of Termination under the Litigation Settlement Agreement occurs. Accordingly, a vote at this juncture by the Debentureholders concerning the acceptability of that distribution would not be truly representative.

Ballots Received, the amount of claims voted, other than U-Haul's claim, total approximately $18,500,000. Approximately $11,-250,000 voted to accept the Plan.[61] The request of the Debentureholders to register a change of vote has been denied. Accordingly, Class 6 has not accepted the Plan by the requisite two-thirds in amount. The Plan is in a cram down posture regardless of the magnitude of U-Haul's claim. The Plan would remain in cram down, even if the Debentureholders were to be allowed to change their vote from rejection to acceptance, unless U-Haul's claim, filed in the amount of $375,000,000, were found to be less than $7,000,000.

■ 3. As Class 6 has rejected the Plan by vote, and Class 7 is deemed to have rejected the Plan pursuant to § 1126(g), the Plan may only be confirmed if it meets the requirements of § 1129(b), which provides in part as follows:

> (b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

Accordingly, the Court may confirm the Plan only if it does not discriminate unfairly, and is fair and equitable, with respect to Classes 6 and 7.

■ Section 1129(b)(2) "... provides guidelines for a court to determine whether a plan is fair and equitable with respect to a dissenting class." 124 Cong.Rec. H11,-104 (1978).[62] That section provides in relevant part as follows:

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

> . . . . .

> (B) With respect to a class of unsecured claims—

> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property.

> (C) With respect to a class of interests—

> (i) the plan provides that each holder of an interest of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, and the value of such interest; or

> (ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

The above-quoted provisions require payment of the allowed amount, as opposed to the value, of the unsecured claim or interest. 124 Cong.Rec. S17,421 (1978).

■ These provisions codify the absolute priority rule with respect to dissenting classes of unsecured claims and dissenting

---

**61.** The vote of Budd Leasing, a rejection in the amount of $458,525.90, was changed to an acceptance in the amount of $352,271.34, pursuant to order of Court.

**62.** § 1129(b)(2) indicates that the confirmation requirements contained therein are "included" within the fair and equitable test. Under § 102(3) of the Bankruptcy Code, the word "includes" is not limiting, and the requirements of § 1129(b)(2) are thus minimum standards which a reorganization plan must meet in order to be considered fair and equitable. 5 Collier on Bankruptcy § 1129.03[4][a], at 1129–52 (15th ed. 1983).

classes of interests. H.R.Rep. No. 595, 95th Cong., 2d Sess. 413–14 (1978), U.S. Code Cong. & Admin.News 1978, 5787. Under the absolute priority rule, which formed a part of the "fair and equitable" test under former Chapter X[63], a class must be compensated in full before any junior class may participate. *See* Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 Am.Bankr.L.J. 133, 143 (1979) One of the seminal decisions concerning the fairness of reorganization plans and the standards by which they are to be evaluated was *Northern Pacific Railway Co. v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913). *Boyd* was an equity receivership reorganization in which the assets of the Northern Pacific Railroad (the "Road") were sold on foreclosure to the newly organized Northern Pacific Railway (the "Railway"). Pursuant to the reorganization plan, the Road's bondholders exchanged their bonds, in the approximate amount of $147,500,000, for new bonds in the Railway.[64] The stockholders of the Road, upon payment of certain assessments, likewise exchanged their shares for new shares in the Railway.[65] Under the

reorganization plan, no provision was made for payment of unsecured debts.[66] An unsecured creditor of the Road brought a bill in equity against the Road and the Railway seeking to subject the property purchased to the payment of his claim. The Court, noting that the reorganization agreement contained a recital that the value of property foreclosed upon was agreed to be $345,000,000, upheld the decree making Boyd's claim a lien upon the property of the Road in the hands of the Railway, subject only to mortgages placed thereon at the time of reorganization.

The fact that at the sale, where there was no competition, the property was bid in at $61,000,000 does not disprove the truth of that recital, and the shareholders cannot now be heard to claim that this material statement was untrue and that as a fact there was no equity out of which unsecured creditors could have been paid, although there was a value which authorized the issuance of $144,000,000 fully paid stock. If the value of the road justified the issuance of stock in exchange for old shares, the creditors were entitled to the benefit of that value,

63. "It must be emphasized that the fair and equitable requirement applies only with respect to dissenting classes. Therefore, unlike the fair and equitable rule contained in Chapter X and section 77 of the Bankruptcy Act under section 1129(b)(2), senior accepting classes are permitted to give up value to junior classes as long as no dissenting intervening class receives less than the amount of its claims in full. If there is no dissenting intervening class and the only dissent is from a class junior to the class to which value have [sic] been given up, then the plan may still be fair and equitable with respect to the dissenting class, as long as no class senior to the dissenting class has received more than 100 percent of the amount of its claims." 124 Cong.Rec. H11,104 (1978).

64. The Railway was to issue new bonds totalling $190,000,000. A portion of the new bonds were to be sold to raise money for the purchase of equipment, discharge of Receivers' Certificates, and other necessary expenditures. The balance were to be exchanged for bonds of the Road. *Northern Pacific Railway Co. v. Boyd, supra*, at 488, 33 S.Ct. at 556.

65. Under the reorganization agreement, $155,000,000 of stock was to be issued,—$75,000,000 of preferred stock and $80,000,000 of common

stock. A portion of the stock was to be used in paying reorganization expenses and certain debts of the Road's subsidiaries. The balance was to be issued in exchange for shares of the Road as follows: The holder of $100 preferred stock in the Road, upon paying $10 per share, would receive $50 preferred and $50 common stock in the Railway. The holder of $100 common stock in the Road, upon paying $15 per share, would receive $100 common stock in the Railway. The cash payments on stock aggregated approximately $11,000,000. *Northern Pacific Railway Co. v. Boyd, supra*, 228 U.S. at 488–89, 33 S.Ct. at 556–57.

66. In addition to the property sold at foreclosure, the Road owned large quantities of unencumbered land. Certain of the Road's unsecured creditors filed a bill praying for sale of these lands and application of the proceeds to their claims. A decree was entered and the property sold to the Railway. The greater part of these proceeds went to the Railway as holder of deficiency claims on the bonds and as purchaser of approximately $14,000,000 of other unsecured claims.

whether it was present or prospective, for dividends or only for purposes of control. In either event it was a right of property out of which the creditors were entitled to be paid before the stockholders could retain it for any purpose whatever.

*Id.* at 508, 33 S.Ct. at 561. While the foreclosure sale was valid as between the parties and the general public, it was "a mere form" with respect to the Road's creditors. The shareholders held the property under a new charter but subject to existing liabilities, in the same fashion as ". . . a defendant who buys his own property at a tax sale." *Id.* at 507, 33 S.Ct. at 561.

The rule of full and absolute priority was reaffirmed in *Case v. Los Angeles Lumber Products Co., Ltd.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). In *Los Angeles Lumber,* the debtor had bonds outstanding in the amount of $3,807,071.88, including principal and interest. Under the proposed reorganization plan, a new corporation would be formed which would acquire substantially all the debtor's assets.[67] The corporation was to issue 811,375 shares of preferred stock and 188,625 shares of common stock.[68] Of the preferred stock, 170,000 shares were to be sold to raise money for necessary betterments, and the remaining 641,375 shares were to be issued to the debtor's bondholders.[69] The shareholders [70] were to receive the 188,625 common shares without payment of any subscription or assessment. The par value of pre-

ferred and common shares to be issued to the debtor's security holders was $830,000, the going concern value of the enterprise.

The Court held that the plan was not fair and equitable because the full value of corporate property was not first applied to the bondholders' claims. Rather, 23% of the value of the enterprise was to be diverted to the shareholders, even though the bondholders would realize less than 25% of their claims if all the assets were awarded to them. *Id.* at 120, 60 S.Ct. at 9. The Court explained:

> It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor. This Court, as we have seen, indicated as much in *Northern Pacific Ry. Co. v. Boyd, supra,* and *Kansas City Terminal Ry. Co. v. Central Union Trust Co., supra* [271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926) ]. Especially in the latter case did this Court stress the necessity, at times, of seeking new money "essential to the success of the undertaking" from the old stockholders. Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made. But if these conditions are not satisfied the stockholder's participation would run afoul of the ruling of this Court in *Kansas City Terminal Ry. Co. v. Central Union Trust Co., supra,* that

---

**67.** Debtor wholly owned six subsidiaries. Its principal asset was the stock of its largest subsidiary, Los Angeles Shipbuilding and Drydock Corporation. The bondholders' lien covered, *inter alia,* the fixed assets of Los Angeles Shipbuilding and Drydock Corporation as well as the debtor's stock in all six subsidiaries. Under the plan, the newly organized company would acquire the assets of Los Angeles Shipbuilding and Drydock Corporation.

**68.** All shares would carry voting rights and a par value of $1.00. The preferred stock would be entitled to a 5% non-cumulative dividend, and then the common stock would have a similar dividend. Thereafter all shares would participate equally in dividends. The preferred stock would have a liquidation preference equal

to the amount of its par value, and then the common stock would enjoy a similar preference. Thereafter, all shares would participate equally.

**69.** Each $1,000 bond would be exchanged for 250 shares of preferred stock.

**70.** Pursuant to a prior "voluntary" reorganization, the debtor's old stock was wiped out by assessment and new stock issued. The stock was issued in two classes, Class A stock going to certain former shareholders who contributed $400,000 to the debtor and Class B stock going to bondholders in payment of unpaid interest coupons. All 188,625 shares of common stock in the newly organized company would go to the Class A shareholders.

"Whenever assessments are demanded, they must be adjusted with the purpose of according to the creditor his full right of priority against the corporate assets, so far as possible in the existing circumstances" .... If, however, those conditions we have mentioned are satisfied, the creditor cannot complain that he is not accorded "his full right of priority against the corporate assets." If that were not the test, then the creditor's rights could be easily diluted by inadequate contributions by stockholders. To the extent of the inadequacy of their contributions the stockholders would be in precisely the position which this Court said in *Northern Pacific Ry. Co. v. Boyd, supra,* the stockholders there were in, viz., "in the position of a mortgagor buying at his own sale" ....

In view of these considerations we believe that to accord "the creditor his full right of priority against the corporate assets" where the debtor is insolvent, the stockholder's participation must be based on a contribution in money or in money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder.

*Id.* at 121–22, 60 S.Ct. at 10 (footnotes and citations omitted).

The Court's holding can be illustrated thus: Suppose the debtor corporation has assets valued on a going concern basis at $9,000,000, and its only liabilities are unsecured claims aggregating $15,000,000. If stock is awarded to creditors in payment of their claims and the shareholders wish to retain a 10% interest after reorganization, they must make a contribution [71] of $1,000,000 to the enterprise.[72] In that event, the 90% interest of the creditors would be worth $9,000,000, the shareholders' 10% participation in the company would be equal in value to their contribution of $1,000,000, and the full value of corporate property, viz., $9,000,000, would have been applied in satisfaction of creditors' claims.

If, on the other hand, the shareholders were to contribute only $500,000, the company would then have a going concern value of $9,500,000, and the creditors' 90% interest would be worth only $8,550,000. Of the $9,000,000 going concern value to which the creditors were entitled, $450,000 would have been appropriated for the benefit of the shareholders, whose 10% participation in the company would be worth $950,000, or $450,000 more than their contribution.[73]

Debtor contends that Hall's proposed contribution of cash in the amount of $5,000,000 plus the value of its guarantees is reasonably equivalent in value to the equity in the reorganized company. According to Debtor, if the equity in reorganized Jartran is worth $9,000,000, then Hall must contribute to Debtor property having a value of $9,000,000. U-Haul disputes the amount that Hall must pay to the Debtor, arguing that the appropriate measure is the value of benefits which will accrue to Hall through ownership of the reorganized company.[74]

Both parties misconstrue the holding of *Los Angeles Lumber,* for even if the equity in reorganized Jartran were held to be $20,000,000, payment by Hall to Debtor of $20,000,000 in cash would not satisfy the conditions for shareholder participation enunciated in that case. Hall's participation

[71]. It must also be shown that the capital contribution is necessary to the success of the undertaking and that the shareholders are the "' ... only or most feasible source of the new capital.'" *Case v. Los Angeles Lumber Products Co., Ltd., supra,* at 121 n. 15, 60 S.Ct. at 19 n. 15 (quoting with approval from *In re Dutch Woodcraft Shops,* 14 F.Supp. 467, 471 (1935)).

[72]. In formulating the above example, the Court has, for the sake of clarity, simplified the holding of *Los Angeles Lumber.* The shareholders' contribution actually need be only "reasonably equivalent in view of all the circumstances" to the value of their participation.

[73]. Similar reasoning applies in the case of solvent, as well as insolvent, corporations. *See Consolidated Rock Products Co. v. DuBois,* 312 U.S. 510, 527, 61 S.Ct. 675, 685, 85 L.Ed. 982 (1941).

[74]. In this regard, U-Haul argues that the value of tax and other benefits must be included. *See* discussion, *infra.*

would then be worth $40,000,000, or twice the amount of its $20,000,000 contribution. The payment by Hall to its wholly owned subsidiary would redound directly to Hall's benefit and would in no way benefit the creditors of this estate.

 Under the holding of *Los Angeles Lumber,* Hall may only retain a 100% interest in reorganized Jartran if the full going concern value of the company has first been allocated to creditors' claims. If the present value of deferred cash payments proposed to be made to creditors under the Plan is less than the going concern value of the firm, then the shareholders' equity has some value, and any contribution by Hall will of necessity be less than the value of its participation. On the other hand, if the present value of proposed payments is equal[75] to the going concern value of the firm, then the shareholders' equity is valueless, and any necessary contribution by Hall would be at least equal to the value of its 100% participation.

 4. The value of a firm for corporate reorganization purposes depends primarily upon its earning capacity, for " 'the commercial value of property consists in the expectation of income from it.' " *Consolidated Rock Products Co. v. DuBois,* 312 U.S. 510, 526, 61 S.Ct. 675, 685, 85 L.Ed. 982 (1941) (quoting with approval *Galveston, H. & S.A. Ry. Co. v. Texas,* 210 U.S. 217, 226, 28 S.Ct. 638, 639, 52 L.Ed. 1031 (1908)). In arriving at a value for these purposes, an estimate must be made of the present value of future earnings. The discounted cash flow approach employed by Dr. Hamada achieves this objective.

In his Report, Dr. Hamada stated that his best estimate of the September 1, 1982 value of shareholders' equity in reorganized Jartran was $16,367,000. This figure was based upon his best estimate of Jar-

tran's real, pure equity cost of capital of 7.4% and a slow vehicle replacement policy in the steady state years. In addition, Dr. Hamada reported "fairly feasible deviations" from this best estimate, ranging from negative $44,069,000 to positive $61,-485,000. The lower value was based upon an 8.15% real cost of equity capital, a fast steady state replacement policy, and a negative 5% variance in the sum of rental revenues and variable costs. The higher figure was based upon a 7.4% cost of capital, a slow steady state replacement policy, and a positive 5% variance in the sum of rental revenues and variable costs.

In the Update, Dr. Hamada reported his best estimate of the January 1, 1983 value of shareholders' equity in reorganized Jartran as $9,159,000. Presumably, "fairly feasible deviations" from this updated estimate would range from negative $52,156,-000 (based upon an 8.15% cost of capital, fast replacement policy, and a negative 5% variance in the sum of rental revenues and variable costs) to positive $54,923,000 (based upon a 7.4% cost of capital, slow vehicle replacement policy, and a positive 5% variance in the sum of rental revenues and variable costs).

 In making the informed and independent determination of value called for in this proceeding, the Court must first decide upon the appropriate rate at which to discount Jartran's projected cash flows. If cash flow projections are made without regard to inflation, then the cost of capital used to discount those cash flows must be a real, inflation-free cost of capital. The reverse is also true; if projections incorporate inflationary increases, then a nominal cost of capital must be used. *See Doca v. Marina Mercante Nicaraguense, S.A.,* 634 F.2d 30, 40 (2d Cir.1980); Roger G. Ibbotson and Rex A. Sinquefield, *Stocks, Bonds, Bills and Inflation: The Past and the*

---

75. Of course, the present value of proposed payments to creditors may be greater than the going concern value of the company. In that event, any necessary contribution by shareholders would be greater than the value of their participation. Such an arrangement would be consistent with the absolute priority rule, which requires that the shareholders' participation not exceed in value the amount of their contribution. *See Consolidated Rock Products Co. v. DuBois,* 312 U.S. 510, 529 n. 27, 61 S.Ct. 675, 686 n. 27, 85 L.Ed. 982 (1941).

*Future* 85 (1982); *see also* Recent Development, *Inflation and the Concept of Reorganization Value,* 34 Vand.L.Rev. 1727 (1981). Dr. Hamada estimated Jartran's real, inflation-free cost of capital, and he required cash flow projections expressed in constant 1982 dollars. He explained that this approach was used in an effort to avoid speculation as to the level of future inflation.

■ In *Doca v. Marina Mercante Nicaraguense, S.A., supra,* the court approved the use of an "adjusted discount rate approach" in the context of computing damage awards for lost future wages. There, the court suggested that lost future wages may be calculated without regard to inflation and then discounted to present value at the real, risk-free rate of interest.[76] Noting that this method "... avoids all predictions about the level of future inflation ...", the court concluded that a discount rate of 2% would be appropriate to compute the damage award in issue. *Id.* at 39. The court observed:

> Although economists disagree over the validity of the assumption that the real rate of interest is constant and consequently independent of inflation, *cf.* Fama, *Interest Rates and Inflation: The Message in the Entrails,* 67 Amer. Econ.Rev. 487 (1977) (real rate constant) *with* Carlson, *Short-Term Interest Rates as Predictors of Inflation: A Comment,* 67 Amer.Econ.Rev. 469 (1977) (real rate varies), there is substantial opinion that

during periods of stable rates of inflation, the real yield of money, whether constant or slightly fluctuating, is approximately 2% ....

*Id.* at 39 n. 10. For purposes of the valuation to be made herein, the Court approves the use of an adjusted discount rate, or real cost of capital, as well as the 2% real, risk-free rate of interest selected.[77]

■ Dr. Hamada used the 2% risk-free rate (r(f)) to compute Jartran's cost of capital in the equation relating risk to return:[78] $r = r(f) + b(r(m) - r(f))$. For the required market risk premium $(r(m) - r(f))$ (that is, the risk premium demanded for investing in a stock of average risk), he estimated an annual rate of 8.3% based upon historical findings of Roger G. Ibbotson and Rex A. Sinquefield in *Stocks, Bonds, Bills and Inflation: The Past and the Future* (1982). No evidence was presented to contradict this estimate. In *In re The Valuation Proceedings under Sections 303(c) and 306 of the Regional Rail Reorganization Act of 1973,* 531 F.Supp. 1191, 1232 (Regional Rail Reorg. Ct.1981), the court noted that "[t]here is rough agreement among the experts on the rate of return on average-risk investments. [Experts who testified in the case] relied on a study performed by Ibbotson and Sinquefield which found that, for the period from 1926 to 1976, the real rate of return for the Standard and Poor's index of 500 stocks was 9.2 percent." *Id.* The real rate of

---

**76.** An alternate method would be inclusion of projected cost of living increases and the use of a nominal, risk-free rate of interest. The court in *Doca* stated "... [W]e are not prepared to require any one particular method by which inflation should be taken into account in estimating lost future wages." Nor did the court require that when an adjusted discount rate is used, it must be set at 2%. The court "... suggest[ed] that a 2% [adjusted] discount rate would normally be fair to both sides." *Doca v. Marina Mercante Nicaraguense, S.A., supra,* at 39–40.

**77.** In the Detail of Assumptions to the Disclosure Statement pro formas, Debtor indicated that "increases in the consumer price index (C.P.I.) are assumed to be 7.5% per year" and that revenue projections "reflect ... recovery of

consumer price index increases." Where revenues are expected to keep pace with inflation, no estimate of the inflation rate need be made. The inflation-free cost of capital is applied to revenue projections that are based only upon real growth. Where, however, revenues are not expected to keep pace with inflation and the real cost of capital is used, the projected revenues expressed in nominal dollars must first be adjusted to current dollars by an estimated inflation factor. In that situation, there necessarily is speculation about the level of future inflation.

**78.** Eugene F. Brigham, in *Financial Management: Theory and Practice* 116 (2nd ed. 1979), refers to this equation as the Security Market Line. *See* note 29, *supra.*

return of 9.2% would include both the required market risk premium and the real, risk-free rate of interest.[79] The Court finds that the 8.3% estimate of the required market risk premium is within a reasonable range and is appropriate, in the context of Dr. Hamada's methodology, for obtaining Jartran's real cost of equity capital.

The remaining variable required to compute cost of capital in the equation relating risk to return is the beta coefficient. As explained *supra*, Dr. Hamada relied on stock market data to determine the unlevered beta coefficients for eleven firms in Jartran's business classification. He chose as his best estimate of Jartran's beta the average of the unlevered beta coefficients for the eleven firms. He added, however, that of the eleven businesses studied, Ryder Systems, Inc. was the firm most comparable to Debtor.

 While it is appropriate to consider stock market data of the type relied upon by Dr. Hamada, some consideration

must also be given to Jartran's particular situation and the risks associated therewith. In this regard, it should be observed that the beta coefficient "... measures the amount of risk which a stock contributes to a portfolio made up of a large number of stocks." *In re The Valuation Proceedings under Sections 303(c) and 306 of the Regional Rail Reorganization Act of 1973, supra,* at 1233. It does not measure all the risk of a stock held in isolation. For purposes of the instant valuation, the difference is significant. Stocks held as part of a portfolio are not as risky as stocks held in isolation, because in a portfolio, negative trends in the returns of some stocks may be offset by positive trends in the returns of others. Thus, as more and more stocks are added to a portfolio, the portfolio's risk declines. The only risks which theoretically remain in a well-diversified portfolio are those risks which affect all firms simultaneously, such as inflation, and therefore cannot be eliminated by diversification.[80]

**79.** Ibbotson and Sinquefield's earlier work referred to by the court is *Stocks, Bonds, Bills and Inflation: The Past (1926–76) and the Future (1977–2000)* (1977). In Lorie and Hamilton, *The Stock Market: Theories and Evidence* 124 (1973), the authors, apparently referring to "real" rates of return, state that "[a] reasonable rule of thumb is to assume a 9 percent annual rate of return for average stocks (i.e., those whose changes in rates of return are about the same as for the market)." Eugene F. Brigham, in *Financial Management: Theory and Practice* 117 n. 17 (2d ed. 1979), states that "[t]he risk premium of an average stock ... cannot be measured with great precision because it is impossible to observe expected returns. However, empirical studies suggest that, where long-term U.S. Treasury bonds are used to measure RF [the risk-free rate] and where k is the return on NYSE stocks, the premium has averaged approximately 6 percent over the past fifty years. The premium of returns on stocks over short-term government securities has averaged over 7 percent." (Citing Ibbotson and Sinquefield's earlier work.)

**80.** Eugene F. Brigham, in *Financial Management: Theory and Practice* 105–08 (2d ed. 1979), explains this phenomenon as follows:

What conditions are necessary for diversification to cause the riskiness of a portfolio to be less than the riskiness of the individual assets contained in the portfolio? The only condition necessary is that the returns on the

stocks in the portfolio do not move exactly together.... [A]s more stocks are added, the portfolio's risk declines and approaches a limit .... In other words, adding more and more stocks (diversification) can eliminate some of the riskiness of a portfolio, but not all of it. Thus, risk consists of two parts: (1) *unsystematic, or diversifiable, risk,* which can be eliminated by adding enough securities to the portfolio, and (2) *systematic, or nondiversifiable, risk,* which is related to broad swings in the stock market and which cannot be eliminated by diversification.

Brigham goes on to explain that unsystematic risk is associated with such events as strikes, marketing programs, and lawsuits. Because these events are random, there is no positive correlation between bad events in one firm and bad events in another. Systematic risk, however, is caused by forces which affect all firms at once, such as inflation and high interest rates. Since there is a positive correlation between the results of these forces from firm to firm, such risks cannot be eliminated by diversification. As Brigham explains, it is systematic risk which remains in a well-diversified portfolio, "... or risk that is inherent in the market, and this risk can be measured by the degree to which a given stock tends to move up and down with the market. The tendency of a stock to move with the market is reflected in its beta coefficient, which is a measure of the stock's volatility relative to an average stock."

The model employed by Dr. Hamada was developed by financial experts on the assumption that investors are risk-averse and will hold stocks in portfolios. Accordingly, the beta coefficient measures the degree to which the stock fluctuates in response to forces which affect the market as a whole. It does not measure the added risks associated with events unique to a particular business, because those risks can be eliminated by diversification.

These additional risks associated with events unique to Jartran must be given some consideration.[81] They include, *inter alia*, Jartran's recent financial problems, its changing management, and its exposure with regard to a number of substantial lawsuits. In order to allow for deviation occasioned by these additional risks, the Court has modified the 7.4% best estimate arrived at by Dr. Hamada and concludes that Jartran's real cost of equity capital is more appropriately in the range of 8.15% (the rate ascribed to Ryder Systems, Inc.), which rate was included within Dr. Hamada's range of "fairly feasible deviations."

5. Dr. Hamada's best estimate of the January 1, 1983 value of shareholders' equity in reorganized Jartran, based upon an 8.15% cost of capital and slow vehicle replacement strategy, is negative $3,628,000, and the corresponding going concern value of the firm is estimated at $115,227,000. These figures ("the January 1, 1983 values") are based upon the original projections of Exhibit E–6. At the hearing on confirmation, Dr. Hamada was extensively cross-examined concerning both the methods he employed and his calculations of value. The Court finds that those methods and calculations were proper and that the January 1, 1983 values represent accurate calculations of what the going concern value and value of shareholders' equity would have been as of that date if the cash flow forecast of Exhibit E–6 were adopted by the Court as its estimate of Jartran's reasonably foreseeable earnings future.

However, the cash flow forecast of Exhibit E–6, because of substantial change of circumstances involving the Debtor, its business plan and property, and the Plan of Reorganization, is not an appropriate estimate of Jartran's reasonably foreseeable earnings. The Third Modification has reduced the capital requirements necessary under the Plan to service the secured Class 3 debt of Chrysler, Ford, and Fruehauf, which is now to be acquired in large part by Hall. Debtor has also formulated a new business plan, which includes management policy decisions affecting expense and capital requirements, such as the elimination of the truck replacement program and substitution therefor of a new vehicle acquisition program described above.

For the basis of the Court's judgments herein, the Court has formulated an estimate of Debtor's future earnings. In arriving at this estimate, the Court begins its analysis with the projections incorporated in Exhibits 102 and 103 prepared by Debtor in connection with the Third Modification and the formulation of Debtor's new management plan. The revenues for 1983, oth-

---

James H. Lorie and Mary T. Hamilton, in *The Stock Market: Theories and Evidence* 123 (1973), explain that a stock may have a very uncertain future when viewed in isolation but may have "... a pattern of price changes opposite to that of the market as a whole. The security goes down when the market goes up and vice versa. The security, though risky in isolation, would contribute to the stability and thereby reduce the riskiness of a diversified portfolio."

81. *See In re Muskegon Motor Specialties,* 366 F.2d 522, 527–28 (6th Cir.1966). *See also In re The Valuation Proceedings under Sections 303(c) and 306 of the Regional Rail Reorganization Act of 1973, supra,* where the court stated that in estimating the cost of equity (of the railroad being valued), "... three factors must be considered: the rate of return demanded by investors for average-risk stocks, the riskiness of railroad stocks relative to average-risk stocks, and the riskiness of an equity investment in the T's lines relative to railroad stocks. We will refer to the two additional risk factors as railroad risk and special risk." The court adopted the conclusion of one expert witness that railroad stocks are average-risk investments. The expert had estimated, *inter alia,* the beta coefficients for a representative sample of railroads. The court then went on to consider the "special risks" associated with the railroad in question.

er than ETS contribution, were projected by Debtor in Exhibit 103, dated December 1, 1983, as $85,764,000. For 1984, Debtor projected revenues of $96,000,000 based upon revenue assumptions contained in the Detail of Assumptions to Exhibit 102 and discussed in depth *supra*. The Court has determined that the percentage increases attributable to general improvement in the economy, improvement in industry pricing, recapture of market share lost during the early summer of 1983, and Debtor's revised accounting procedures, are reasonable adjustments, of proper magnitude. With respect to adjustments for productivity for 1984, each of the factors detailed in Debtor's Explanation of Variance, other than the increase described therein as "emergence from chapter 11", are entitled to consideration for their revenue effect. The Court, however, has determined that the aggregate 5.5% increase is unrealistic and requires substantial reduction. Accordingly, the projected revenue increase for 1984 attributable to productivity has been reduced to 3%. The Court's adjusted percentage increase in revenue for 1984 is 13%, resulting in revenues of approximately $97,000,000.

■ For the years 1985, 1986, and 1987, the accounting procedure adjustment and the one-time adjustment for recapture of market share lost during 1983 are inapplicable and have no revenue effect. The Court has determined that the projected increases for each of the years 1985, 1986, and 1987 attributable to general improve-

ment in the economy and to improvement in industry pricing are reasonable adjustments, all of proper magnitude. For each of these years, it is the Court's opinion that the productivity adjustment has been overstated, and the Court has reduced the adjustments to a level of 1.5% for each year. The Court's adjusted percentage increases in revenue for 1985, 1986, and 1987 are therefore 9.5%, 8.5% and 10.5%, respectively. The Court further finds Debtor's adjustments to revenues for these years, based upon revenue effectiveness of new trucks, as compared to existing fleet, of 100% in 1985, 90% in 1986, and 80% in 1987 to be reasonable and within the realm of realization.[82] The net result is revenue of $115,000,000, $130,000,000, and $160,000,000 for the years 1985, 1986, and 1987.

6. The sensitivity analysis performed by Dr. Hamada provides an appropriate vehicle for adjusting the January 1, 1983 values to reflect the cash flow forecast adopted by the Court (the "adjusted forecast"). The first item as to which Dr. Hamada performed a sensitivity analysis was "rental revenues minus variable costs", which for convenience the Court shall refer to as "net rental revenues". In applying the sensitivity analysis, the Court has estimated the percentage by which net rental revenues in the adjusted forecast fall short of rental revenues in Exhibit E–6.[83] The Court's calculations are shown in Appendix F hereto. The percentage deviation in net rental revenues was calculated by estimating first the present value,[84] as of January 1, 1983,

82. For purposes of calculating the revenue from new trucks, the Court has assumed, based upon evidence adduced, that there will be attrition of approximately fifty vehicles per year and that approximately 75% of those receipts denominated "Truck Rental" in Exhibit 103 are attributable to the rental of Debtor's trucks, as opposed to revenue derived from trailers and other sources. (For example, revenue has been calculated for 1985 as follows: 1984 revenue of $97,000,000 was multiplied by 1.095 to obtain $106,215,000, representing 1985 revenue attributable to the existing fleet of trucks and trailers and all other sources. Of this amount, 75%, or $79,661,000, represents revenue attributable only to the existing fleet of 10,750 trucks. The resulting revenue of $7,410 per truck was then multiplied

by 1,200, the number of trucks to be purchased in 1985. The product, $8,892,000, was added to revenue derived from existing fleet, $106,215,000, to obtain total revenue for 1985 of $115,107,000, which has been rounded to the nearest million.)

83. Any reference to the projections of Exhibit E–6 includes, where applicable, the projections relied upon by Dr. Hamada for the steady state years, viz., the years not covered by Exhibit E–6.

84. In calculating the present value ("PV") of a sum "e" to be received at the end of "t" periods, discounted at the rate "r" per period, the Court has used the formula

of the net rental revenues projected in Exhibit E–6 and then the present value of the net rental revenues in the adjusted forecast.

The present value of net rental revenues projected in Exhibit E–6 was computed as follows: 1) the inflationary component (7.5% per year) was removed from the relevant revenue and expense figures; 2) an annual [85] net rental revenue figure was calculated for each year covered by Exhibit E–6; 3) an estimate was made of the annual net rental revenue in the steady state years; [86] and 4) the net rental revenue figures were discounted to January 1, 1983 at the annual rate of 8.15%. The resulting figure is $843,313,000.

The present value of net rental revenues projected in the Court's adjusted forecast was estimated in a similar fashion, as shown in Appendix G. Exhibit 103, upon which the adjusted forecast is based, con-

$$PV = \frac{e}{(1 + r)^t}$$

In calculating the present value of an annuity of the sum "e" to be received at the end of each period for "t" periods, at the rate "r" per period, the Court has used the formula

$$PV = e\left(\frac{1 - \frac{1}{(1 + r)^t}}{r}\right)$$

See V. Brudney and M. Chirelstein, *Corporate Finance* 38, 40 (2d ed. 1979). The present value of a perpetuity of the sum "e" per period, discounted at the rate "r", has been calculated as

$$\frac{e}{r}$$

**85.** Dr. Hamada discounted all cash flows from the month of receipt or disbursement. For purposes of applying the sensitivity analyses and other adjustments to going concern value, the Court assumes that all cash inflows and outflows occur annually on December 31st.

**86.** A steady state in cash flows (other than vehicle investment) was assumed for the years post-1987. The exact figures relied upon by Dr. Hamada for the steady state years are not in evidence. The Court has used the cash flow forecast for 1987 as the basis for calculations with regard to post-1987 cash flows. Any difference between the cash flow forecast for 1987 and that for the steady state years would be minimal.

**87.** Variable costs in Exhibit E–6 ranged from 45.5% to 45.6% of rental revenues, and the aver-

tains no detail as to variable costs, but combines all operational expenses into one figure. Accordingly, the Court has estimated the variable costs for each year of the adjusted forecast. Based upon information contained in Exhibit 102 and in Exhibits E–3 and E–6 to the Disclosure Statement, variable costs in the adjusted forecast are assumed to be 50% of rental revenues.[87]

The present value of net rental revenues in the adjusted forecast is estimated at $644,709,000, or 23.6% less than in the original cash flow forecast relied upon by Dr. Hamada. Table 7 of the sensitivity analysis indicates that a 5% change in net rental revenues causes a $41,426,000 change in the going concern value of the firm. Accordingly, a 23.6% decrease in net rental revenues should result in a $195,531,000 decrease in the going concern value of the firm.[88]

age for the years 1983–87 was 45.6%. In determining whether variable costs should be estimated at a higher percentage of revenues in the adjusted forecast, the Court compared those variable costs which were separately stated in Exhibit 102 with the corresponding items in Exhibit E–3 to the Disclosure Statement. Dealer commissions in Exhibit 102 are included at 19.6% of revenues, while in Exhibit E–3, they are included at 19.1%, or .5% less. In Exhibit 102, maintenance and repair expenses are included at an average of 22.3% of revenues, while in Exhibit E–3, they are included at an average of 15.6%. However, the category "maintenance and repairs" in Exhibit 102 may also include "physical damage" items, which are separately stated in Exhibit E–3. In the latter exhibit, maintenance plus physical damage expenses comprise on the average 19.4% of revenues, or 2.9% less than maintenance and repair expenses in Exhibit 102. The category "other direct expenses" in Exhibit 102 appears to be the counterpart of "other operating expenses" in Exhibit E–3. The former comprise on the average 5.3% of revenues, while the latter are on the average 4.5%, or .8% less. Accordingly, the Court has estimated that variable costs, as a percentage of revenues in the adjusted forecast, are approximately 4.2% higher than the 45.6% level projected in Exhibit E–6. The Court has rounded this estimate to 50%.

**88.** An examination of Table 7 (as well as Tables 1 through 6 and Table 8) reveals that with each 5% change in an input variable, going concern value changes by a given amount, e.g., $41,426,-

374

The next item as to which Dr. Hamada performed a sensitivity analysis was fixed costs. In applying this sensitivity analysis, the Court has made estimates similar to those made for rental revenues minus variable costs. These calculations are reproduced in Appendix H hereto.[89] As indicated therein, the present value, as of January 1, 1983, of fixed costs as originally projected in Exhibit E–6 is estimated at $273,911,000 and of fixed costs in the adjusted forecast at $286,580,000, for an increase of 4.6%. According to Table 7 of the Update, a 5% variance in fixed costs results in a $13,616,000 change in going concern value. A 4.6% increase in fixed costs would therefore result in a $12,527,-000 decrease in going concern value.

Dr. Hamada performed sensitivity analyses as to replacement costs, disposal revenue, and as to the sum of replacement costs and disposal revenue ("net replacement costs"). The Court has employed the combined sensitivity analysis for net replacement costs, and the calculations with respect thereto are shown in Appendix I. As indicated therein, the present value, as of January 1, 1983, of net replacement costs as originally forecast is estimated at $263,579,000.[90] In computing this value, the Court has assumed that disposal revenue per truck during the steady state years would be $2,700 [91] (in 1982 dollars).

000 for every 5% change in net rental revenues, $13,616,000 for every 5% change in fixed costs, and $3,045,000 for every 5% change in disposal revenue. These figures suggest a linear relationship between percentage change in an input variable and change in the amount of going concern value.

Such a linear relationship logically exists, because the going concern value of the firm represents the discounted present value of all forecasted cash flows. The present value of all forecasted cash flows is in turn equal to the sum of the present values of the various component cash flow streams, such as rental revenues and fixed costs. Accordingly, as the present value of any one of these component streams increases or decreases, the total present value of all discounted cash flows increases or decreases by a like amount.

The foregoing suggests that if, for example, a 5% variance in net rental revenues causes a $41,426,000 change in going concern value (see Appendix C, Table 7), then $41,426,000 is equal to 5% of the present value of net rental revenues in the original forecast. At a discount rate of 8.15%, the present value (as of January 1, 1983) of net rental revenues in the original forecast would then be twenty times $41,426,000, or $828,520,000. This figure differs by only 1.8% from the Court's estimate of $843,313,000.

89. Again, because all operational expenses are combined in Exhibit 103, the Court has estimated the magnitude of fixed costs based on information contained in Exhibit 102 and Exhibits E–3 and E–6 to the Disclosure Statement. Comparison of the two operating statements reveals that the category "Administrative expenses" in Exhibit 102 is the counterpart of the two categories "Field Administrative" and "Corporate Administrative" in Exhibit E–3. The Detail of Assumptions also states that the administrative expense category of Exhibit 102 includes both field and corporate overheads. It also appears that field and corporate administrative expenses in Exhibit E–3 are identical to the field and corporate administrative expenses of Exhibit E–6 (except for one typographical error). Accordingly, the Court has assumed that administrative expenses for purposes of Exhibit 103 (and the adjusted forecast) would be approximately the amounts listed in that category on Exhibit 102.

The other component of "fixed costs" for purposes of the sensitivity analysis is "license and tax." A comparison of Exhibit 102 with Exhibit E–3 suggests that the category "Fixed expenses" on the former is approximately equivalent to the sum of "insurance" plus "license and tax" on the latter. The Court has estimated that license and tax would comprise approximately 28.6% of these fixed expenses. The 28.6% figure was derived from Exhibit E–3, in which license and tax is on the average 28.6% (for the years 1983–87) of the sum of insurance plus license and tax.

90. In performing these calculations, the Court has included the cash price of each vehicle ($14,000 in 1982 dollars) in the year of purchase. If the deferred payments for purchase of these vehicles were expressed in constant 1982 dollars and discounted at 8.15%, then the value of such deferred payments, as of the year of purchase, would be approximately equal to the cash price. The cash price would be less than such discounted value if the real, inflation-free interest rate charged for financing the acquisition were greater than 8.15%. For purposes of the estimates made herein, the difference would not be significant.

91. With a slow steady state vehicle replacement strategy, one-fifth of the fleet (2,200 vehicles) would be replaced each year, and the vehicles disposed of would be about five years old. An examination of Exhibit E–6 suggests that vehicles used for five years will yield disposal revenue of approximately $2,700 per truck. In that

In computing the present value of net replacement costs [92] in the adjusted forecast, the Court has not used the "New Vehicle" expenditures listed in Exhibit 103 (which would require conjecture as to amortized payments post-1987) but has included the cash price of each vehicle in the year of purchase. *See* note 90, *supra.* A steady state in vehicle replacement is assumed beginning 1989, with a constant fleet size of 15,000 trucks and minimum annual replacement of 8%.[93] Disposal revenue has been projected at $600 per truck (in 1982 dollars).[94]

The present value, as of January 1, 1983, of net replacement costs in the adjusted forecast is estimated at $167,044,000, or 36.6% less than in the original cash flow forecast. Table 7 of the Update indicates that a 5% variance in net replacement costs causes a $14,207,000 change in the going concern value of the firm. Accordingly, a 36.6% decrease in net replacement costs should result in a $103,995,000 increase in going concern value.

Although Dr. Hamada performed no sensitivity analysis with respect to refurbishment costs, an adjustment must be made to reflect the fact that Debtor's revised business plan contains no formal refurbishment program. Accordingly, the Court has estimated the present value, as of January 1, 1983, of refurbishment costs in the original cash flow forecast.[95] This estimate of $15,061,000, calculated as shown in Appendix J, would represent an increase in the going concern value of the firm.

Adjustments must also be made with respect to the decreased advertising costs and increased insurance expenses in the adjusted forecast. According to the Court's calculations, the present value, as of January 1, 1983, of advertising expenses in the original cash flow forecast is $87,209,000 and in the adjusted forecast is $51,553,000. These calculations are shown in Appendix K.[96] The decrease of $35,656,000 represents an increase in the going concern value of the firm. As of January 1, 1983,

Exhibit, Debtor projected disposal revenue for 1984 of $2,665,000 (in 1982 dollars) on account of 1,000 trucks. The vehicles projected to be disposed of that year would be approximately five years old.

The Court has also assumed that in the steady state years, Debtor would outservice vehicles in October and inservice during February through April of the following year, as planned for the 1983–87 replacement program. Accordingly, the figures for 1988 reflect the purchase price of 3,000 vehicles and disposal revenue for 2,200 vehicles. The steady state figure of $24,860,000 represents the difference between the purchase price and disposal revenue for 2,200 vehicles.

**92.** The Court has included in the net replacement costs all vehicle acquisition costs for the years 1983–87.

**93.** The revised projections of Exhibits 102 and 103 cover the period through 1987 and do not reflect or include any provision for replacement of vehicles. As the Debtor is valued herein as a perpetuity, some provision for replacement of vehicles must be assumed. The Court has used the 8% figure as a minimum replacement rate for new vehicles, representing a 12½-year use life.

The Court has assumed outservicing of units in October and inservicing during February through April of the following year. The negative net replacement cost figure for 1988 reflects

the disposal revenue from 1,200 trucks, and the figure for the steady state years represents the difference between the purchase price and disposal revenue for 1,200 trucks.

**94.** Debtor's original business plan called for disposal of 3,000 vehicles in 1987. At that time, the vehicles would be about eight years old, and according to Exhibit E–6, they would yield disposal revenue of only $933 per truck (in 1982 dollars). Accordingly, under the Court's assumption of 8% fleet replacement per year (where vehicles will be 12½ years old at retirement), $600 would be a maximum figure for disposal revenue per truck.

**95.** In Exhibit E–6, refurbishment costs for 1985 are erroneously listed as $12,020,000 (in 1985 dollars). The correct figure would be $12,920,000, based upon refurbishment of 2,600 vehicles in 1985 at a cost of $4,000 per unit (in 1982 dollars). The Court has used the corrected figure in light of Dr. Hamada's testimony that he brought to Debtor's attention (and corrected) certain arithmetical errors in the pro forma financial statements.

**96.** An examination of Exhibits E–3 and E–6 reveals that advertising expenses on the receipts/disbursements statement are the same as advertising expenses on the operating statement. Accordingly, in estimating the present value of advertising expenses in the adjusted forecast,

the present value of insurance expenses in the original cash flow forecast is $61,063,000 and in the adjusted forecast is $75,132,000.[97] These calculations are shown in Appendix L. The increase of $14,069,000 represents a decrease in the going concern value of the firm.

■■■■■■ The foregoing positive and negative adjustments result in a net decrease in going concern value of $67,415,000. Accordingly, the Court's estimate of the January 1, 1983 going concern value of Debtor's operating assets is $47,812,000. This figure must be further adjusted to reflect the going concern value as of the Effective Date of Debtor's Plan. At this time, that date cannot be predicted with any certainty, and the Court finds that an estimate of value as of July 31, 1984 will serve as a reasonably close approximation of value as of the Effective Date of Debtor's Plan.

To update the going concern value to July 31, 1984, an estimate must be made of the present value (as of January 1, 1983) of cash flows for the first nineteen months of the adjusted forecast.[98] Examination of Exhibit 103 indicates that the net cash flows from operations for 1983 were projected at approximately $4,345,000.[99] For 1984, the figure would be approximately $11,268,000.[100] Of this latter amount, $6,573,000 is estimated as the amount attributable to the first seven months of 1984. The Court's estimate of the present value of these net cash flows as of January 1, 1983 is $9,830,000.[101] Removing this amount from the going concern value of $47,812,000 results in a value of $37,982,000 (as of January 1, 1983) for all post-July, 1984 cash flows. The Court has "redated" this value to July 31, 1984 by applying an annual rate of 14.64%, compounded monthly (or an effective annual rate of 15.65%).[102]

the Court has used the figures listed in Exhibit 102.

97. In performing these calculations, the Court has estimated that approximately 71.4% of the fixed expenses in Exhibit 102 represent insurance costs. *See* note 89, *supra.* A comparison of Exhibits E–3 and E–6 suggests that insurance costs as reported on the receipts/disbursements statement are on the average 8% less than insurance costs on the operating statement. Accordingly, the Court has calculated insurance costs in the adjusted forecast as approximately 92% of the estimated insurance costs of Exhibit 102.

98. The Court's method of "updating" the going concern value to July 31, 1984 is similar to the method employed by Dr. Hamada in his Update, as illustrated in Table 9, *supra.* However, the Court has eliminated the final step, viz., the adjustment for favorable (or unfavorable) cash flow variance, as being logically inconsistent with the valuation model employed. The going concern value obtained through the discounted cash flow approach represents the present value of the firm's prospective cash flows. Cash flows for any period prior to the operative valuation date are not included in that value. Accordingly, an adjustment which represents the difference between actual and projected cash flows for such prior period is not necessary.

99. In estimating the net cash flows for these purposes, the Court has used the revenue figures denominated "Truck Rental" and "ETS Contribution" on Exhibit 103 and deducted therefrom the disbursements labeled "Operations." This method, while not precise, should yield a rea-

sonably close approximation of net cash flows for this period.

100. The Court has used a similar method in estimating net cash flows for 1984. However, the "Truck Rental" figure of Exhibit 103 has been reduced to $97,000,000 to reflect the amount in the adjusted forecast. The disbursements labeled "Operations" have also been decreased by $1,161,000, which represents the corresponding reduction in variable costs (one-half the difference between $99,321,000 and $97,000,000).

101. The Court has computed present value as though net cash flows for 1983 and for the first seven months of 1984 were received on December 31, 1983 and July 31, 1984, respectively.

102. See discussion *supra,* note 42. In "redating" the cash flows to July 31, 1984, the Court has used an estimate of Jartran's nominal, as opposed to real, cost of capital. The current market value of Jartran's debt, as estimated *infra,* is expressed in current dollars, and the going concern value of the firm must also be so expressed. For these purposes, Jartran's nominal cost of capital is estimated at 15.65% (8.15% plus estimated inflationary component of 7.5%) and the 14.64% rate referred to above is the rate which, if compounded monthly, would yield an effective annual rate of approximately 15.65%. (Technically, the nominal cost of capital given the assumptions made would be 16.26%, or .0815 + .075 + (.0815)(.075). The Court has dropped the cross-product term as unwarranted in light of the estimates used.)

As a result of these adjustments, the going concern value of Debtor's operating assets as of July 31, 1984 is estimated at $47,823,000, or approximately $48,000,000. To this value must be added the value of Jartran's non-operating assets. Jartran has no significant cash reserves which are not required for working capital purposes. The only assets whose value is not reflected in the projected cash flows are the potential preference recoveries, and certain real property in Dearborn, Michigan. The Court finds that the values reported in the liquidation analysis, Jartran Exhibit No. 160, are adequate estimates of the values of these assets for purposes of the instant valuation. Accordingly, the combined value of these assets is estimated at approximately $4,500,000 and the going concern value of reorganized Jartran as $52,500,-000.

Dr. Hamada's estimate of the market value of Jartran's reorganized debt, in the amount of $118,855,000 [103], was made as of January 1, 1983 and was based upon a

January 31, 1983 effective date. The Court has updated this value to July 31, 1984, not only to reflect the passage of time and payment of certain liabilities, but also to reflect the restructuring of Class 3 obligations pursuant to the Third Modification. In calculating this updated value, the Court has adopted Dr. Hamada's estimate as an accurate calculation of the market value of Jartran's reorganized debt as of January 1, 1983. In particular, the Court finds that the average yield for Moody's Baa bonds as of January 1, 1983, viz., 14.14%, is a reasonable rate, in light of the risks involved, at which to discount the projected payments to creditors.[104]

The calculations made in updating the market value of debt to July 31, 1984 are shown in Appendix M. The Court first deducted the present value (as of January 1, 1983) of the payments formerly projected to be made to Class 3 under the original Plan.[105] The projected payments to Classes 2, 4, and 5 were also removed.[106] Next, the

103. Dr. Hamada obtained different values for Jartran's reorganized debt based upon differing assumptions as to its cost of capital. The slight difference results from the fact that the cost of capital was used to discount prepayments to Class 3 and excess cash flow payments to Class 6.

104. "Bonds which are rated Baa are considered as medium grade obligations, i.e., they are neither highly protected nor poorly secured. Interest payments and principal security appear adequate for the present but certain protective elements may be lacking or may be characteristically unreliable over any great length of time. Such bonds lack outstanding investment characteristics and in fact have speculative characteristics as well." *Moody's Bond Record,* September, 1984. The Aaa rate is reserved for bonds of the highest quality. Whether or not the Class 6 installments guaranteed by Hall should be discounted at the Aaa rate is open to question. In any event, the Court observes that if a higher rate were used, the difference in market value obtained would be negligible. As for the prepayments to Class 3 and the excess cash flow payments to Class 6, the Court approves the use of Jartran's cost of capital. The riskiness of these payments is similar to the risk associated with Debtor's cash flows.

105. To calculate the present value of Class 3 payments, the Court first reduced the December, 1990 balloon payment by the prepayments

projected in Exhibit E–6 for the years 1983–87. No consideration has been given to prepayments which may have been included by Dr. Hamada for the years 1988–90. Pursuant to provisions of the original Plan and accompanying agreements, all prepayments have been credited to Debtor's obligations in the inverse order of their maturity. In accordance with § 5.3 of the original Plan, the excess cash flow prepayments have been credited on a future value basis, computed at 10% interest, compounded annually.

To compute the present value (as of January 1, 1983) of the Class 3 prepayments, they were converted to 1982 dollars and then discounted at the cost of capital. For purposes of these computations, payment was deemed to be made annually on December 31st. The regularly scheduled installments were discounted from the month of payment at the January 1, 1983 Baa rate, viz., 14.14%. (The 1.11% figure used in these computations represents one-twelfth of the stated annual rate which, if compounded monthly, yields an effective annual rate of approximately 14.14%.)

106. Dr. Hamada presumably used the $3,903,-000 figure in Exhibit E–6 as the total of projected payments to these classes. As Classes 2, 4, and one-half the amount of Class 5 would be paid on the Effective Date of the Plan, he discounted these payments from January 31, 1983 to January 1, 1983 at the Baa rate. The balance

Court deducted the present value of payments scheduled to be made to Class 6 and to ETS creditors prior to July 31, 1984.[107] What remained was the present value (as of January 1, 1983) of post-July, 1984 payments to ETS creditors and to Class 6. The Court "redated" these flows to July 31, 1984 [108] and then added the value of payments projected to be made to Classes 2, 4, and 5.[109] To this amount, the Court added the two missed installments to Class 6, which according to Exhibit 103 would be paid on the Effective Date of the Plan.[110] Finally, the present value of the new Class 3 payments, viz., the payments projected to be made to Hall and Fruehauf pursuant to the Third Modification, was added to obtain the updated market value of the reorganized debt.[111] According to the Court's

of Class 5 would be due on July 31, 1983, and he discounted this latter installment for a period of seven months. The Court, in deducting the payments to Classes 2, 4, and 5, has used the $3,903,000 figure of Exhibit E–6 but has not discounted the payments for the one month and seven month periods indicated. The amounts are small, and the difference based upon discounting for such minimal periods would be insignificant.

**107.** There were two $1,000,000 payments scheduled to be made to Class 6 on June 30, 1983 and June 30, 1984. These were discounted to January 1, 1983 at the Aaa rate. (The .94% figure used in these computations represents one-twelfth of the stated annual rate which, if compounded monthly, yields an effective annual rate of approximately 11.83%.)

In estimating the value, as of January 1, 1983, of payments scheduled to be made to ETS creditors prior to July 31, 1984, the Court relied upon the projections of Exhibit E–6 and assumed that payments have been made as scheduled. The 1983 payments were treated as one annual installment paid on December 31st. Of the payments projected for 1984, $314,000 was estimated as the amount attributable to the first seven months and was deemed paid on July 31, 1984.

**108.** In redating the payment streams to July 31, 1984, the Court has, in effect, applied the Baa rate to the June 30, 1985 payment to Class 6, guaranteed by Hall. This payment should actually be compounded at the January 1, 1983 Aaa rate used by Dr. Hamada, but again, the difference in value would be insignificant.

**109.** For Classes 2, 4, and 5, the Court added the amounts projected in Exhibit 103. No consideration was given to the minimal reduction in value caused by a six-month deferral of one-half the Class 5 claims.

**110.** Excess cash flow payments to Class 6 were projected in Exhibit E–6 for the years 1986–87 and were presumably included in the value arrived at by Dr. Hamada. The excess cash flow payments projected in Exhibit 103 are greater than those in the original forecast. Mr. Rumsey testified that for conservative purposes, the maximum possible liability was projected. The Court has made no adjustment to reflect the additional excess cash flow payments projected in Exhibit 103.

**111.** Payments under the Hall Note do not begin until January of 1985, and each installment is to equal one-sixtieth of the Note principal plus interest thereon remaining from time to time unpaid. The principal amount of the Hall Note is to equal the amount of the Hall Payment plus interest thereon from the Effective Date of the Plan (which is also the date of the Note) to December 31, 1984. The Hall Note is to bear interest at the rate which Hall becomes obligated to pay for permanent financing of the Hall Payment. Regardless of the interest rate ultimately selected, the present value (as of July 31, 1984) of payments to be made to Hall is equal to the amount of the Hall Payment. Pursuant to the provisions of the Third Modification, the Hall Payment is to equal $52,000,000 minus the amount of all payments made as required by the modified Adequate Protection Order entered on January 12, 1984. The required monthly payments aggregate $625,000 per month for the months of January through April, 1984 and $1,250,000 for subsequent months. In determining the amount of the Hall Payment, the Court has assumed that all adequate protection payments have been made as required.

In estimating the present value of payments to Fruehauf, the Court has treated the equal monthly installments of $200,000 as payable on the last day of each month. The projections of Exhibit 101 have been used as the basis for valuing the quarterly payments representing 2% of rental revenues derived from Fruehauf equipment. The quarterly payments for the period after June 30, 1984 have been treated as payable thirty days after the end of the calendar quarter. The payment which would be due on August 31, 1984 for the first two quarters of 1984 has not been discounted to July 31, 1984 because of the minimal amount involved. In addition, no consideration has been given to possible prepayments which Fruehauf may receive under the Excess Cash Flow formula or to prepayments which may become due either Hall or Fruehauf as a result of vehicle retirement.

In discounting the payments to Fruehauf, the Court has used the July, 1984 average yield on Moody's Baa bonds, viz., 15.15%. (The 1.18% figure used in these computations represents one-twelfth of the stated annual rate which, if

calculations, the value of the debt as of July 31, 1984 is approximately $71,000,000.

The Court's estimate of the updated value of shareholders' equity is negative $18,500,000, being the difference between the $52,500,000 going concern value and the $71,000,000 value of debt. Accordingly, one aspect of the *Los Angeles Lumber* test is satisfied. Inasmuch as the shareholders' equity is valueless, any contribution by Hall will necessarily be equal to or greater than the value of its 100% ownership interest.

The Court further finds that Hall is the most feasible source of the new capital and that its contribution is necessary to assure the viability of reorganized Jartran. As explained in greater detail *infra* in connection with U-Haul's contentions concerning § 1129(a)(3), the company was marketed for a substantial period prior to the filing of the petition herein. Other than the proposed Hall acquisition, no firm commitment for financing was obtained. Nor has Debtor received any such commitments since the filing of the petition on December 31, 1981.[112] After a review of the entire record, the Court is satisfied that the Hall contribution is necessary to Jartran's successful reorganization within the purview of the *Los Angeles Lumber* decision.

7. In arriving at these conclusions, the Court has been mindful of Debtor's substantial net operating loss carryforwards and investment tax credits and their potential value not only to Debtor but also to Hall or any other potential investor. U-Haul contends that in evaluating the adequacy of the Hall contribution, the present value of tax savings to be achieved by Hall as a result of its acquisition of Debtor must be calculated and added to the going concern value otherwise determined. At the

confirmation hearings, U-Haul called as an expert witness Dr. Sidney Davidson, Arthur Young Professor of Accounting and Director of Business Research at the University of Chicago's Graduate School of Business. Dr. Davidson calculated, *inter alia*, the January 1, 1983 value of projected Hall tax savings which may result from using Jartran's post-petition net operating losses and investment tax credits. In performing the present value calculations, to demonstrate range of valuation, Dr. Davidson used three alternative discount factors, viz., 7%, 10%, and 15%. His calculations are summarized in U-Haul Exhibit No. 52.

According to Dr. Davidson's testimony and the exhibits prepared in connection therewith, the value as of January 1, 1983 of Hall's projected tax savings resulting from Jartran losses during the years 1982 and 1983 is $7,908,000 at the 15% discount rate, $8,058,000 at the 10% rate, and $8,155,000 at the 7% rate. The value as of January 1, 1983 of projected tax savings resulting from Jartran's post-petition investment tax credits is estimated at $13,010,000, $17,703,000, and $21,643,000 at the 15%, 10%, and 7% discount rates, respectively. In his analysis, Dr. Davidson then added these values to Dr. Hamada's best estimate of the January 1, 1983 value of shareholders' equity to obtain the total value of benefits secured by Hall in connection with its ownership of Jartran. This total value is estimated at $30,077,000 at the 15% discount rate, $34,920,000 at 10% rate, and $38,957,000 at the 7% rate.

According to U-Haul, it is this total package of benefits against which the adequacy of the Hall contribution must be measured. U-Haul contends that unless Hall pays, depending upon the discount factor selected, an amount ranging from approximately $30,000,000 to $39,000,000 for its shares in Debtor, then its contribution is inadequate

---

compounded monthly, yields an effective annual rate of approximately 15.15%. The 3.59% figure represents one-fourth of such stated annual rate.) Finally, the Court has not adjusted the present value of payments to Class 6 and to ETS creditors based on this higher rate, because the difference in value would not be significant.

**112.** The Court is aware that U-Haul has prepared its own plan of reorganization for Jartran. While such an alternative plan may have been prepared, it does not necessarily represent a superior or even feasible source of equity funding. *See* note 116, *infra*.

within the purview of the *Los Angeles Lumber* decision. U-Haul further contends that the magnitude of potential tax benefits is relevant to determining the necessity *vel non* of seeking additional capital from the former shareholders. Given these alleged substantial benefits, Debtor should be an attractive investment to other potential purchasers.

Initially, it may be observed that the values calculated by Dr. Davidson have now substantially changed. The investment tax credits projected by Dr. Davidson were based upon a vehicle replacement program which has been eliminated and superseded by the vehicle acquisition program. The acquisition program contemplates the purchase of less than one-half the number of vehicles required by the replacement program for substantially the same time period. Additionally, the steady state vehicle replacement strategy, assumed in the Court's adjusted forecast, calls for the purchase of 1,200 vehicles per year rather than the 2,200 vehicles required under the steady state assumptions of the original business plan. Another variable in Dr. Davidson's methodology is the value of shareholders' equity in Jartran, assumed by him to be $9,159,000, but which the Court has determined to be negative $18,500,000. The remaining variable is the value to Hall of tax savings resulting from Debtor's net operating losses for the years 1982 and 1983. This component of value has increased, because the tax savings have now been realized and need not be discounted to present value. Giving effect to all these changes in the total value of benefits to be secured by Hall, that benefit package remains essentially valueless, and the Hall contribution accordingly remains adequate.

These revisions do not, however, reflect value attributable to additional tax savings from net operating losses generated to this date or to projected losses which may exist as a result of Debtor's revised business plan and the adjusted forecast arrived at by the Court. While such additional value may exist, it should also be observed that the realization of the tax savings is subject to a number of contingencies, including continuation in effect of relevant tax provisions, potential challenge under § 269 of the Internal Revenue Code, and possible recapture of benefits utilized. Accordingly, even if the tax benefits accruing to Hall were quantified, a substantial discount would be required because of the foregoing contingencies.

■ The Court, however, concludes that this type of tax benefit analysis, in the context of benefits accruing to Hall, is inappropriate and unwarranted. Tax savings accruing to the debtor, as distinguished from tax benefits realized by others, represent property of the debtor corporation to which, under the absolute priority rule, the creditors are first entitled. In his testimony at the confirmation hearings held herein, Dr. Hamada indicated that Debtor's operating losses and investment tax credits had been utilized in his discounted cash flow analysis, which formed the basis of his going concern value estimate.

■ For purposes of the subject valuation, the only relevance of the tax benefits, unused by Debtor and thereby available only to a potential investor, is their value if any to the creditors herein. These tax attributes are not, in accordance with generally accepted accounting principles, an asset on Debtor's balance sheet. Dr. Davidson's methodology attempts to quantify the value of benefits to Hall, which is not equivalent to the value, if any, of those benefits to the creditors of this estate. However, to the extent that his testimony and analysis informs the Court of the magnitude of these benefits, the evidence has some marginal relevance on the questions of value and of the necessity of seeking money from Debtor's former shareholders. For this reason, Debtor's motion to strike Dr. Davidson's testimony will be denied.[113]

---

**113.** The exhibits offered in connection with Dr. Davidson's testimony, viz., U-Haul Exhibits Nos. 38, 39, 51, and 52, will be received.

The market value of these tax benefits cannot be quantified. The parties have considered the parameters of the benefits, and the Court is satisfied that whatever value they have to the creditors of this estate has been realized in the Hall acquisition transaction. Prior to the petition herein, Debtor engaged in a thorough marketing effort, wherein its tax attributes were disclosed and highlighted. No viable offers materialized other than that of Hall, as discussed *infra*. As Mr. Tahmoush testified in his deposition, designated portions of which were received in evidence, tax benefits to be realized by Hall were a vital consideration for acquisition. To this extent, the value of tax benefits has been realized by the estate and its creditors. U-Haul's contention that the present value of tax benefits to Hall is an exact measure of the market value of those benefits is erroneous. It is unrealistic to expect that a prospective purchaser would pay dollar for dollar for potential tax savings.[114]

■ 8. A further requirement of § 1129(b) is that the plan not discriminate unfairly with respect to impaired classes that have rejected the plan. U-Haul contends that the settlement between the Debentureholders and the defendants in Adversary No. 82 A 3964 is not fair and equitable and discriminates unfairly with respect to Class 6. That settlement provides, *inter alia*, for payment by Hall to the Debentureholders of a sum measured as 3% of Jartran's value at an uncertain future date designated therein. Hall also agrees to indemnify the Debentureholders against certain costs of litigation and to pay them a percentage of any net proceeds in excess of $10,000,000 received by Debtor in connection with the Phoenix and Miami suits.

According to U-Haul, the Debentureholders are subordinate to the other creditors in Class 6, and because those creditors are not being paid in full, the receipt by the Deben-

tureholders of the foregoing considerations from Hall violates the absolute priority rule. U-Haul further contends that insofar as the Debentureholders are members of Class 6, their disparate treatment under the settlement documents is unfairly discriminatory within the purview of § 1129(b).

With regard to the settlement between Hall and the shareholder committee, U-Haul urges that it too is unfair and inequitable with respect to Class 6. Pursuant to that settlement, Hall is to pay $.50 per share to each minority shareholder who surrenders his stock certificates and releases Hall from all causes of action arising out of such stock ownership, including any claim that Hall's acquisition of Debtor, in conjunction with the Plan, effects a freeze out of minority shareholders. According to U-Haul, the receipt by the shareholders of any consideration from Hall violates the absolute priority rule, because the Class 6 creditors are not being paid in full.

■ 9. A compromise or settlement proposed in connection with a plan of reorganization must be fair and equitable. *See Protective Committee v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968); *United States v. Aweco, Inc. (In re Aweco, Inc.),* 725 F.2d 293, 298 (5th Cir.1984); *In re Investors Funding Corp. of New York,* 8 B.R. 739, 743 (S.D.N. Y.1980). In analyzing the fairness of such a settlement, the Court must consider all factors bearing on the wisdom of the compromise. Basic to this process is a comparison of the compromise terms with the likely rewards of litigation. *Protective Committee v. Anderson, supra,* 390 U.S. at 425, 88 S.Ct. at 1163.

At the outset, it should be noted that Debtor has filed no counterclaim in Adversary No. 82 A 3964. Debtor's counsel stated that Debtor has no legitimate causes of action arising out of its transactions with the Debentureholders and that Debtor's

---

**114.** U-Haul Exhibit No. 52, insofar as it relates to additional present value accruing to an entity in a related line of business, is entitled to no probative weight. It is highly speculative and based upon assumptions and a hypothetical transaction unsupported by a scintilla of evidence.

proposed release of any such claims does not relinquish any valuable property of the estate.

■ Should Debtor prevail, there would be no benefit or affirmative relief afforded to it; the only consequence would be the depletion of the estate by virtue of litigation expenses. Should the Debentureholders prevail in their claims for breach of the Purchase Agreements, there would be, in addition to litigation expenses, substantial recovery by the Debentureholders by way of the additional claims against assets of this estate. With these considerations, the settlement agreement, wherein the Debtor gives up nothing except the Release and Consent to Subrogation described above, is necessarily within the reasonable range of litigation possibilities and can only be considered beneficial to the estate and its creditors.

In connection with the Litigation Settlement Agreement and the Second Modification to the Plan, direct and substantial benefits accrue to the Class 6 creditors, who will receive enhanced distribution by virtue of the Debentureholders' waiver of any payment as members of that class. This result was accomplished through negotiations actively advanced by the creditors' committee in an effort to resolve an issue relating to subordination of the debentures to claims of other Class 6 creditors. A special subcommittee of the creditors' committee was formed to study the debentures and the various interpretations of the subordination provisions therein advanced by the parties in interest. They concluded that the issue was not easily resolved without substantial and lengthy litigation with attendant costs and delay. Accordingly, when it became apparent that there was a prospect of settlement between the Debentureholders and the defendants in Adversary No. 82 A 3964, the committee announced that it would withhold its support of the settlement unless a waiver of distribution by the Debentureholders were also included. Resolution of this subordination issue, incidental to the settlement of the adversary proceeding, only benefits the other holders of Class 6 claims; there are no corresponding detriments. The source of all consideration flowing to the Debentureholders, other than Debtor's Release and Consent to Subrogation, is Hall, Ryder, and the eighteen creditors holding guarantees of Jartran indebtedness.

Notwithstanding that Debtor makes little or no settlement contribution, U-Haul contends that the settlement violates the absolute priority rule and renders the Plan unfairly discriminatory. It is U-Haul's theory that the third-party considerations promised to the Debentureholders and also to the minority shareholders pursuant to their respective settlement agreements are granted at the expense of the unsecured creditor class. U-Haul argues that Hall, by these settlement arrangements, has targeted payments to particularly troublesome objectors in lieu of funding the Plan in an adequate amount. U-Haul assumes that if Hall did not pay these moneys under the settlement, Hall would instead increase its contribution to the Plan by a like amount.

There is no justification in fact or law for this assumption and the legal conclusion U-Haul draws therefrom. The payments are in settlement of substantial disputes that peripherally involve the Debtor and impact directly on its prospects for effective reorganization. There is nothing in the record that would indicate that, but for the settlement agreements, Hall would designate these moneys as additional contribution to the reorganized Debtor. Hall has steadfastly contended that its contributions, as provided in the Plan as finally modified, are legally sufficient to sustain confirmation. The Court has considered this issue at great length and has arrived at the same conclusion. The contention that these payments have neutralized opposition on this issue is unwarranted and of little weight, inasmuch as U-Haul, with all of its resources and with substantial motivation, has been the primary and now sole contender that Hall's contribution to reorganization is inadequate. All substantive issues have been strenuously presented to the Court, and all safeguards embodied in

§ 1129(b) concerning fair and equitable treatment for· nonaccepting classes have been considered and enforced.

For the foregoing reasons, the Court finds each of the proposed settlements is fair and equitable and does not discriminate unfairly within the meaning and purview of § 1129(b). The Court will allow the Joint Application for Approval of Settlement filed by the parties to Adversary No. 82 A 3964 and authorizes the Debtor to execute the Release and Consent to Subrogation contemplated thereby. Concurrent herewith, the Court will enter the Order of Dismissal submitted by the parties as Exhibit A to the Stipulation. The court has reviewed and dismisses as unfounded U-Haul's further objection to the Plan, arising out of the settlement agreements, based upon lack of good faith and failure of other requirements for confirmation set out in § 1129(a)(3), for reasons discussed at greater length *infra*.

If an Event of Termination, as provided in the Litigation Settlement Agreement, occurs, the Debentureholders' waiver of participation in the Class 6 distribution is null and void and of no force nor effect. Thereupon the Debentureholders, as Class 6 creditors, would share in the distribution of Class 6 benefits, but only to the extent provided in the Plan, which in Paragraph 15.5 preserves rights and obligations that Debtor's creditors and/or shareholders may have *inter sese* regarding their respective claims or interests or the relative priority or subordination thereof. Under this scenario, there can be no claim of unfair discrimination since subordination rights are recognized and preserved in the Plan.

10. U-Haul contends further that the Plan discriminates unfairly with respect to Class 6, because Class 5 is not a valid administrative convenience class, and accordingly, the proposed payment of Class 5 claims provided in the Plan constitutes unauthorized preferential treatment. If Class 5 were not a valid administrative convenience class, then the payment in full of the unsecured claims placed in Class 5 would be unfairly discriminatory vis-a-vis the treatment of unsecured claims in Class 6. For reasons detailed *infra*, the Court approves, as reasonable and necessary for administrative convenience, the designation of Class 5 as a separate class of claims within the meaning and purview of § 1122(b) of the Code. Accordingly, the disparate treatment afforded Class 5 claims is contemplated and authorized by the statute and does not render the Plan unfairly discriminatory.

11. Finally, U-Haul argues that the treatment of Class 3 claims constitutes unfair discrimination with respect to Class 6. U-Haul contends that the Restructuring Agreements, one between Hall and Jartran, and one between Fruehauf and Jartran, together with the December 5 agreement, establish Hall as successor to the rights of Chrysler and Ford against Jartran to the extent of approximately $145,000,000, secured by the fleet originally acquired from Chrysler and Ford and additional collateral characterized as proceeds from rental of trucks. U-Haul's contention is without merit. The total obligation of Jartran to Hall is limited by the statement of principal and interest in the Hall Note, which is incorporated in the above-described agreements. The principal is defined as the amount of the Hall Payment, viz., $52,000,-000, less any adequate protection payments made on or after January 1, 1984, plus interest accruing from the date of the Note through December 31, 1984 (the "Principal Sum"). Hall is entitled to interest on this Principal Sum at the rate which Hall becomes obligated to pay for its permanent financing of the Hall Payment.

The Court finds that the transfer of the "Creditor Agreements" between Chrysler and Jartran and Ford and Jartran, as defined in the "Debt Restructuring Agreement" between Jartran and Hall, constitutes a collateral transaction. Upon Jartran's default under its Debt Restructuring Agreement with Hall, the acceleration of debt applies only to the Principal Sum and accrued interest thereon. In accordance with the December 5 agreement, the Princi-

pal Sum would now be reduced to $45,750,-000 as of July 31, 1984, as a result of application of adequate protection payments made by Debtor. The collateral provided in the Creditor Agreements, viz., Chrysler and Ford vehicles, stands as security therefor. The fair market value of those vehicles exceeds $52,000,000. No distribution under the Plan will be made to Class 3 claimants over and above the amount of their allowed secured claims.[115] Accordingly, it is irrelevant as to whether Jartran in its Debt Restructuring Agreement with Hall has granted to Hall rental and base proceeds from such vehicles, as additional security. To the extent that this alleged additional collateral would ever be applied to the payment of the Principal Sum, the lien on the vehicles would be released pro tanto. Consequently, under no circumstances is the treatment of Class 3 unfairly discriminatory with respect to Class 6. The Court finds that the Plan does not discriminate unfairly, and is fair and equitable, with respect to Classes 6 and 7, each of which is a class of claims or interests that is impaired under, and has not accepted, the Plan.

12. The foregoing discussion relates to the cram down requirements of § 1129(b). To confirm the Plan, the requirements of § 1129(a), other than paragraph (8) also must be satisfied. U-Haul asserts that the Plan should fail of confirmation because it does not meet the requirements of § 1129(a)(3) in that it has not been "... proposed in good faith and not by any means forbidden by law." U-Haul contends that the Plan is predicated upon breach of fiduciary duty by Jartran's Board of Directors, principally involving failure to refrain from self-dealing and failure to obtain the best possible price for Debtor and/or its assets. One of the factors asserted as required to be considered in the determination of price is the availability of tax benefits to a prospective purchaser, including both pre-petition and post-petition net operating losses and potential investment tax credits. The burden of proof as to these matters is fixed upon the Debtor.

The Court acknowledges the authorities delineating the fiduciary responsibilities of directors of corporations, whether solvent or subject to administration under Chapter 11 of the Code. However, it is the Court's judgment that these responsibilities have not been breached in this case and that the Debtor has sustained its burden of proof on these issues. The Court finds that the Plan has been proposed in good faith and not by any means forbidden by law.

During 1980 and 1981, Jartran, by and through its Board of Directors and executive officers, attempted to secure additional capital either through loans or equity financing. The efforts included preparation of an offering document, used in the solicitation of prospective investors. Contacts were made with more than fifty individuals and entities. In spite of extensive efforts, no firm offers were forthcoming and no arrangements concluded other than that proposed by Hall, which equity financing and related considerations are the basis for Debtor's Plan.

Other than Hall's proposals, the only discussions which might be characterized as active negotiations were those with Ameribond. The original Ameribond-Jartran letter of intent was executed by the parties in the spring of 1981. By that fall, no concrete arrangement had been negotiated. The unilateral understanding of Mr. Cheslock that the September 11, 1981 letter by him to the secured creditors of Jartran constituted a firm commitment is unfounded. The Ameribond undertaking to provide $20,000,000 equity capital was clearly and unequivocally conditioned upon "... satisfactory resolution of th[e] debt restructuring ...", principally involving Chrysler, Ford and Fruehauf. No such restructuring

---

115. The Court notes that, during closing arguments in January, 1984, Hall through its counsel unequivocally admitted that in the event of Debtor's default under the Debt Restructuring Agreement with Hall, "... Hall's only right to accelerate pertains to the $52,000,000 note. It does not have the option by the terms of either the Plan or its agreement than [sic] to assert a claim in excess of $52,000,000 on account of Ford or Chrysler debt."

of debt was agreed to or consummated. Mr. Cheslock testified that in his mind such an agreement was reached at the mid-September, 1981 meeting attended by Jartran and its secured creditors. However, no documents or other evidence of such an agreement were offered or adduced, even after specific inquiry by the Court. The Court finds that under these circumstances, Ryder's testimony that Ameribond at no time came up with a "... definite deal, or ... with any money" to be reasonable and credible. In his view, Hall was the only "solid" deal, and the only one which would be consummated.

■ Since the filing of the petition under Chapter 11, no further offers have been submitted by Ameribond or any other entity.[116] Having marketed the company extensively prior to the filing of the petition herein, the Debtor's principals will not be required, in the fulfillment of their fiduciary obligations, to undertake further unproductive and apparently futile marketing efforts during the pendency of this case. In this regard, the Court further finds Cheslock's testimony that if he were only given sixty to ninety days, he could bring in a buyer at between $10,000,000 and $20,000,000 to be pure speculation and entitled to no credibility. There is no reason to believe that Cheslock, having failed to finalize a viable and reasonable deal, either as principal or broker, during the course of extensive negotiations during 1981, could now succeed. Further, no weight has been given to Cheslock's testimony that he called Mr. Tahmoush in or about January, 1983 to inquire whether Hall would be interested in discussing any terms for prospective purchase of Jartran, and to the alleged negative response given by Tahmoush. At that time, the confirmation hearing was under way and Debtor's efforts were properly directed to confirma-

tion of its proposed Plan. It was reasonable that Debtor's principals not then be interested in nebulous prospects referred to by Cheslock, who had demonstrated little success in his prior endeavors. Their continued effort to confirm and consummate the Plan, exclusively and legally before the Court, was not, under any realistic application of the law concerning these matters, a violation of their fiduciary responsibilities.

■ The Court finds that each of the members of the Board of Directors of Jartran and each of its principal executive officers has met and fulfilled his fiduciary duties and responsibilities and has carried the burden of proof with respect thereto. Debtor has proven and established that the company was adequately marketed, with due consideration to all of its assets and prospects, including the tax attributes available to appropriate prospective investors and arising from net operating loss carry forwards and investment tax credits, and that the price embodied within the Plan is fair and adequate in every respect.

13. U-Haul further contends that the Plan fails to meet the good faith and other requirements of § 1129(a)(3) because the settlement between Hall and the shareholder committee, as well as the settlement of Adversary No. 82 A 3964 involving Hall, the Debentureholders, and others, are allegedly "side deals" arranged by Hall to "buy off" opposition to the Plan. U-Haul relies heavily on the decision in *In re Featherworks Corporation*, 25 B.R. 634 (Bankr.E.D.N.Y.1982) and argues that these settlements have the effect of neutralizing the Code's built-in safeguards against abuse of the confirmation process.

In that case, the debtor ("Featherworks") therein, was the wholly-owned subsidiary of Puro Down International of New Jersey Corp., formerly known as Hudson

---

**116.** U-Haul, from time to time during the course of these proceedings, submitted an acquisition offer within its proposed plan of reorganization, which the Court has refused to consider as being inappropriately filed during Debtor's extended exclusivity period. The Court in this posture of the case has not been called upon to determine whether the U-Haul proposal would violate the antitrust laws; but the Court has concerns about the legal implications of the economic organization of the nationwide, intercity, one-way truck and trailer rental business which would be effected by the confirmation of such a plan.

Feather & Down Products, Inc. ("Hudson"). Hudson in turn was owned by Puro International, Ltd., which in turn was owned by Windsor Trading Corporation ("Windsor"). Arthur Puro was the president and chief operating officer of both Windsor [117] and Hudson and was also in control of the debtor. Hudson and Windsor were unsecured creditors to the extent of $1,400,000 and $4,000,000, respectively. Windsor also held a secured claim of $1,000,000 and a post-petition claim of over $2,000,000, apparently arising out of post-petition financing. Walter E. Heller & Co. ("Heller") financed Featherworks pre-petition and was owed at filing in excess of $5,000,000 secured by a lien on inventory and accounts receivable.

The debtor prepared a plan dividing creditors into four classes. Class I creditors, holders of priority claims, were to be paid in full on confirmation. All general unsecured creditors, placed in Class II, were to share in a $40,000 distribution. This fund and the moneys for priority creditors were provided by Windsor. Windsor waived participation in this fund on its $4,000,000 unsecured claim, thereby providing a 1.3% dividend to the other unsecured creditors. Heller's pre-petition secured claim made up the entire Class III and was to be satisfied by the transfer to it of debtor's inventory and accounts receivables. The unsecured portion of Heller's claim, included in Class II, was estimated to be $1,000,000. Subsequently, after partial liquidation of its collateral pursuant to modification of the automatic stay, the shortfall was determined to be closer to $1,500,000. Class IV was composed of secured creditors whose claims were not impaired, including Windsor's pre-petition and post-petition liens on debtor's machinery, equipment, inventory and accounts receivable.

Heller voted to reject the plan and was joined by five other Class II creditors, including two of the largest in the class. During the confirmation hearing, Heller sought leave of court to change its vote from rejection to acceptance, which motion was opposed by Far West Garments, Inc. ("Far West"), the largest non-insider Class II creditor, after Heller, and one of the rejecting creditors. Far West contended that Heller's attempted change of vote was not in good faith and sought entry of an order wherein the court would notify the United States Attorney of a possible violation of 18 U.S.C. § 152. The gravamen of the alleged offense was stated to be the receipt by Heller of $25,000 paid to it by Arthur Puro concurrent with the attempted change of vote by Windsor. Heller contended that it had been initially prepared to accept the plan but that it had rejected the plan when it discovered, in the course of collateral liquidation, that representations as to quality and weight of the inventory were false, and that as a consequence Heller was then prepared to sue debtor, Windsor and Puro for its further damage arising from this breach of warranty. Heller contended the $25,000 payment was given in exchange for its releases of Windsor and Puro and for the assignment of certain accounts receivable and was in no way a consideration for its change of vote. As to this contention, the court concluded that "... the timing and the surrounding circumstances [were] at least suspect." The court found that Heller's discovery of the true value of its collateral and the magnitude of its shortfall "... bore directly on the acceptability of the total distribution to all unsecured creditors of $40,000.00" and concluded that the additional $25,000 "might have made the plan marginally more acceptable." The court opined:

> The Code depends upon the self-interest of the creditors to act as a barrier against abuse of the bankruptcy laws. If a majority in number and amount of all creditors vote for a plan, there is good reason to believe that that plan is in the best interest of all creditors, since it would not receive such a vote otherwise. However, if any creditor receives some special consideration peculiar to him, his vote is no longer disinterested and unbi-

**117.** Arthur Puro's wife and daughter owned Windsor.

ased and the Code's built-in controls are neutralized.

The court denied Heller's application to change its vote and refused confirmation but declined to refer the alleged criminal violation to the United States Attorney on the grounds that the court had insufficient knowledge to warrant such reference. The court noted that Heller and Puro apparently acted on the advice of counsel and that such reliance, with respect to other conduct prohibited by 18 U.S.C. § 152, negates the presence of the requisite fraudulent intent.

At the hearing on the shareholder committee's application to withdraw objections to confirmation in the context of their overall settlement with Hall, U-Haul, by its counsel, argued that the same situation confronting the *Featherworks* court exists here. The Court does not agree. The shareholders' agreement was negotiated by Hall with the shareholder committee, acting on behalf of the 700 or more minority shareholders, and not with but one dissenting member of a class whose supporting vote was essential to acceptance of the plan by that class and to confirmation. The subject settlement was unanimously approved by the shareholder committee and has been fully and voluntarily disclosed to the court. In connection with the hearing on the shareholder committee's application to withdraw objections, the committee caused notice of the hearing and of the agreement to be mailed to each of the 700 or more shareholders which it represented. Further notice was published in the Wall Street Journal. The parties to the agreement have been zealous in their effort to avoid any conduct which would be suspect and which could be characterized as improper. At first, Hall's proposed payment to shareholders, provided in the agreement, was conditioned upon approval by the Court of the committee's application to withdraw objections to confirmation. Subsequently, the parties abrogated this condition. The undertaking to release, provided in the Letter of Transmittal, nevertheless remains unaffected. The Court finds that the proposed releases constitute the real and effective consideration for the payment by Hall of moneys to the shareholders.

The shareholder settlement does not involve a change of vote. Pursuant to § 1126(g) of the Bankruptcy Code, debtor's shareholders are deemed to have rejected the Plan and accordingly, all the statutory safeguards afforded in Section 1129(b) are applicable.

In *Featherworks*, the payment by Arthur Puro, allegedly in exchange for releases and an assignment of accounts receivable, was coincidental with an attempted change in vote which, if allowed, would have rendered the Plan consensual, and the safeguards of § 1129(b) would not have been considered by the court. In such a context, it was reasonable for the court to question the bona fides of the transaction. In this case, there are no circumstances surrounding the shareholder settlement which would give rise to an inference of bad faith.

Nor is the settlement of Adversary No. 82 A 3964, among Hall, the Debentureholders, and others, violative of the good faith or other requirements of § 1129(a)(3). As with the shareholder agreement, U-Haul characterizes the settlement as a side deal entered into by Hall for the purpose of buying off opposition to the Plan. As discussed at length *supra*, Hall's settlement with the Debentureholders resolves the substantial claims brought by the Debentureholders against Hall, Ryder, and Jartran in Adversary No. 82 A 3964 and incidentally resolves the issue concerning subordination of the debentures to the claims of other Class 6 creditors. Pursuant to the settlement documents, the Debentureholders are to receive from Hall a sum measured as 3% of Jartran's value at an uncertain future date, a percentage of any net proceeds in excess of $10,000,000 received by Debtor in connection with the Phoenix and Miami suits, and an indemnification against certain costs of litigation. In exchange therefor, and for certain other considerations including Ryder's assignment of a portion of his rights under the Option/Call Agreement, the Debentureholders agree to waive participation in the Class 6

distribution and to dismiss the adversary proceeding and release all claims against Hall, Ryder, and Jartran in connection therewith. Although the Litigation Settlement Agreement includes a provision requiring the Debentureholders to change their vote, the change in vote was not regarded by the parties as a significant consideration. They have now stipulated that failure of the Debentureholders to change their vote will not constitute a default under the agreement, and the Court considers the provision expunged. That the provision was included in the agreement does not give rise, in these circumstances, to an inference of bad faith.[118]

It is the Court's conclusion that the subject settlement is not, as contended by U-Haul, a special deal arranged to silence opposition, but is a proper, negotiated settlement involving not only Debtor, Hall, Ryder, and the Debentureholders, but also creditors holding a substantial amount of the claims against this estate. There was full disclosure of the settlement discussions early in the negotiation process, and the Unsecured Creditors' Committee took an active part in those negotiations and supports the settlement agreement. Unlike the situation in *Featherworks*, all of the Code's safeguards have been given effect. Indeed, U-Haul's contention that the settlement has silenced opposition to the Plan is hardly credible in light of the powerful forces mobilized in opposition to the Plan by U-Haul itself in the course of these proceedings.

14. Finally, it is U-Haul's position that confirmation must be denied, in that there has been a proposal of a Plan in bad faith and by means forbidden by law by virtue of the letter agreement in evidence as U-Haul Exhibit 40–A. The letter agreement obligates Ryder not to oppose a Successful Plan, as defined in the Option/Call Agree-

ment, in consideration of Hall's undertaking, *inter alia*, to defend or cause Jartran to defend Ryder in U-Haul litigation and to indemnify him up to $2,000,000 for damages as a result thereof. As discussed above, a Successful Plan is one wherein Hall obtains at least 80% of the outstanding stock in Jartran and Ryder obtains releases from all guarantees of Jartran indebtedness entered into by Ryder or Ryder Corporation. In determining whether a plan is a Successful Plan, Ryder and Ryder Corporation retain the right to waive or not to waive releases of their guarantees. Further, Ryder may oppose any plan which impairs his or Ryder Corporation's rights under Exhibit 40–A or the agreements of December 31, 1981.

 The evidence indicates that Ryder has been provided defense services in the U-Haul litigation long before the execution of the letter agreement. The course of conduct of the parties, supported by Ryder's testimony, sustains the inference that the April 30, 1982 letter agreement merely documented the previous understanding of the parties arrived at but omitted from the documentation prepared on December 31, 1981. Though separately documented, realistically there was but one transaction, which had for its prime purpose the acquisition by Hall of Ryder's stock interest in Debtor. Hall could be expected to secure for itself by appropriate documentation, all benefits derived therefrom, including the proposal of a Plan of Reorganization unopposed by Ryder.

The Court, during the course of these proceedings, has denied U-Haul's motion to avoid the December 31, 1981 transaction in its entirety. The court's previous ruling did not encompass the letter agreement of April 30, 1982, Exhibit 40–A. The provisions therein are severable and the Court

---

**118.** Although the Court has not found solicitation of vote in bad faith, it is the Court's opinion that such a solicitation would not warrant denial of confirmation based upon § 1129(a)(3). Bad faith solicitation is addressed in § 1126(e). Section 221(3) of the Bankruptcy Act of 1898, as amended, the section from which § 1129(a)(3)

is derived, stated that the court could confirm a plan if satisfied that "the proposal of the plan and its acceptance [were] in good faith ...." Section 1129(a)(3) speaks only to the proposal of a plan and does not address acceptance of such plan.

finds Exhibit 40–A to be unenforceable as against public policy.

■ U-Haul contends that the agreement embodied in Exhibit 40–A constitutes a violation of 18 U.S.C. § 152, which provides in pertinent part as follows:

Whoever knowingly and fraudulently gives, offers, receives or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof, for acting or forbearing to act in any case under title 11; ...

. . . . .

Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

It appears that the conduct of the parties relevant to Exhibit 40–A falls within the prohibition of § 152. However, the Court finds that the entire agreement was prepared by and entered into on the advice of counsel. Furthermore, the benefits derived by Ryder under the transaction as a whole were adequately supported by his transfer to Hall of the 92% controlling interest in Jartran. The statutory requirement of knowing and fraudulent intent is negated by these factors and the Court finds that the letter agreement and the promises therein do not constitute a violation of § 152.

The crux of U-Haul's argument, in this context, is that Hall has bought off Ryder, characterized as the only arguably independent member of the Jartran Board of Directors, and induced a breach of his fiduciary duty to Jartran's creditors to seek out "competing purchasers who may start a bidding war that would increase the price Hall must pay for Jartran." Regardless of whatever would be required of Ryder in the performance of his fiduciary duty, it is preposterous to suggest that there would ever be a bidding war for Jartran. In its failing financial condition, Jartran was not a marketable commodity. Exhaustive effort was made to obtain capital and to restructure secured debt. All marketing efforts failed. The proposition advanced that but for the restrictions imposed on

Ryder by the letter agreement of April 30, 1982, Ryder would have continued to market the Debtor is not supported by the facts. Jartran sustained no detriment from Ryder's agreement not to oppose the Hall acquisition. He had done all that he could do in this regard. Moreover, little if any benefit accrued to Hall from Ryder's agreement not to oppose a Successful Plan. A Successful Plan, by definition, would provide for the release of all Ryder guarantees of Jartran indebtedness, amounting to more than $200,000,000. It is unreasonable to postulate that Ryder would oppose a plan of reorganization providing to him such a great economic advantage, even absent the letter agreement. In light of the above, Exhibit 40–A, although unenforceable, does not rise to the level of bad faith that warrants a denial of confirmation. On the contrary, the Court finds that the Plan has been proposed in good faith and not by any means forbidden by law.

15. U-Haul contends further that the Plan should not be confirmed inasmuch as it fails to meet the confirmation requirement of § 1129(a)(7), which provides in part as follows:

(7) With respect to each class—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; ...

■ With respect to Classes 1, 2, 3, and 4, the Court finds that each holder of a claim of such class has either accepted the plan or will receive full payment of its claim on the Effective Date of the Plan. As to Class 5, each holder of a claim of such class will receive 50% of the amount of his claim on the Effective Date of the Plan and 50% six months thereafter. In accordance with the analysis of the hypothetical Chapter 7 liquidation discussed *infra*, each of such claimants would receive

nothing if the Debtor were liquidated under Chapter 7. As to Class 7, the members of which are Debtor's shareholders, the Plan provides that their interests are to be cancelled upon the Effective Date of the Plan. With a certainty, Debtor's shareholders would also receive nothing if the Debtor were liquidated under Chapter 7.

Class 6 is a rejecting class. In order for the Court to determine whether the requirement of § 1129(a)(7)(A)(ii) has been met as to each holder of a Class 6 claim, the Court must determine, based upon the evidence adduced, what each member of Class 6 would receive in a hypothetical Chapter 7 case. That hypothetical dividend must then be compared with the proposed distribution to Class 6 claims under the Plan. Debtor's liquidation analysis, Exhibit 160, is reproduced in part below:

JARTRAN, INC.
HYPOTHETICAL LIQUIDATION
FIRST QUARTER 1984
($000)

LIQUIDATION VALUE OF ASSETS (1) .............................. $80,696

LESS:

| | | |
|---|---|---|
| Secured Creditors Assets | | |
| Class 1 Secured, Estimated Liquidation value (2) ............ $ | 535 | |
| Class 3 Secured, at Appraisal, less depreciation (3) .......... | 58,268 | |
| Total .......................................................... | | 58,803 |

NET AVAILABLE FOR LIQUIDATION ...................................... $ 21,893

LESS:

| | |
|---|---|
| Priority Claims for Lost Equipment (4) ......................... $ | 11,654 |
| Estimated Cost of "Hostage" Vehicle Recovery (5) ............. | 6,578 |
| Chapter 11 Administrative Expenses (6) ......................... | 34,340 |
| Prepetition Priority (7) ........................................ | 340 |
| Prepetition Priority Tax (8) .................................... | 1,021 |
| Total Claims Superior to Unsecured Creditors ...................... $ | 53,933 |

NET DEFICIENCY PRIOR TO UNSECURED CREDITORS CLAIMS ................ $ (32,040)

The $80,696,000 indicated above as the "Liquidation Value of Assets" represents the sum of values for specific assets designated in Schedule I of Exhibit 160, the relevant portion of which is as follows:

($000)

| Description | Amount |
|---|---|
| Cash and Short-Term Investments (1) .......................... $ | 250 |
| Receivables (net) (2) ......................................... | 1,500 |
| Inventories (3) ............................................... | 38 |
| Prepaid Expenses (4) .......................................... | — |
| Revenue Earning Equipment (5) | |
| Class 1 ................................................... | 158 |
| Class 3 ................................................... | 58,268 |
| Operating Property & Equipment (6) | |
| Class 1 ................................................... | 377 |
| Other ..................................................... | 465 |
| Other Assets (7) .............................................. | — |
| ETS (8) ...................................................... | 2,000 |
| Preferences (9) | |
| Disbursements over $10 .................................... | 3,570 |
| Disbursements between $5 and $10 .......................... | 570 |
| Litigation (net) (10) ......................................... | 13,500 |
| Total Assets available for Chapter 7 distribution .............. $ | 80,696 |

Debtor has concluded, as indicated above, that the "Net Deficiency Prior to Unsecured Claims" amounts to $32,040,000. U-Haul challenges this conclusion and has,

upon cross-examination of Kenneth Rumsey, the witness through whom Jartran has offered Exhibit 160, controverted the valuation of specific items.

With regard to "Cash and Short-Term Investments," U-Haul asserts that the correct figure is $1,000,000, based upon Mr. Rumsey's testimony that as of January 4, 1984, Jartran had approximately $1,000,000 cash on hand. Mr. Rumsey explained that at that time, Jartran was at its credit limit and anticipated seeking additional funds during the first quarter of 1984. If a liquidation were to occur at or about the end of the first quarter, according to Mr. Rumsey's testimony, the working capital would continue to dwindle to that time as a result of current bills. Given an on-going operation, cash on hand fluctuates on a day to day basis, and Jartran's estimate of $250,000 is therefore not unrealistic.

Exhibit 160 lists "Receivables (net)" as $1,500,000. In the notes thereto, gross receivables are listed as $3,500,000, of which $2,000,000 are "doubtful." Upon cross-examination, Rumsey testified that of the $2,000,000 in doubtful accounts, $1,000,000 represents amounts uncollectible without regard to liquidation, and the balance of $1,000,000 represents amounts which would become uncollectible in a liquidation mode. The assumption that 40% of accounts considered to be good accounts would be uncollectible in a Chapter 7 situation is reasonable and perhaps optimistic.

With regard to the $58,268,000 value ascribed to Class 3 "Revenue Earning Equipment," U-Haul asserts that as a net figure, this amount has been calculated upon an inappropriate straight line depreciation allowance of approximately $1,000,000 per month. U-Haul's contention that it should be $225,000 per month is unsupported in the record. Moreover, the notes to Exhibit 160 indicate that $58,268,000 was the net value of these assets as of October 31, 1983. This amount has been carried over to March 31, 1984 without further adjust-ment for depreciation. If further adjustment had been considered, the net value would be reduced by approximately $5,000,000. Without this adjustment, the effective depreciation is only at the rate of approximately $665,000 per month. The acquisition cost of the 11,000 trucks and 19,000 utility trailers, being the revenue earning equipment, exceeded $200,000,000. Based upon a liberal use life estimate for this equipment, $665,000 per month (or even $1,000,000) would be a reasonable depreciation allowance. Regardless, the net valuation of the revenue earning equipment would be distributed upon liquidation to the secured creditors. Only to the extent that this valuation exceeds the amount of the secured debt would any amount be available for distribution to the unsecured creditors. It is the Court's judgment that the net valuation, under no circumstances, would exceed the secured debt.

As to all other assets referred to in Schedule I of Exhibit 160, the Court finds that the values assigned are within the range of realization upon a Chapter 7 liquidation, except for "Litigation (net)", valued therein at $13,500,000. This valuation has been addressed in connection with the estimation of claims, made in a separate order entered concurrent herewith, wherein the Court has concluded that no value should be ascribed to the litigation. Accordingly, the "Total Assets Available for Chapter 7 Distribution" is reduced by $13,500,000. The amount therefore available upon a liquidation, other than to secured creditors, is $8,393,000.[119]

U-Haul further contests the exclusion by Debtor of any value for Debtor's dealer network and goodwill. It is U-Haul's position that because substantial efforts and funds were expended in the development of Debtor's dealer network, it should have some value upon liquidation. That Debtor invested a great deal of time and money in a dealer network does not imply that upon liquidation any part of its investment will

119. This sum represents the amount available as of March 31, 1984. The Court considers this value to be an adequate estimate of the amount which would currently be available for distribution under Chapter 7.

be recovered. On the contrary, the Court finds Ryder's testimony that Debtor could not sell its dealer network in a liquidation context to be reasonable and valid. For similar reasons, the Court finds Debtor's omission of any value for goodwill to be equally sound.

U-Haul further contests Debtor's failure to assign any value to certain litigation brought by U-Haul against Debtor, Hall, Ryder, and others, pending before this Court as Adversary No. 82 A 2594. In that suit, it is alleged, *inter alia,* that the members of Jartran's board of directors have breached their fiduciary duty to the creditors herein and that Hall and Ryder are liable on an alter ego theory for all of Jartran's debts. The Court finds that for purposes of the liquidation analysis, no value should be assigned to that litigation. As to U-Haul's alter ego claim against Hall, Debtor's motion for summary judgment has been granted by separate order entered concurrent herewith. With respect to the alter ego claims against Ryder, the request for abstention made by defendants has been denied without prejudice to renew the same before the United States District Court pursuant to 28 U.S.C. § 1334(c)(1). This action is substantially the same as Count V of the Phoenix suit and is more appropriately tried in that forum. With respect to U-Haul's cause of action based upon breach of fiduciary duty by Jartran's board of directors, Jartran's motion for summary judgment has been denied and the case set for trial. Notwithstanding, the Court agrees with Debtor that the cause of action has no value for purposes of this analysis. The issues raised concerning breach of fiduciary duty are also raised in connection with the good faith and other requirements of § 1129(a)(3), which the Court has discussed in detail and rejected, *supra.*

Pursuant to the above, no further adjustments to the liquidation value are required, and the Court finds that $8,393,000 is all that would be available in a Chapter 7

liquidation after distribution to secured creditors. Of this amount, nothing will remain for distribution to general unsecured creditors after payment of priority claims.

Debtor has allocated $11,054,000 to "Priority Claims for Lost Equipment" and $6,578,000 for "Estimated Cost of 'Hostage' Vehicle Recovery".[120] U-Haul challenges Debtor's contention that these charges are entitled to administrative expense priority pursuant to the provisions of the cash collateral/adequate protection orders, offered and received into evidence as Jartran Group Exhibit No. 13. The Court has reviewed these exhibits and finds that Debtor's contention has no basis in law or fact. To the extent that these liabilities are actually incurred, they are construed to be additional deficiency claims owing to the secured creditors.

The largest category of priority claims included in the Exhibit 160 analysis is "Chapter 11 Administrative Expenses" in the amount of $34,340,000. Of this amount, $1,000,000 represents estimated lease obligations for Debtor's Florida headquarter facilities. No admissible evidence was presented to support the amount claimed, and the entire $1,000,000 will be excluded from consideration. Finally, $6,575,000 represents legal and examiner fees and expenses which, for the most part, have not yet been allowed by the Court. It is not necessary for these purposes to estimate the reasonable value of these legal and examiner fees and expenses. Even if the total amounts are excluded, the result of the inquiry is unchanged. Giving effect to all of the above, the $8,393,000 available for distribution after payment of secured creditors will be $19,733,000 short of the amount necessary to pay even the priority claims in the hypothetical Chapter 7 liquidation.

 Under the Plan, Class 6 creditors are to receive a minimum of $1,000,000 per year for each of ten years. The first three installments are guaranteed by Hall, and

---

**120.** Hostage vehicles are those vehicles that are held by terminated dealers and must be re-

claimed and domiciled pending sale on liquidation.

the first two are to be paid on the Effective Date of the Plan. Accordingly, the requirements of § 1129(a)(7) have clearly been met with respect to Class 6.

16. U-Haul further contends that Debtor's Plan, as finally modified, fails to meet the feasibility requirements of Section 1129(a)(11), which provides as follows:

> "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

■■ The touchstone of feasibility is whether or not the Debtor emerges from reorganization with reasonable prospects of financial stability and success, and in particular the ability to meet the requirements for capital expenses. Availability of prospective credit, both capital and trade, adequacy of funds for equipment replacement, and provisions for adequate working capital are some of the other factors required to be examined by the Court.

■■ All things considered, Debtor's achievements since its organization in 1978 and initial incursions into nationwide markets for truck and trailer rentals, undisputedly dominated by U-Haul, have been impressive. In a matter of months, Debtor acquired and put into service approximately 11,000 trucks and 19,000 utility trailers and established a nationwide network of independent dealer agents for sales and service. Debtor's first significant revenues were generated in the latter part of 1979 and by 1981 they had increased to over $86,000,000. During the period of Chapter 11 administration, Debtor maintained its revenue position in the face of adverse market conditions and despite the negative aspects of operating as a debtor in possession. In 1983, transactions actually increased even though there was a small reduction in revenue due to pricing level decline generally applicable to the industry as a whole. Expenses were down, largely as a result of an extensive cost-cutting program implemented by Debtor since the filing of the petition herein.

Jartran's revised projections, prepared in connection with the Third Modification, are more conservative than those initially presented in the Disclosure Statement. The Court has made further revisions in the projected statement of profit and loss and has arrived at a forecast which it considers to be reasonable and within the realm of achievement. Based upon this adjusted forecast, the Court concludes that the revenues for the foreseeable future will adequately provide for payment of all operating expenses and the servicing of fixed obligations, both secured and unsecured, as required by the Plan. The Court is mindful that there will be a financial shortfall for the years 1984, 1985, and 1986, ranging from approximately $400,000 in 1984 to $7,200,000 in 1985 and decreasing to approximately $4,600,000 in 1986.[121] In 1987, it can reasonably be expected that Debtor's revenues will exceed operational costs and debt service by an amount in excess of $7,000,000. Based upon the steady state assumptions, described in detail *supra* in connection with the determination of going concern value, Debtor's anticipated surplus for the year 1988 will be even greater. In 1989, the first year of steady state vehicle replacement, the new vehicle cost, including not only amortized payments from the previous purchases of vehicles under the acquisition program but also down payments and principal and interest on the 1,200 replacement vehicles, will be substantially increased. Notwithstanding this increase, the cash surplus will exceed $4,000,000. In 1990, the amortized payments from the vehicles purchased in 1985 will be extinguished and, more substantially, the obligation of Debtor to Hall in connection

---

**121.** In calculating these amounts, we have used as a starting point the receipts and disbursements set forth in Exhibit 103 and substituted therein the revenue figures in the Court's adjusted forecast. We have modified the operational disbursements in Exhibit 103 by deducting the variable costs associated with revenues contemplated over and above the court's forecast, viz., 50% of the revenue difference.

with the Third Modification will have been satisfied in full, thereby increasing the surplus by an amount in excess of $13,000,000 for that year and consequently for each subsequent year. In 1991, there will be additional increases in surplus by virtue of the satisfaction of obligations owed to Fruehauf and extinguishment of amortized payments attributable to 1986 purchases. The surplus will further increase in 1992 and thereafter will approach a steady state.[122]

Debtor's pro forma Consolidated Balance Sheet for April 1, 1984 (based upon assumption of a March 31, 1984 Effective Date), included in Jartran Exhibit No. 104, shows "Stockholders' Equity" in the amount of $6,000,000 for accounting purposes. The Court is mindful that based upon a going concern valuation, calculated from projected cash flows discounted to current date as reduced by the present value of reorganized debt, the shareholders' equity is a substantial negative figure, and essentially valueless. If the Plan of Reorganization had provided for the offering of securities, either debt or equity, to members of the general public, the equity deficit would materially influence the Court's judgment herein. In this case, almost all of the reorganized debt and equity will be held by Fruehauf and Hall. Hall is the sponsor and source of funds for the Plan and, by virtue of the Third Modification, will be Debtor's principal secured creditor. Hall has voluntarily exposed its investment to risk. It has measured Debtor's financial prospects and apparently concluded that its best interest is served by involvement. Ford and Chrysler will be paid out in cash on the Effective Date of the Plan. Fruehauf remains a secured creditor with more than adequate collateral, insuring its payment in full.

The unsecured creditors will receive upon the Effective Date the first two annual $1,000,000 installments which were initially contemplated to be paid under the Plan on June 30, 1983 and June 30, 1984. Hall has guaranteed the payment to be made on June 30, 1985. The Court has determined that beginning with the year 1987, and for each year thereafter, the Debtor will generate from its operations more than sufficient funds with which to satisfy its Plan obligations to the unsecured creditors. While it appears that there will be a financial shortfall for 1986, the Court is satisfied that Debtor, through the support of Hall dictated by its own self-interest, will arrange the necessary operating cash, including the funds required for timely payment of the 1986 installment to Class 6. Hall's demonstrated commitment to the financial viability of Jartran is a prime consideration in the Court's judgment that the reorganized Debtor will not be liquidated or have a need for further financial reorganization.

In the Third Modification, Hall commits to guarantee an additional $5,000,000 line of credit over and above Jartran's existing $10,000,000 line of credit with the Bank of New York. Jartran has been authorized by the Court to borrow up to $16,500,000. Kenneth Rumsey testified that Hall, by John Addeo, its Vice President and Assistant to the Chairman, has committed to provide whatever guarantees may be required in order to acquire the increased line of credit.

Under the terms of the Plan, Hall also guarantees the first three $1,000,000 annual installment payments to Class 6 and provides a $5,000,000 equity contribution. In connection with the Third Modification, Hall commits to an investment of $52,000,000 to acquire the claims of Ford and Chrysler and to provide payment of a por-

---

**122.** Exhibit 103 omits all debt service to secured creditors for the year 1984 (other than the 2% rental revenue payments to Fruehauf). However, the Effective Date of the Plan is necessarily subsequent to September, 1984, and Debtor accordingly will have paid during 1984, prior to the Effective Date of the Plan, at least $8,750,000 as debt service to those creditors pursuant to the amended adequate protection order entered herein. The effect of these payments is to increase the cash deficit for 1984 by a like amount, and because the Hall Payment will be correspondingly decreased, the deficits for 1985 and 1986 will be reduced and the surplus for subsequent years will be increased.

tion of Debtor's lease obligations to Frue-hauf. During the course of administration, Hall has guaranteed $1,200,000 of rent obligations for Debtor's corporate headquarters and $340,000 for telephone equipment installed thereat. In the Plan, Hall commits to retain 90% of Jartran stock for three years subsequent to the Effective Date and at least 51% during the fourth through sixth years after the Effective Date.

It is inconceivable that Hall, given the magnitude of its investment to date, its commitments under the Plan, and its exposure on its guarantees, would withdraw its support of Debtor and allow any liquidation or further financial reorganization within the meaningful future. The likelihood that Hall would terminate its interest and accept its losses is further rendered improbable because of the large and significant tax benefits which would accrue to Hall only through Debtor's continued operation over an extended period of time.

17. U-Haul also objected to confirmation of the Plan based upon Debtor's alleged failure to comply with the provisions of § 1129(a)(10) of the Bankruptcy Code. As a condition to confirmation, § 1129(a)(10) requires that "[a]t least one class of claims has accepted the plan, determined without including any acceptances by any insider holding a claim of such class." On June 29, 1984, Congress passed the Bankruptcy Amendments and Federal Judgeship Act of 1984, which was subsequently enacted into law. Section 512(a) of this Act amends § 1129(a)(10) to read as follows:

> (10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

Pending cases are unaffected by the change. Pursuant to § 553(a) of the Act, the amendment is applicable only to cases filed 90 days after the date of enactment. Accordingly, U-Haul's objections will be evaluated under the original provisions of § 1129(a)(10).

The one class acceptance requirement of § 1129(a)(10) has created problems of interpretation for the courts concerning the effect that should be given a "deemed acceptance" pursuant to § 1126(f) of the Bankruptcy Code. Under § 1126(f), "... a class that is not impaired under a plan is deemed to have accepted the plan ...." [123] The interaction between § 1126(f) and § 1129(a)(10) presented the courts with the issue of whether an unimpaired class which is "deemed to have accepted the plan" satisfies the requirement in § 1129(a)(10) that "[a]t least one class of claims has accepted the plan...."

There is a split of authority on this issue. Some courts have determined that deemed acceptance is not sufficient for purposes of § 1129(a)(10) and have held that the affirmative acceptance of at least one impaired class is required. *In re Polytherm Industries, Inc.,* 33 B.R. 823, 831 (W.D.Wisc. 1983); *In re Gagel & Gagel,* 30 B.R. 627, 630 (Bankr.S.D.Ohio 1983); *In re Economy Cast Stone Co.,* 16 B.R. 647, 652 (Bankr.E.D.Va.1981); *In re Barrington Oaks General Partnership,* 15 B.R. 952, 967 (Bankr. Utah 1981); *In re Marston Enterprises, Inc.,* 13 B.R. 514, 519 (Bankr.E.D.N.Y. 1981). Other courts have found that a deemed acceptance pursuant to § 1126(f) satisfies the one class acceptance requirement. *In re Masnorth Corp.,* 28 B.R. 892, 899 (Bankr.N.D.Ga.1983); *In re W.E. Parks Lumber Co., Inc.,* 19 B.R. 285, 289 (Bankr.W.D.La.1982); *In re Landau Boat Co.,* 13 B.R. 788, 790 (Bankr.W.D.Mo.1981); *In re Bel Air Associates, Ltd.,* 4 B.R. 168, 176 (Bankr.W.D.Okla.1980). Those courts holding the "deemed acceptance" insufficient have reasoned that the language of § 1129(a)(8) of the Code creates an inference that a "deemed acceptance" is not the equivalent of an "acceptance". The confir-

---

**123.** Under § 510(c) of the Bankruptcy Amendments and Federal Judgeship Act of 1984, § 1126(f) is amended by striking out "is deemed" and inserting in lieu thereof ", and each holder of a claim or interest of such class, are conclusively presumed."

mation requirement of § 1129(a)(8) provides that "[w]ith respect to each class— (A) such class has accepted the plan; or (B) such class is not impaired under the plan." Proponents of the view that an affirmative acceptance is required argue that the language of § 1129(a)(8) implies a distinction between nonimpairment and acceptance, from which it may be inferred that an acceptance of an impaired class and a deemed acceptance of an unimpaired class are different and distinct concepts. *See In re Polytherm Industries, Inc., supra.*

Courts holding that the deemed acceptance of § 1126(f) satisfies the one class acceptance requirement of § 1129(a)(10) have relied on the clear language of the statute. According words their common meanings, "accepted" as used in § 1126(f) should have the same meaning as "accepted" as used in § 1129(a)(10), unless a contrary indication appears. *See* Ethan D. Fogel, in *Confirmation and the Unimpaired Class of Creditors: Is a "Deemed Acceptance" Deemed an Acceptance?*, 58 Am. Bankr.L.J. 151 (1984).[124] The Court in *In re Landau Boat Co., supra,* at 791, succinctly stated this position:

> [I]f the Congress had intended that there be an affirmative acceptance requirement in the section, it would have been easy enough to insert such a word. The language is not there and should not be implanted by the Court.

Additionally, § 1129(a)(10) expressly excludes acceptance of the plan by insiders. As one commentator has observed, if "legislators knew how to exclude one group of acceptances from qualification under Section 1129(a)(10), they could have—and presumably would have, had it been their intent—excluded deemed acceptances." Fogel, *supra,* at 154.

The Court agrees that a statute should be given its plain meaning and concludes that the one class acceptance requirement of § 1129(a)(10) is satisfied by the deemed acceptance of an unimpaired class pursuant to § 1126(f). The recently enacted amendment of § 1129(a)(10) lends support to this interpretation. If former § 1129(a)(10) required the acceptance of an impaired class, there would be no need to amend the statute to include this language.

Debtor's Plan has three classes which are unimpaired, viz., Classes 1, 2, and 4, and three classes which are impaired, viz., Classes 3, 5, and 6. (The composition and treatment of each class under the Plan has been described, *supra.*) As the Court has determined that the requirement of § 1129(a)(10) is satisfied by the deemed acceptance of an unimpaired class, the Plan clearly meets this confirmation requirement with the existence of three unimpaired classes.

Even if the affirmative acceptance of an impaired class were required under the original language of § 1129(a)(10), such a requirement would be satisfied by Debtor's Plan. Classes 3 and 5, both impaired, have voted to accept the Plan. Under § 1124(1), a class is impaired if its legal, equitable, or contractual rights are altered in any fashion[125]. Accordingly, U-Haul's argument that there is no accepting impaired class is unfounded. Under any standard, the treatment of Class 3 under the Plan has altered their original contract rights with Debtor. U-Haul contends that in determining whether Class 3 is impaired for these purposes, the claims of Chrysler and Ford are insider claims and should be excluded. Assuming, but not deciding, that this contention is correct, Fruehauf remains a Class 3 claimant and is impaired

---

**124.** The author argues that a fair reading of sections 1126(f) and 1129(a)(10) suggests that a deemed acceptance should satisfy the one class acceptance requirement for confirmation. He asserts, "One does less violence to the statute by treating the alternative references in section 1129(a)(8) to acceptance and non-impairment as redundant than by saying that an 'acceptance'

albeit deemed, is not really an 'acceptance'." Fogel, *supra,* at 159.

**125.** A class of claims may be impaired even where, with respect to claims of that class, the alteration of legal, equitable, and contractual rights enhances the value of such claims. 5 Collier on Bankruptcy ¶ 1124.03[i] at 1124–14 (15th ed. 1983).

under the Plan. Class 3 is an accepting impaired class under any circumstances.

U-Haul further contends that Class 5 is an invalid administrative convenience class, the claims of which properly belong in Class 6, and as such it should not be considered an accepting impaired class for these purposes. Class 5 consists of all claims of $500 to $2,500 and those voluntarily reduced to $2,500. Under the Plan, Class 5 claims will be paid one-half on the Effective Date and the balance six months later. Class 4 consists of claims of $500 or less, including those voluntarily reduced to $500, and are to be paid in full on the Effective Date. Both Classes 4 and 5 are administrative convenience classes.

■■■ U-Haul argues that under § 1122(b), only one administrative convenience class is permitted. Debtor asserts that the purpose of creating an administrative convenience class is to eliminate numerous claims, thereby avoiding administrative costs, and that this result may be accomplished with one or more classes.

Section 1122(b) provides as follows:

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

Under § 1122(b), the bankruptcy court must approve the debtor's classification, applying a "reasonable and necessary" standard. In *In re S & W Enterprise*, 37 B.R. 153, 162 (Bankr.N.D.Ill.1984), the court indicated that it perceived the purpose of § 1122(b) to be the elimination of claims and thereby the avoidance of administration costs. This Court also believes that the purpose and intended goal of § 1122(b) is the reduction of administrative costs accomplished by reducing the number of claims to be dealt with post-petition.

The Court finds that Debtor's classification of administrative convenience claims into two classes achieves this goal, consistent with the purpose of the statute, and accordingly approves the classification as reasonable and necessary.[126] Debtor's Plan meets the requirements of § 1129(a)(10) and Debtor's treatment of Classes 4 and 5 is in compliance with § 1122(b) of the Bankruptcy Code.

18. U-Haul objects to the Plan on other grounds relating to the confirmation requirements of § 1129. The Court has considered these contentions and finds that each one is without merit. The Court finds that all the requirements of § 1129(a), other than paragraph (8), have been met. The Court further finds that the requirements of § 1129(b) have been satisfied. Accordingly, the proponent of the Plan having made a request for confirmation notwithstanding the requirements of § 1129(a)(8), the Plan shall be confirmed.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that the Joint Application for Approval of Settlement filed by Debtor and others be, and the same is hereby allowed.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Application of Debentureholders for Leave to Amend their Ballots to Vote in Favor of Confirmation of Debtor's Plan of Reorganization be, and the same is hereby denied.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Debtor's Motion to strike certain testimony given by Dr. Sidney Davidson be, and the same is hereby denied.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Motion of U-HAUL INTERNATIONAL, INC. for Summary Denial of Confirmation be, and the same is hereby denied.

**126.** U-Haul's primary objection to Debtor's classification scheme is that it is an attempt to artificially create an accepting impaired class (Class 5) for purposes of satisfying the requirement of § 1129(a)(10). As the Court has determined that an accepting impaired class is not essential to confirmation under § 1129(a)(10), and that Class 3 is in any event an accepting impaired class, U-Haul's contention that Debtor's classification is purely an attempt to "gerrymander" classification for purposes of confirmation is without merit and ·dismissed.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the oral Motion of U–HAUL INTERNATIONAL, INC. for Denial of Confirmation based upon U-Haul Exhibit 40–A and related evidence in the record be, and the same is hereby denied.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Debtor's Fifth Amended Plan of Reorganization, as thrice modified, be, and the same is hereby confirmed.

## APPENDIX A

### JARTRAN, INC. AND SUBSIDIARY
### PRO FORMA RECEIPTS/DISBURSEMENTS
(000)

| | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|
| Receipts | | | | | | |
| Rental Operations | $ 88,515 | $106,260 | $127,470 | $145,320 | $165,690 | $188,895 |
| Interest Income | 350 | 140 | 140 | 140 | 350 | 1,000 |
| ETS Contribution | 2,183 | 2,324 | 2,274 | 2,196 | 2,009 | 2,150 |
| Hall Contribution | — | 5,000 | — | — | — | — |
| Revenue Equipment | | | | | | |
| Disposals | — | 3,960 | 3,080 | 2,200 | 4,168 | 4,020 |
| Short-Term Borrowings | 2,750 | 657 | (129) | 588 | (3,866) | — |
| Total Receipts | 93,798 | 118,341 | 132,835 | 150,444 | 168,351 | 196,065 |
| Disbursements | | | | | | |
| Commissions | 16,218 | 18,970 | 22,903 | 26,150 | 29,865 | 34,024 |
| Maintenance | 16,450 | 16,000 | 18,950 | 21,610 | 24,650 | 28,100 |
| Physical Damage | 3,679 | 3,850 | 4,600 | 5,250 | 6,000 | 6,850 |
| Insurance | 4,721 | 5,560 | 5,900 | 6,268 | 6,663 | 7,088 |
| License and Tax | 3,400 | 2,365 | 2,546 | 2,735 | 2,940 | 3,160 |
| Sales Tax | 4,215 | 5,060 | 6,070 | 6,920 | 7,890 | 8,995 |
| Other Operating Expenses | 3,100 | 4,550 | 5,450 | 6,200 | 7,100 | 8,100 |
| Capital Expenditures | | | | | | |
| —SRE | 1,196 | 1,286 | 1,383 | 1,486 | 1,597 | 1,717 |
| —Vehicle Down Payments | — | — | 1,505 | 1,620 | 1,742 | 5,616 |
| —Refurbishment | — | 1,591 | 7,396 | 12,020 | — | — |
| Debt Service | 13,553 | 25,529 | 23,712 | 26,865 | 39,622 | 50,988 |
| Advertising | 7,600 | 8,345 | 9,220 | 8,320 | 9,150 | 10,070 |
| Field Administrative Expenses | 9,100 | 9,800 | 10,500 | 11,300 | 12,150 | 13,100 |
| Corporate Administrative | | | | | | |
| Expenses | 11,000 | 14,800 | 12,700 | 13,700 | 14,700 | 15,800 |
| Total Disbursements | 94,232 | 117,706 | 132,835 | 150,444 | 164,069 | 193,608 |
| Net Cash Change | $ (434) | $ 635 | $ — | $ — | $ 4,282 | $ 2,457 |
| Memo: Debt Service | | | | | | |
| Class 3—Scheduled | $ 12,500 | $ 15,000 | $ 15,000 | $ 15,000 | $ 19,000 | $ 21,000 |
| Class 3—Prepayment | | | | | | |
| —Retirement | — | 3,960 | 3,080 | 2,200 | 4,168 | 4,020 |
| Class 3—Prepayment | | | | | | |
| —Excess Cash | — | — | — | — | 2,666 | 818 |
| Class 6—Scheduled | — | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Class 6—Prepayment | | | | | | |
| —Excess Cash | — | — | — | — | 533 | 164 |
| Replacement Vehicles | | | | | | |
| —Principal | — | — | 1,561 | 3,797 | 6,391 | 13,322 |
| —Interest | — | — | 1,396 | 3,322 | 5,255 | 10,664 |
| Class 2, 4 and 5 | | | | | | |
| Creditors | — | 3,903 | — | — | — | — |
| ETS Debt | 683 | 724 | 539 | 346 | 9 | — |
| Short-term Interest | 370 | 942 | 1,136 | 1,200 | 600 | — |
| TOTAL | $ 13,553 | $ 25,529 | $ 23,712 | $ 26,865 | $ 39,622 | $ 50,988 |

October 18, 1982

## APPENDIX B

Table 1
### SENSITIVITY ANALYSIS
Estimated Value of Jartran and of Stockholders' Equity
As of 9/1/82
Estimated Real Cost of Capital = .0740

Assuming Slow Steady-State Replacement Policy
(thousands of dollars)

| Revenues and Costs Altered | Change Relative to Best Estimate | | | | |
|---|---|---|---|---|---|
| | −10% | −5% | Best Estimate | +5% | +10% |
| **VALUE OF FIRM** | | | | | |
| Rental revenue and variable costs... | 39,628 | 84,746 | 129,864 | 174,982 | 220,100 |
| Fixed costs ........................ | 159,828 | 144,846 | 129,864 | 114,882 | 99,900 |
| Disposal revenue ................... | 123,162 | 126,513 | 129,864 | 133,215 | 136,566 |
| Replacement costs.................. | 167,471 | 148,667 | 129,864 | 111,061 | 92,257 |
| Disposal revenue and replacement costs ........................... | 160,769 | 145,316 | 129,864 | 114,412 | 98,959 |
| **VALUE OF STOCKHOLDERS' EQUITY** | | | | | |
| Rental revenue and variable costs... | −73,869 | −28,751 | 16,367 | 61,485 | 106,603 |
| Fixed costs ........................ | 46,331 | 31,349 | 16,367 | 1,385 | −13,597 |
| Disposal revenue ................... | 9,665 | 13,016 | 16,367 | 19,718 | 23,069 |
| Replacement costs.................. | 53,974 | 35,170 | 16,367 | −2,436 | −21,240 |
| Disposal revenue and replacement costs ........................... | 47,272 | 31,819 | 16,367 | 915 | −14,538 |

Table 2

SENSITIVITY ANALYSIS

Estimated Value of Jartran and of Stockholders' Equity

As of 9/1/82

Estimated Real Cost of Capital = .0740

Assuming Fast Steady-State Replacement Policy

(thousands of dollars)

| Revenues and Costs Altered | Change Relative to Best Estimate | | | | |
|---|---|---|---|---|---|
| | −10% | −5% | Best Estimate | +5% | +10% |
| VALUE OF FIRM | | | | | |
| Rental revenue and variable costs... | 31,713 | 76,831 | 121,949 | 167,067 | 212,185 |
| Fixed costs ........................ | 151,913 | 136,931 | 121,949 | 106,967 | 91,985 |
| Disposal revenue ................... | 109,028 | 115,489 | 121,949 | 128,409 | 134,869 |
| Replacement costs................. | 166,566 | 144,257 | 121,949 | 99,640 | 77,332 |
| Disposal revenue and replacement costs ........................... | 153,645 | 137,797 | 121,949 | 106,101 | 90,253 |
| VALUE OF STOCKHOLDERS' EQUITY | | | | | |
| Rental revenue and variable costs... | −81,784 | −36,666 | 8,452 | 53,570 | 98,688 |
| Fixed costs ........................ | 38,416 | 23,434 | 8,452 | −6,530 | −21,512 |
| Disposal revenue ................... | −4,469 | 1,992 | 8,452 | 14,912 | 21,372 |
| Replacement costs................. | 53,069 | 30,760 | 8,452 | −13,857 | −36,165 |
| Disposal revenue and replacement costs ........................... | 40,148 | 24,300 | 8,452 | −7,396 | −23,244 |

Table 3
### SENSITIVITY ANALYSIS
Estimated Value of Jartran and of Stockholders' Equity
As of 9/1/82
Estimated Real Cost of Capital = .0815

Assuming Slow Steady-State Replacement Policy
(thousands of dollars)

| Revenues and Costs Altered | Change Relative to Best Estimate | | | | |
| --- | --- | --- | --- | --- | --- |
| | −10% | −5% | Best Estimate | +5% | +10% |
| **VALUE OF FIRM** | | | | | |
| Rental revenue and variable costs... | 35,402 | 76,190 | 116,978 | 157,766 | 198,555 |
| Fixed costs ........................ | 144,227 | 130,603 | 116,978 | 103,354 | 89,730 |
| Disposal revenue .................. | 111,046 | 114,012 | 116,978 | 119,945 | 122,911 |
| Replacement costs................. | 150,592 | 133,785 | 116,978 | 100,171 | 83,364 |
| Disposal revenue and replacement costs ........................... | 144,660 | 130,819 | 116,978 | 103,138 | 89,297 |
| **VALUE OF STOCKHOLDERS' EQUITY** | | | | | |
| Rental revenue and variable costs... | −77,939 | −37,151 | 3,637 | 44,425 | 85,214 |
| Fixed costs ........................ | 30,886 | 17,262 | 3,637 | −9,987 | −23,611 |
| Disposal revenue .................. | −2,295 | 671 | 3,637 | 6,604 | 9,570 |
| Replacement costs................. | 37,251 | 20,444 | 3,637 | −13,170 | −29,977 |
| Disposal revenue and replacement costs ........................... | 31,319 | 17,478 | 3,637 | −10,203 | −24,044 |

Table 4

SENSITIVITY ANALYSIS

Estimated Value of Jartran and of Stockholders' Equity

As of 9/1/82

Estimated Real Cost of Capital = .0815

Assuming Fast Steady-State Replacement Policy
(thousands of dollars)

| Revenues and Costs Altered | Change Relative to Best Estimate | | | | |
|---|---|---|---|---|---|
| | −10% | −5% | Best Estimate | +5% | +10% |
| VALUE OF FIRM | | | | | |
| Rental revenue and variable costs... | 28,484 | 69,272 | 110,060 | 150,848 | 191,636 |
| Fixed costs ...................... | 137,309 | 123,684 | 110,060 | 96,436 | 82,812 |
| Disposal revenue .................. | 98,740 | 104,400 | 110,060 | 115,720 | 121,381 |
| Replacement costs................. | 149,754 | 129,907 | 110,060 | 90,213 | 70,366 |
| Disposal revenue and replacement costs .......................... | 138,434 | 124,247 | 110,060 | 95,873 | 81,687 |
| VALUE OF STOCKHOLDERS' EQUITY | | | | | |
| Rental revenue and variable costs... | −84,847 | −44,069 | −3,281 | 37,507 | 78,295 |
| Fixed costs ...................... | 23,968 | 10,343 | −3,281 | −16,905 | −30,529 |
| Disposal revenue .................. | −14,601 | −8,941 | −3,281 | 2,379 | 8,040 |
| Replacement costs................. | 36,413 | 16,566 | −3,281 | −23,128 | −42,975 |
| Disposal revenue and replacement costs .......................... | 25,093 | 10,906 | −3,281 | −17,468 | −31,654 |

APPENDIX C

Table 5
SENSITIVITY ANALYSIS
Estimated Value of Jartran and of Stockholders' Equity
As of 1/1/83
Estimated Real Cost of Capital = .0740

Assuming Slow Steady-State Replacement Policy
(thousands of dollars)

| Revenues and Costs Altered | Change Relative to Best Estimate | | | | |
| --- | --- | --- | --- | --- | --- |
| | −10% | −5% | Best Estimate | +5% | +10% |
| VALUE OF FIRM | | | | | |
| Rental revenue and variable costs... | 36,623 | 82,387 | 128,151 | 173,915 | 219,678 |
| Fixed costs ........................ | 158,101 | 143,126 | 128,151 | 113,176 | 98,200 |
| Disposal revenue .................... | 121,288 | 124,719 | 128,151 | 131,582 | 135,014 |
| Replacement costs.................. | 166,663 | 147,407 | 128,151 | 108,895 | 89,639 |
| Disposal revenue and replacement costs .......................... | 159,800 | 143,975 | 128,151 | 112,326 | 96,502 |
| VALUE OF STOCKHOLDERS' EQUITY | | | | | |
| Rental revenue and variable costs... | −82,369 | −36,605 | 9,159 | 54,923 | 100,686 |
| Fixed costs ........................ | 39,109 | 24,134 | 9,159 | −5,816 | −20,792 |
| Disposal revenue .................... | 2,296 | 5,727 | 9,159 | 12,590 | 16,022 |
| Replacement costs.................. | 47,671 | 28,415 | 9,159 | −10,097 | −29,353 |
| Disposal revenue and replacement costs .......................... | 40,808 | 24,983 | 9,159 | −6,666 | −22,490 |

Table 6
SENSITIVITY ANALYSIS
Estimated Value of Jartran and of Stockholders' Equity
As of 1/1/83
Estimated Real Cost of Capital = .0740

Assuming Fast Steady-State Replacement Policy
(thousands of dollars)

| Revenues and Costs Altered | Change Relative to Best Estimate | | | | |
|---|---|---|---|---|---|
| | −10% | −5% | Best Estimate | +5% | +10% |
| VALUE OF FIRM | | | | | |
| Rental revenue and variable costs... | 28,518 | 74,281 | 120,045 | 165,809 | 211,573 |
| Fixed costs ........................ | 149,995 | 135,020 | 120,045 | 105,070 | 90,095 |
| Disposal revenue ................... | 106,813 | 113,429 | 120,045 | 126,661 | 133,277 |
| Replacement costs.................. | 165,736 | 142,891 | 120,045 | 97,199 | 74,354 |
| Disposal revenue and replacement costs ........................... | 152,505 | 136,275 | 120,045 | 103,815 | 87,585 |
| VALUE OF STOCKHOLDERS' EQUITY | | | | | |
| Rental revenue and variable costs... | −90,474 | −44,711 | 1,053 | 46,817 | 92,581 |
| Fixed costs ........................ | 31,003 | 16,028 | 1,053 | −13,922 | −28,897 |
| Disposal revenue ................... | −12,179 | −5,563 | 1,053 | 7,669 | 14,285 |
| Replacement costs.................. | 46,744 | 23,899 | 1,053 | −21,793 | −44,638 |
| Disposal revenue and replacement costs ........................... | 33,513 | 17,283 | 1,053 | −15,177 | −31,407 |

Table 7
SENSITIVITY ANALYSIS
Estimated Value of Jartran and of Stockholders' Equity
As of 1/1/83
Estimated Real Cost of Capital = .0815

Assuming Slow Steady-State Replacement Policy
(thousands of dollars)

| | Change Relative to Best Estimate | | | | |
|---|---|---|---|---|---|
| Revenues and Costs Altered | −10% | −5% | Best Estimate | +5% | +10% |
| **VALUE OF FIRM** | | | | | |
| Rental revenue and variable costs... | 32,374 | 73,800 | 115,227 | 156,653 | 198,079 |
| Fixed costs ........................ | 142,459 | 128,843 | 115,227 | 101,610 | 87,994 |
| Disposal revenue ................... | 109,137 | 112,182 | 115,227 | 118,271 | 121,316 |
| Replacement costs.................. | 149,730 | 132,478 | 115,227 | 97,975 | 80,723 |
| Disposal revenue and replacement costs ......................... | 143,641 | 129,434 | 115,227 | 101,020 | 86,812 |
| **VALUE OF STOCKHOLDERS' EQUITY** | | | | | |
| Rental revenue and variable costs... | −86,481 | −45,055 | −3,628 | 37,798 | 79,224 |
| Fixed costs ........................ | 23,604 | 9,988 | −3,628 | −17,245 | −30,861 |
| Disposal revenue ................... | −9,718 | −6,673 | −3,628 | −584 | 2,461 |
| Replacement costs.................. | 30,875 | 13,623 | −3,628 | −20,880 | −38,132 |
| Disposal revenue and replacement costs ......................... | 24,786 | 10,579 | −3,628 | −17,836 | −32,043 |

Table 8
SENSITIVITY ANALYSIS
Estimated Value of Jartran and of Stockholders' Equity
As of 1/1/83
Estimated Real Cost of Capital = .0815

Assuming Fast Steady-State Replacement Policy
(thousands of dollars)

| | Change Relative to Best Estimate | | | | |
|---|---|---|---|---|---|
| Revenues and Costs Altered | −10% | −5% | Best Estimate | +5% | +10% |
| **VALUE OF FIRM** | | | | | |
| Rental revenue and variable costs... | 25,273 | 66,699 | 108,125 | 149,552 | 190,978 |
| Fixed costs ........................ | 135,358 | 121,742 | 108,125 | 94,509 | 80,893 |
| Disposal revenue ................... | 96,505 | 102,315 | 108,125 | 113,935 | 119,745 |
| Replacement costs.................. | 148,870 | 128,498 | 108,125 | 87,753 | 67,381 |
| Disposal revenue and replacement costs ......................... | 137,250 | 122,687 | 108,125 | 93,563 | 79,001 |
| **VALUE OF STOCKHOLDERS' EQUITY** | | | | | |
| Rental revenue and variable costs... | −93,582 | −52,156 | −10,730 | 30,697 | 72,123 |
| Fixed costs .......................:.. | 16,503 | 2,887 | −10,730 | −24,346 | −37,963 |
| Disposal revenue ................... | −22,350 | −16,540 | −10,730 | −4,920 | 890 |
| Replacement costs.................. | 30,015 | 9,643 | −10,730 | −31,102 | −51,474 |
| Disposal revenue and replacement costs ......................... | 18,395 | 3,832 | −10,730 | −25,292 | −39,854 |

# APPENDIX D

Corporate Accounting
December 1, 1983

Jartran, Inc.
Truck Rental Statements of Operation
Ten Years Ended December 31, 1987
Unaudited
(000's)

| | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | — | 2,914 | 56,261 | 86,212 | 82,162 | 81,298 | 96,311 | 118,222 | 140,272 | 181,383 |
| Fixed expenses (excluding depreciation and interest) | — | 859 | 7,720 | 11,331 | 7,359 | 8,834 | 8,912 | 10,082 | 11,370 | 13,947 |
| Maintenance and repairs | — | 762 | 4,345 | 19,273 | 19,262 | 18,778 | 23,309 | 26,708 | 30,445 | 36,441 |
| Dealer commissions | — | 594 | 10,467 | 16,398 | 15,787 | 15,902 | 18,742 | 23,101 | 27,508 | 35,508 |
| Other direct expenses | — | 73 | 2,120 | 3,677 | 3,530 | 4,979 | 5,244 | 6,315 | 7,175 | 8,252 |
| Total direct expenses | — | 2,288 | 24,652 | 50,679 | 45,938 | 48,493 | 56,207 | 66,206 | 76,498 | 94,148 |
| Total direct margin | — | 626 | 31,609 | 35,533 | 36,224 | 32,805 | 40,104 | 52,016 | 63,774 | 87,235 |
| Advertising | — | 314 | 4,418 | 3,548 | 7,369 | 6,156 | 4,366 | 4,891 | 5,380 | 5,918 |
| Administrative expenses | $424 | 3,174 | 21,432 | 23,689 | 21,069 | 21,930 | 23,811 | 25,585 | 27,432 | 29,806 |
| Legal expenses (excluding Chapter 11) | — | — | 2,279 | 4,409 | 1,473 | 300 | 330 | 360 | 400 | 440 |
| Truck rental pretax profit (loss) before interest and depreciation | (424) | (2,862) | 3,480 | 3,887 | 6,313 | 4,419 | 11,597 | 21,180 | 30,562 | 51,071 |
| Interest | | | | | | | | | | |
| Prepetition vehicle/restructured interest | — | 777 | 14,057 | 30,036 | 11,761* | 11,483* | 9,438** | 8,742 | 7,304 | 5,679 |
| Prepetition working capital/restructured interest | — | — | 1,663 | 2,924 | 595* | 657* | 808** | 822 | 726 | 613 |
| Postpetition new vehicle | — | — | — | — | — | — | — | 2,317 | 4,326 | 9,236 |
| Postpetition working capital | — | — | — | — | 346 | 863 | 1,583 | 1,884 | 2,008 | 1,035 |
| Total interest expense | — | 777 | 15,720 | 32,960 | 12,702 | 13,003 | 11,829 | 13,765 | 14,364 | 16,563 |
| Vehicle depreciation | — | 492 | 11,270 | 22,160 | 15,007 | 13,074 | 11,819 | 13,153 | 15,022 | 19,555 |
| Truck rental pretax profit (loss) | (424) | (4,131) | (23,510) | (51,233) | (21,396) | (21,658) | (12,051) | (5,738) | 1,176 | 14,953 |
| ETS Contribution | — | — | 278 | 1,297 | 1,664 | 1,839 | 1,100 | 1,200 | 1,400 | 1,700 |
| Goodwill | — | — | — | — | — | — | (655) | (874) | (874) | (874) |
| Consolidated Pretax profit (loss) | (424) | (4,131) | (23,232) | (49,936) | (19,732) | (19,819) | (11,606) | (5,412) | 1,702 | 15,779 |

* Imputed interest
** Includes imputed interest for first quarter only.

## APPENDIX E

### JARTRAN, INC.
Summary of Receipts and Disbursements
Years Ended December 31, 1982 Through 1987
(000's)

| | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|
| **RECEIPTS** | | | | | | |
| Truck Rental | $85,270 | 85,764 | 99,321 | 121,889 | 144,600 | 186,944 |
| ETS Contribution | 1,828 | 2,785 | 1,100 | 1,200 | 1,400 | 1,700 |
| Hall Equity Contribution | — | — | 5,000 | — | — | — |
| Total Receipts | 87,098 | 88,549 | 105,421 | 123,089 | 146,000 | 188,644 |
| **DISBURSEMENTS** | | | | | | |
| Operations | 76,094 | 84,204 | 87,993 | 100,445 | 113,546 | 133,569 |
| Debt Service | | | | | | |
| Secured Creditors | 12,250 | 15,000 | — | — | — | — |
| F. B. Hall | — | — | — | 15,876 | 15,876 | 15,876 |
| Fruehauf Restructure | — | — | 237 | 2,555 | 2,804 | 3,044 |
| New Vehicle | — | — | — | 4,584 | 7,607 | 12,833 |
| Interest on Short Term | | | | | | |
| Debt | 279 | 885 | 1,583 | 1,884 | 2,008 | 1,035 |
| Legal | | | | | | |
| Phoenix Case | 140 | 105 | 1,755 | — | — | — |
| Miami Case | — | 13 | 2,487 | — | — | — |
| Chapter 11 | | | | | | |
| Class 2 | — | — | 1,365 | — | — | — |
| Class 4 | — | — | 1,220 | — | — | — |
| Class 5 | — | — | 2,354 | — | — | — |
| Class 6 | — | — | 2,000 | 1,500 | 1,500 | 1,500 |
| Administrative | 190 | 135 | 1,181 | — | — | — |
| Legal | — | 43 | 2,500 | — | — | — |
| Total Disbursements | 88,953 | 100,385 | 104,675 | 126,844 | 143,341 | 167,857 |
| Increase/(Decrease) in Cash | $ (1,855) | (11,836) | 746 | (3,755) | 2,659 | 20,787 |
| Short Term Borrowings | $ 2,750 | 11,500 | 7,500 | 14,500 | 11,500 | 4,500 |
| Short Term Borrowing Repayments | $ — | 2,500 | 8,000 | 10,500 | 14,500 | 16,500 |
| Ending Book Balance | $ 1,328 | (1,508) | (1,262) | (1,017) | (1,358) | 7,429 |
| Ending Short Term Borrowings | $ 2,750 | 11,750 | 11,000 | 15,000 | 12,000 | 0 |
| Peak Short Term Borrowings | $ 2,750 | 11,750 | 15,000 | 18,500 | 22,000 | 16,500 |

Treasury Dept.
December 1, 1983

## APPENDIX F

Jartran, Inc.
SUMMARY OF CURRENT CLASS 3 RESTRUCTURING AND REFINANCING
COMPARED TO PLAN OF REORGANIZATION
(000's)

| | Ford, Chrysler and Fruehauf Refinancing (A) | | Fruehauf (B) | | | | Total Class 3 Refinancing | | Current Plan of Reorganization | | Total Refinancing B/(W) Plan of Reorganization | |
| | | | Fixed Payments | | 2% of Revenues | | | | | | | |
| | Monthly | Annual | Monthly | Annual | Qtrly | Annual | Monthly(C) | Annual | Monthly | Annual | Monthly(C) | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1984 | $ — | — | — | — | 79 | 316 | 26 | 316 | 1,250 | 15,000 | 1,224 | 14,684 |
| 1985 | 1,323 | 15,876 | 200 | 2,400 | 92 | 368 | 1,553 | 18,636 | 1,250 | 15,000 | (303) | (3,636) |
| 1986 | 1,323 | 15,876 | 200 | 2,400 | 104 | 416 | 1,558 | 18,696 | 1,583 | 19,000 | 25 | 304 |
| 1987 | 1,323 | 15,876 | 200 | 2,400 | 108 | 432 | 1,559 | 18,708 | 1,750 | 21,000 | 191 | 2,292 |
| 1988 | 1,323 | 15,876 | 200 | 2,400 | 112 | 448 | 1,560 | 18,720 | 1,750 | 21,000 | 190 | 2,280 |
| 1989 | 1,323 | 15,876 | 200 | 2,400 | 116 | 464 | 1,562 | 18,744 | 1,750 | 21,000 | 188 | 2,256 |
| 1990 (11 months) | — | — | 200 | 2,200 | 120 | 360 | 240 | 2,640 | 1,749 | 19,248 | 1,509 | 16,608 |
| 1990 (1 month) | — | — | 200 | 200 | 120 | 120 | 240 | 240 | 41,652 | 41,652 | 41,412 | 41,412 |
| Totals | — | $79,380 | — | 14,400 | — | 2,924 | — | 96,700 | — | 172,900 | — | 76,200 |
| NPV @ 13.5% (As of 1/1/84) | | $51,990 | | 8,598 | | 1,811 | | 62,399 | | 98,470 | | 36,071 |

(A) Represents current assumption of $52,000 to be paid in total to Ford, Chrysler and Fruehauf by F. B. Hall on 4/1/84. Current refinancing plan is for Jartran to pay Hall back over six years with no payments in 1984 and even monthly payments over the next five years at a 13.5% interest rate on the outstanding balance beginning the date Hall pays Ford, Chrysler and Fruehauf.

(B) Represents payments to be made to Fruehauf in future to retain lease concept. 2% of revenues on equipment financed by Fruehauf approximately 18,200 utility trailers and 500 Ford F-700 trucks.

(C) Adjusted to include ¼ of quarterly payment to Fruehauf. Some differences may occur due to rounding.

Treasury
November 30, 1983

## APPENDIX G

Rental Revenues Minus Variable Costs
Calculation of Percentage Change from
Original Cash Flow Forecast

(1) Calculate the present value as of January 1, 1983 of rental revenues minus variable costs ("PV") as originally forecast in Exhibit E–6:

(a) Remove the inflationary component (7.5% per year) from the projections of Exhibit E–6:

| | (thousands of dollars) | | | | |
| | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|
| Rental Revenues | 98,847 | 110,304 | 116,977 | 124,069 | 131,576 |
| Commissions | 17,647 | 19,819 | 21,050 | 22,363 | 23,700 |
| Maintenance | 14,884 | 16,398 | 17,395 | 18,458 | 19,573 |
| Physical Damage | 3,581 | 3,981 | 4,226 | 4,493 | 4,771 |
| Sales Tax | 4,707 | 5,253 | 5,570 | 5,908 | 6,266 |
| Other Operating Expenses | 4,233 | 4,716 | 4,991 | 5,316 | 5,642 |
| Total Variable Costs | 45,052 | 50,167 | 53,232 | 56,538 | 59,952 |
| Rental Revenues minus Variable Costs | 53,795 | 60,137 | 63,745 | 67,531 | 71,624 |

(b) Estimate net rental revenues for the steady-state years (beginning 1988): $71,624,000.00

(c) Discount the stream of net rental revenues to January 1, 1983 at the rate of 8.15%:

$$\text{PV of 1983 net rental revenues} = \frac{\$53,795,000}{(1 + .0815)} = \$49,741,000$$

$$\text{PV of 1984 net rental revenues} = \frac{\$60,137,000}{(1 + .0815)^2} = \$51,417,000$$

$$\text{PV of 1985 net rental revenues} = \frac{\$63,745,000}{(1 + .0815)^3} = \$50,391,000$$

PV of 1986 net rental revenues $= \dfrac{\$67,531,000}{(1 + .0815)^4} = \$49,361,000$

PV of 1987 net rental revenues $= \dfrac{\$71,624,000}{(1 + .0815)^5} = \$48,408,000$

PV of net rental revenues in the steady-state years = PV of a perpetuity of $71,624,000 per year minus PV of a 5-year annuity of $71,624,000

$$= \dfrac{\$71,624,000}{.0815} - \$71,624,000 \left( \dfrac{1 - \dfrac{1}{(1 + .0815)^5}}{.0815} \right)$$

$$= \$878,822,000 - \$284,827,000$$

$$= \$593,995,000$$

Total PV of rental revenues minus variable costs as originally forecast in Exhibit E–6 = \$49,741,000 + \$51,417,000 + \$50,391,000 + \$49,361,000 + \$48,408,000 + \$593,995,000 = \$843,313,000

(2) Calculate PV of rental revenues minus variable costs in the adjusted forecast:

 (a) Convert revenue projections of the adjusted forecasts to 1982 dollars:

| | (thousands of dollars) | | | | |
| --- | --- | --- | --- | --- | --- |
| | 1983 | 1984 | 1985 | 1986 | 1987 |
| Rental revenue in adjusted forecast | 85,764 | 97,000 | 115,000 | 130,000 | 160,000 |
| Converting to 1982 dollars | 79,780 | 83,937 | 92,570 | 97,344 | 111,449 |

 (b) Estimate variable costs as 50% of rental revenues

| | 1983 | 1984 | 1985 | 1986 | 1987 |
| --- | --- | --- | --- | --- | --- |
| as 50% of rental revenues | 39,890 | 41,969 | 46,285 | 48,672 | 55,725 |
| Rental revenues minus variable costs | 39,890 | 41,968 | 46,285 | 48,672 | 55,724 |

 (c) Estimate net rental revenues for the steady-state years (beginning 1988): \$55,724,000

 (d) Discount the stream of net rental revenues to January 1, 1983 at the rate of 8.15%:

PV of 1983 net rental revenues $= \dfrac{\$39,890,000}{(1 + .0815)} = \$36,884,000$

PV of 1984 net rental revenues $= \dfrac{\$41,968,000}{(1 + .0815)^2} = \$35,882,000$

PV of 1985 net rental revenues $= \dfrac{\$46,285,000}{(1 + .0815)^3} = \$36,589,000$

PV of 1986 net rental revenues $= \dfrac{\$48,672,000}{(1 + .0815)^4} = \$35,576,000$

PV of 1987 net rental revenues $= \dfrac{\$55,724,000}{(1 + .0815)^5} = \$37,662,000$

PV of 1987 net rental revenues in the steady-state years = PV of a perpetuity of $55,724,000 per year minus PV of a 5-year annuity of $55,724,000

$$= \dfrac{\$55,724,000}{.0815} - \$55,724,000 \left( \dfrac{1 - \dfrac{1}{(1 + .0815)^5}}{.0815} \right)$$

$$= \$683,730,000 - \$221,614,000$$

$$= \$462,116,000$$

Total PV of rental revenues minus variable costs in the adjusted forecast = \$36,884,000 + \$35,882,000 + \$36,589,000 + \$35,576,000 + \$37,662,000 + \$462,116,000 = \$644,709,000

(3) Calculate percentage change in rental revenues from the original cash flow forecast of Exhibit E–6:

$$\dfrac{\$843,313,000 - \$644,709,000}{\$843,313,000} = 23.6\%$$

## APPENDIX H
### Fixed Costs Calculation of Percentage Change from
### Original Cash Flow Forecast

(1) Calculate the present value as of January 1, 1983 ("PV") of fixed costs as originally forecast in Exhibit E–6:

 (a) Remove the inflationary component (7.5% per year) from the projections of Exhibit E–6:

| | | | (thousands of dollars) | | |
|---|---|---|---|---|---|
| | 1983 | 1984 | 1985 | 1986 | 1987 |
| License and Tax | 2,200 | 2,203 | 2,202 | 2,201 | 2,201 |
| Field Administrative Expenses | 9,116 | 9,086 | 9,096 | 9,098 | 9,125 |
| Corporate Administrative Expenses | 10,997* | 10,990 | 11,028 | 11,007 | 11,006 |
| Total Fixed Costs | 22,293 | 22,279 | 22,326 | 22,306 | 22,332 |

 \* Corporate administrative expenses for 1983 are erroneously listed as $14,800,000 in Exhibit E–6. According to Exhibit E–3, the correct figure is $11,800,000.

 (b) Estimate fixed costs for the steady-state years (beginning 1988): $22,332,000

 (c) Discount the stream of fixed costs to January 1, 1983 at the rate of 8.15%:

$$\text{PV of 1983 fixed costs} = \frac{\$22,293,000}{(1 + .0815)} = \$20,613,000$$

$$\text{PV of 1984 fixed costs} = \frac{\$22,279,000}{(1 + .0815)^2} = \$19,048,000$$

$$\text{PV of 1985 fixed costs} = \frac{\$22,326,000}{(1 + .0815)^3} = \$17,649,000$$

$$\text{PV of 1986 fixed costs} = \frac{\$22,306,000}{(1 + .0815)^4} = \$16,304,000$$

$$\text{PV of 1987 fixed costs} = \frac{\$22,332,000}{(1 + .0815)^5} = \$15,093,000$$

PV of fixed costs in the steady-state years = PV of a perpetuity of $22,332,000 per year minus PV of a 5-year annuity of $22,332,000

$$= \frac{\$22,332,000}{.0815} - \$22,332,000 \left( \frac{1 - \dfrac{1}{(1 + .0815)^5}}{.0815} \right)$$

$$= \$274,012,000 - \$88,808,000$$

$$= \$185,204,000$$

 Total PV of fixed costs as originally forecast in Exhibit E–6 = $20,613,000 + $19,048,000 + $17,649,000 + $16,304,000 + $15,093,000 + $185,204,000 = $273,911,000

(2) Calculate PV of fixed costs in the adjusted forecast:

 (a) Convert fixed costs in the adjusted forecast to 1982 dollars:

| | | | (thousands of dollars) | | |
|---|---|---|---|---|---|
| | 1983 | 1984 | 1985 | 1986 | 1987 |
| Field and Corporate Administrative Expenses | 21,930 | 23,811 | 25,585 | 27,432 | 29,806 |
| License and Tax | 2,527 | 2,549 | 2,883 | 3,252 | 3,989 |
| Total Fixed Costs | 24,457 | 26,360 | 28,468 | 30,684 | 33,795 |
| Adjusted to 1982 dollars | 22,751 | 22,810 | 22,916 | 22,976 | 23,540 |

 (b) Estimate fixed costs for the steady-state years (beginning 1988): $23,540,000

 (c) Discount the stream of fixed costs to January 1, 1983 at the rate of 8.15%:

$$\text{PV of 1983 fixed costs} = \frac{\$228,751,000}{(1 + .0815)} = \$21,037,000$$

$$\text{PV of 1984 fixed costs} = \frac{\$22,810,000}{(1 + .0815)^2} = \$19,502,000$$

$$\text{PV of 1985 fixed costs} = \frac{\$22,916,000}{(1 + .0815)^3} = \$18,115,000$$

$$\text{PV of 1986 fixed costs} = \frac{\$22,976,000}{(1 + .0815)^4} = \$16,794,000$$

$$\text{PV of 1987 fixed costs} = \frac{\$23,540,000}{(1 + .0815)^5} = \$15,910,000$$

PV of fixed costs in the steady-state years = PV of a perpetuity of $23,540,000 per year minus PV of a 5-year annuity of $23,540,000

$$= \frac{\$23,540,000}{.0815} - \$23,540,000 \left( \frac{1 - \dfrac{1}{(1 + .0815)^5}}{.0815} \right)$$

$$= \$288,834,000 - \$93,612,000$$

$$= \$195,222,000$$

Total PV of fixed costs in the adjusted forecast = $21,037,000 + $19,502,000 + $18,115,000 + $16,794,000 + $15,910,000 + $195,222,000 = $286,580,000

(3) Calculate percentage change in fixed costs from the original cash flow forecast of Exhibit E–6:

$$\frac{\$286,580,000 - \$273,911,000}{\$273,911,000} = 4.6\%$$

# APPENDIX I

Net Replacement Costs Calculation of Percentage Change from
Original Cash Flow Forecast

(1) Calculate the present value as of January 1, 1983 ("PV") of net replacement costs as originally forecast in Exhibit E–6:

 (a) Estimate net replacement costs for the years 1983–87:

| | (thousands of dollars) | | | | |
| --- | --- | --- | --- | --- | --- |
| | 1983 | 1984 | 1985 | 1986 | 1987 |
| Cash price of vehicles purchased (in 1982 dollars) | 0 | 14,000 | 14,000 | 14,000 | 42,000 |
| Disposal revenue (in 1982 dollars) | 3,684 | 2,665 | 1,771 | 3,121 | 2,800 |
| Net Replacement Costs | (3,684) | 11,335 | 12,229 | 10,879 | 39,200 |

 (b) Estimate net replacement costs for 1988: $42,000,000 − $5,940,000 = $36,060,000

 (c) Estimate net replacement costs for the steady-state years (beginning 1989): $30,800,000 − $5,940,000 = $24,860,000

 (d) Discount the stream of net replacement costs to January 1, 1983 at the rate of 8.15%:

$$\text{PV of 1983 net replacement costs} = \frac{(\$3,684,000)}{(1 + .0815)} = (\$3,406,000)$$

$$\text{PV of 1984 net replacement costs} = \frac{\$11,335,000}{(1 + .0815)^2} = \$9,691,000$$

$$\text{PV of 1985 net replacement costs} = \frac{\$12,229,000}{(1 + .0815)^3} = \$9,667,000$$

$$\text{PV of 1986 net replacement costs} = \frac{\$10,879,000}{(1 + .0815)^4} = \$7,952,000$$

$$\text{PV of 1987 net replacement costs} = \frac{\$39,200,000}{(1 + .0815)^5} = \$26,494,000$$

$$\text{PV of 1988 net replacement costs} = \frac{\$36,060,000}{(1 + .0815)^6} = \$22,536,000$$

PV of a perpetuity of $24,860,000 per year minus PV of a six-year annuity of $24,860,000

$$= \frac{\$24,860,000}{.0815} - \$24,860,000 \left( \frac{1 - \frac{1}{(1 + .0815)^5}}{.0815} \right)$$

$$= \$305,031,000 - \$114,386,000$$

$$= \$190,645,000$$

Total PV of net replacement costs in the original cash flow forecast = ($3,406,000) + $9,691,000 + $9,667,000 + $7,952,000 + $26,494,000 + $22,536,000 + $190,645,000 = $263,579,000

(2) Calculate PV of net replacement costs (and acquisition costs) in the adjusted forecast:

(a) Estimate costs for the years 1983–1987:

| | | | (thousands of dollars) | | |
|---|---|---|---|---|---|
| | 1983 | 1984 | 1985 | 1986 | 1987 |
| Cash price of vehicles purchased (in 1982 dollars) | 0 | 0 | 16,800 | 11,200 | 33,600 |

(b) Estimate net replacement costs for 1988: ($720,000)

(c) Estimate net replacement costs for the steady-state years (beginning 1989): $16,800,000 − $720,000 = $16,080,000

(d) Discount the stream of net replacement costs to January 1, 1983 at the rate of 8.15%:

PV of 1983 acquisition costs = 0

PV of 1984 acquisition costs = 0

$$\text{PV of 1985 acquisition costs} = \frac{\$16,800,000}{(1 + .0815)^3} = \$13,281,000$$

$$\text{PV of 1986 acquisition costs} = \frac{\$11,200,000}{(1 + .0815)^4} = \$8,187,000$$

$$\text{PV of 1987 acquisition costs} = \frac{\$33,600,000}{(1 + .0815)^5} = \$22,709,000$$

$$\text{PV of 1988 net replacement costs} = \frac{(\$720,000)}{(1 + .0815)^6} = (\$450,000)$$

PV of net replacement costs in the steady-state years = PV of a perpetuity of $16,080,000 per year minus PV of a six-year annuity of $16,080,000

$$= \frac{\$16,080,000}{.0815} - \$16,080,000 \left( \frac{1 - \frac{1}{(1 + .0815)^6}}{.0815} \right)$$

$$= \$197,301,000 - \$73,984,000$$

$$= \$123,317,000$$

Total PV of net replacement costs in the adjusted forecast = $13,281,000 + $8,187,000 + $22,709,000 + ($450,000) + $123,317,000 = $167,044,000

(3) Calculate percentage decrease in net replacement costs from original forecast:

$$\frac{\$263,579,000 - \$167,044,000}{\$263,579,000} = 36.6\%$$

## APPENDIX J

Refurbishment Costs in Original Cash Flow Forecast
Calculation of Value as of January 1, 1983

(1) Remove inflationary component of projected refurbishment costs:

(thousands of dollars)

| 1983 | 1984 | 1985 |
|------|------|------|
| 1,480 | 6,400 | 10,400 |

(2) Discount the projected refurbishment costs to January 1, 1983 at the rate of 8.15%:

$$\text{PV of 1983 refurbishment costs} = \frac{\$1,480,000}{(1+.0815)} = \$1,368,000$$

$$\text{PV of 1984 refurbishment costs} = \frac{\$6,400,000}{(1+.0815)^2} = \$5,472,000$$

$$\text{PV of 1985 refurbishment costs} = \frac{\$10,400,000}{(1+.0815)^3} = \$8,221,000$$

Total PV of refurbishment costs in original cash flow forecast
= \$1,368,000 + \$5,472,000 + \$8,221,000 = \$15,061,000

## APPENDIX K

Advertising Expenses

Calculation of Increase in Adjusted Forecast

(1) Calculate the present value, as of January 1, 1983, of advertising expenses in the original cash flow forecast:

(thousands of dollars)

| | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|------|------|------|------|------|
| Advertising Expenses (after adjusting for inflation) | 7,763 | 7,978 | 6,697 | 6,852 | 7,014 |

$$\text{PV of 1983 advertising costs} = \frac{\$7,763,000}{(1+.0815)} = \$7,178,000$$

$$\text{PV of 1984 advertising costs} = \frac{\$7,978,000}{(1+.0815)^2} = \$6,821,000$$

$$\text{PV of 1985 advertising costs} = \frac{\$6,697,000}{(1+.0815)^3} = \$5,294,000$$

$$\text{PV of 1986 advertising costs} = \frac{\$6,852,000}{(1+.0815)^4} = \$5,008,000$$

$$\text{PV of 1987 advertising costs} = \frac{\$7,014,000}{(1+.0815)^5} = \$4,740,000$$

PV of advertising costs in the steady-state years (beginning 1988) = PV of a perpetuity of \$7,014,000 per year minus PV of a five-year annuity of \$7,014,000 per year

$$= \frac{\$7,014,000}{.0815} - \$7,014,000 \left( \frac{1 - \frac{1}{(1+.0815)^5}}{.0815} \right)$$

$$= \$86,061,000 - \$27,893,000$$

$$= \$58,168,000$$

Total PV of advertising costs in the original cash flow forecast
= \$7,178,000 + \$6,821,000 + \$5,294,000 + \$5,008,000 + \$4,740,000 + \$58,168,000 = \$87,209,000

(2) Calculate the present value of advertising expenses in the adjusted forecast:

(thousands of dollars)

| | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|------|------|------|------|------|
| Advertising Expenses (after adjusting for inflation) | 5,727 | 3,778 | 3,937 | 4,029 | 4,122 |

$$\text{PV of 1983 advertising costs} = \frac{\$5,727,000}{(1+.0815)} = \$5,295,000$$

$$\text{PV of 1984 advertising costs} = \frac{\$3,778,000}{(1+.0815)^2} = \$3,230,000$$

$$\text{PV of 1985 advertising costs} = \frac{\$3,937,000}{(1+.0815)^3} = \$3,112,000$$

$$\text{PV of 1986 advertising costs} = \frac{\$4,029,000}{(1+.0815)^4} = \$2,945,000$$

$$\text{PV of 1987 advertising costs} = \frac{\$4,122,000}{(1+.0815)^5} = \$2,786,000$$

PV of advertising costs in the steady-state years = PV of a perpetuity of \$4,122,000 per year minus PV of a five-year annuity of \$4,122,000 per year

$$= \frac{\$4,122,000}{.0815} - \$4,122,000 \left( \frac{1 - \frac{1}{(1+.0815)^5}}{.0815} \right)$$

$$= \$50,577,000 - \$16,392,000$$

$$= \$34,185,000$$

Total PV of advertising costs in the adjusted forecast = \$5,295,000 + \$3,230,000 + \$3,112,000 + \$2,945,000 + \$2,786,000 + \$34,185,000 = \$51,553,000

(3) Calculate decrease from original cash flow forecast:
\$87,209,000 − \$51,553,000 = \$35,656,000

## APPENDIX L

Insurance Expenses

Calculation of Increase in Adjusted Forecast

(1) Calculate the present value, as of January 1, 1983 ("PV"), of insurance costs in the original forecast:

(thousands of dollars)

| | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|------|------|------|------|------|
| Insurance Expenses (after adjusting for inflation) | 5,172 | 5,105 | 5,045 | 4,989 | 4,937 |

$$\text{PV of 1983 insurance costs} = \frac{\$5,172,000}{(1+.0815)} = \$4,782,000$$

$$\text{PV of 1984 insurance costs} = \frac{\$5,105,000}{(1+.0815)^2} = \$4,365,000$$

$$\text{PV of 1985 insurance costs} = \frac{\$5,045,000}{(1+.0815)^3} = \$3,988,000$$

$$\text{PV of 1986 insurance costs} = \frac{\$4,989,000}{(1+.0815)^4} = \$3,647,000$$

$$\text{PV of 1987 insurance costs} = \frac{\$4,937,000}{(1+.0815)^5} = \$3,337,000$$

PV of insurance costs in the steady-state years (beginning 1988) = PV of a perpetuity of \$4,937,000 per year minus PV of a five-year annuity of \$4,937,000 per year

$$= \frac{\$4,937,000}{.0815} - \$4,937,000 \left( \frac{1 - \frac{1}{(1+.0815)^5}}{.0815} \right)$$

$$= \$60,577,000 - \$19,633,000$$

$$= \$40,944,000$$

Total PV of insurance costs in the original cash flow forecast
= \$4,782,000 + \$4,365,000 + \$3,988,000 + \$3,647,000 + \$3,337,000 + \$40,944,000 = \$61,063,000

(2) Calculate the present value of insurance expenses in the adjusted forecast:

(thousands of dollars)

| | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|
| Estimated insurance expenses | 5,800 | 5,900 | 6,600 | 7,500 | 9,200 |
| After adjusting for inflation | 5,395 | 5,105 | 5,313 | 5,616 | 6,408 |

PV of 1983 insurance costs $= \dfrac{\$5,395,000}{(1+.0815)} = \$4,988,000$

PV of 1984 insurance costs $= \dfrac{\$5,105,000}{(1+.0815)^2} = \$4,365,000$

PV of 1985 insurance costs $= \dfrac{\$5,313,000}{(1+.0815)^3} = \$4,200,000$

PV of 1986 insurance costs $= \dfrac{\$5,616,000}{(1+.0815)^4} = \$4,105,000$

PV of 1987 insurance costs $= \dfrac{\$6,408,000}{(1+.0815)^5} = \$4,331,000$

PV of advertising costs in the steady-state years = PV of a perpetuity of $6,408,000 per year minus PV of a five-year annuity of $6,408,000 per year

$$= \frac{\$6,408,000}{.0815} - \$6,408,000 \left( \frac{1 - \dfrac{1}{(1+.0815)^5}}{.0815} \right)$$

$$= \$78,626,000 - \$25,483,000$$

$$= \$53,143,000$$

Total PV of insurance costs in the adjusted forecast = $4,988,000 + $4,365,000 + $4,200,000 + $4,105,000 + $4,331,000 + $53,143,000 = $75,132,000

(3) Calculate increase in insurance expenses in the adjusted forecast: $75,132,000 − $61,063,000 = $14,069,000

# APPENDIX M

### Estimate of Updated Market

### Value of Debt

(1) Remove from January 1, 1983 market value of debt the present value, as of January 1, 1983, of all payments to Class 3:

(a) Reduce the December, 1990 balloon payment by the prepayments projected in Exhibit E-6:

| | |
|---|---|
| 1983 vehicle retirement prepayment: | $3,960,000 |
| 1984 vehicle retirement prepayment: | $3,080,000 |
| 1985 vehicle retirement prepayment: | $2,200,000 |
| 1986 vehicle retirement prepayment: | $4,168,000 |
| 1986 excess cash flow prepayment: | $2,666,000 |

December, 1990 value = $2,666,000(1 + .10)^4 = $3,903,000

| | |
|---|---|
| 1987 vehicle retirement prepayment: | $4,020,000 |
| 1987 excess cash flow prepayment: | $818,000 |

December, 1990 value = $818,000(1 + .10)^3 = $1,089,000

December, 1990 balloon payment as reduced by amount of vehicle retirement prepayments and by December, 1990 value of excess cash flow prepayments = $41,652,000 − $22,420,000 = $19,232,000

(b) Calculate present value (as of January 1, 1983) of scheduled Class 3 payments:

(i) PV monthly payments January, 1983 through December, 1985 =

PV of a 36-month annuity of $1,250,000 per month =

$$\$1,250,000 \left( \frac{1 - \dfrac{1}{(1+.0111)^{36}}}{.0111} \right) = \$36,926,000$$

(ii) PV monthly payments January, 1986 through December, 1986 =

PV of a 12-month annuity of $1,583,333 per month commencing after 36 months =

$$\$1,583,333 \left( \frac{1 - \dfrac{1}{(1+.0111)^{48}}}{.0111} \right) -$$

$$\$1,583,333 \left( \frac{1 - \dfrac{1}{(1+.0111)^{36}}}{.0111} \right)$$

$$= \$58,669,000 - \$46,772,000 = \$11,897,000$$

(iii) PV monthly payments January, 1987 through November, 1990 =

PV of a 47-month annuity of $1,750,000 per month commencing after 48 months =

$$\$1,750,000 \left( \frac{1 - \dfrac{1}{(1+.0111)^{95}}}{.0111} \right) -$$

$$\$1,750,000 \left( \frac{1 - \dfrac{1}{(1+.0111)^{48}}}{.0111} \right)$$

$$= \$102,414,000 - \$64,845,000 = \$37,569,000$$

(iv) PV of December, 1990 balloon payment (as reduced by prepayments) =

$$\frac{\$19,232,000}{(1+.1414)^8} = \$6,676,000$$

Total PV of scheduled Class 3 payments (after reducing balloon payment) = $93,068,000

(c) Calculate present value (as of January 1, 1983) of prepayments projected in Exhibit E-6:

(i) Convert prepayments to 1982 dollars:

(thousands of dollars)

| 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|
| 3,684 | 2,665 | 1,771 | 5,117 | 3,370 |

(ii) Discount to January 1, 1983 at the rate of 8.15%:

PV of 1983 prepayment = $\dfrac{\$3,684,000}{(1+.0815)} = \$3,406,000$

PV of 1984 prepayment = $\dfrac{\$2,665,000}{(1+.0815)^2} = \$2,279,000$

PV of 1985 prepayment = $\dfrac{\$1,771,000}{(1+.0815)^3} = \$1,400,000$

PV of 1986 prepayments = $\dfrac{\$5,117,000}{(1+.0815)^4} = \$3,740,000$

$\underline{\$3,370,000}$

PV of 1987 pre-payments = $(1 + .0815)^5$ = \$2,278,000

Total PV of Class 3 prepayments = \$13,103,000

(d) Remove all Class 3 payments from debt figure:

\$118,855,000 − \$106,171,000 = \$12,684,000

(2) Remove payments to Classes 2, 4, and 5:

\$12,684,000 − \$3,903,000 = \$8,781,000

(3) Remove present value (as of January 1, 1983) of Class 6 payments scheduled for June 30, 1983 and June 30, 1984:

$$\text{PV of 1983 payment} = \frac{\$1,000,000}{(1 + .0094)^6} = \$945,000$$

$$\text{PV of 1984 payment} = \frac{\$1,000,000}{(1 + .0094)^{18}} = \$845,000$$

\$8,781,000 − \$1,790,000 = \$6,991,000

(4) Remove present value (as of January 1, 1983) of payments to ETS creditors made between January 1, 1983 and July 31, 1984:

$$\text{PV of 1983 payments} = \frac{\$724,000}{(1 + .1414)} = \$634,000$$

$$\text{PV of 1984 payments} = \frac{\$314,000}{(1 + .0111)^{19}} = \$255,000$$

\$6,991,000 − \$889,000 = \$6,102,000

(5) Redate remaining payments to July 31, 1984:

$\$6,102,000(1 + .0111)^{19}$ = \$7,526,000

(6) Add payments to Classes 2, 4, and 5:

\$7,526,000 + \$4,939,000 = \$12,465,000

(7) Add the two missed payments to Class 6:

\$12,465,000 + \$2,000,000 = \$14,465,000

(8) Add present value, as of July 31, 1984, of payments to Hall and Fruehauf:

(a) PV of payments to Hall = amount of Hall payment = \$52,000,000 − \$6,250,000 = \$45,750,000

(b) PV of payments to Fruehauf = PV of stream of monthly payments of \$200,000 each + PV of quarterly payments measured by percentage of rental revenues

(i) PV of 72 monthly payments of \$200,000 each beginning January, 1985 = PV of a 72-month annuity of \$200,000 per month beginning after 5 months =

$$\$200,000 \left( \frac{1 - \frac{1}{(1 + .0118)^{77}}}{.0118} \right) -$$

$$\$200,000 \left( \frac{1 - \frac{1}{(1 + .0118)^{5}}}{.0118} \right)$$

= \$10,081,000 − \$966,000 = \$9,115,000

(ii) Calculate PV of quarterly payments measured by percentage of rental revenues:

PV of payments for first two quarters of 1984 = \$158,000

PV of payments for last two quarters of 1984 =

$$\$79,000 \left( \frac{1 - \frac{1}{(1 + .0359)^{2}}}{.0359} \right) = \$150,000$$

PV of quarterly payments for 1985 =

$$\$92,000 \left( \frac{1 - \frac{1}{(1 + .0359)^{6}}}{.0359} \right) -$$

$$\$92,000 \left( \frac{1 - \frac{1}{(1 + .0359)^{2}}}{.0359} \right)$$

= \$489,000 − \$175,000 = \$314,000

PV of quarterly payments for 1986 =

$$\$104,000 \left( \frac{1 - \frac{1}{(1 + .0359)^{10}}}{.0359} \right) -$$

$$\$104,000 \left( \frac{1 - \frac{1}{(1 + .0359)^{6}}}{.0359} \right)$$

= \$861,000 − \$552,000 = \$309,000

PV of quarterly payments for 1987 =

$$\$108,000 \left( \frac{1 - \frac{1}{(1 + .0359)^{14}}}{.0359} \right) -$$

$$\$108,000 \left( \frac{1 - \frac{1}{(1 + .0359)^{10}}}{.0359} \right)$$

= \$1,172,000 − \$894,000 = \$278,000

PV of quarterly payments for 1988 =

$$\$112,000 \left( \frac{1 - \frac{1}{(1 + .0359)^{18}}}{.0359} \right) -$$

$$\$112,000 \left( \frac{1 - \frac{1}{(1 + .0359)^{14}}}{.0359} \right)$$

= \$1,466,000 − \$1,216,000 = \$250,000

PV of quarterly payments for 1989 =

$$\$116,000 \left( \frac{1 - \frac{1}{(1 + .0359)^{22}}}{.0359} \right) -$$

$$\$116,000 \left( \frac{1 - \frac{1}{(1 + .0359)^{18}}}{.0359} \right)$$

= \$1,744,000 − \$1,519,000 = \$225,000

PV of quarterly payments for 1990 =

$$\$120,000 \left( \frac{1 - \frac{1}{(1 + .0359)^{26}}}{.0359} \right) -$$

$$\$120,000 \left( \frac{1 - \frac{1}{(1 + .0359)^{22}}}{.0359} \right)$$

= \$2,007,000 − \$1,804,000 = \$203,000

Total PV of quarterly payments to Fruehauf = \$1,887,000

Total PV of all payments to Fruehauf = $11,002,000

PV of payments to Hall and Fruehauf = $45,750,000 + $11,002,000 = $56,752,000

Add PV of Hall and Fruehauf payments to debt figure:

$14,465,000 + $56,752,000 = $71,217,000